**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**R. ALEXANDER ACOSTA, SECRETARY OF LABOR, UNITED STATES DEPT. OF LABOR,**

**Plaintiff,**

**v.**

**SPECIAL POLICE FORCE CORP., et al.,**

**Defendants.**

**CIVIL NO. 15-1506 (GAG)**

## OPINION AND ORDER

Secretary of Labor, U.S. Department of Labor, R. Alexander Acosta[1] ("Plaintiff") sued Defendants Héctor Rivera Ortiz ("Rivera"), and Special Police Force Corp. ("SPF") (collectively "Defendants"), under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201, *et seq.* ("FLSA" or "Act"), alleging minimum wage, overtime, and record keeping violations under the FLSA. (Docket No. 1 ¶¶ 33-37).[2] Plaintiff moved for summary judgment against Rivera and SPF, (Docket No. 55), both of whom opposed the motion. (Docket Nos. 71; 85). Plaintiffs replied. (Docket Nos. 75; 101). SPF moved to amend its opposition, which the Court allowed for a narrow purpose. (Docket Nos. 94; 109). SPF filed an amended opposition and memorandum in support. (Docket Nos. 114; 115).

---

[1] Secretary of Labor R. Alexander Acosta is automatically substituted as a party in this case. See FED. R. CIV. P. 25(d).

[2] Plaintiffs also sued Freddy De Jesus, but did not include him in their motion for summary judgment, noting that they would seek entry of default against him instead. (Docket No. 55-2 at 1 n.2).

Plaintiff moves for summary judgment arguing that Defendants violated the FLSA by failing to pay minimum wage and overtime compensation to their employees, as well as failing to make, keep, and preserve certain wage and hour records for employees. (Docket No. 55 at 1). Plaintiff also seeks liquidated damages and a prospective injunction. Id. In the event liquidated damages are not awarded, Plaintiff requests an injunction to restrain Defendants from continuing to withhold unpaid minimum wage and overtime compensation. Id. at 1-2.

After disposing of preliminary matters involving SPF's amended opposition and Local Rule 56, the Court **GRANTS in part** and **DENIES in part** Plaintiff's motion for summary judgment at Docket No. 55.

## I.   SPF's Amended Opposition

As an initial matter, the Court addresses an issue with Defendant SPF's amended opposition to Plaintiff's motion for summary judgment.

Plaintiff filed its motion for summary judgment on April 6, 2017. SPF requested and received multiple extensions of time to respond, even though it failed to meet the initial response deadline. (Docket Nos. 55; 64; 66; 80; 83). When SPF moved to amend its opposition, it asked to do so specifically to withdraw its argument that it did not generate more than $500,000 in annual gross income ("AGI"). (Docket No. 94 at 2). The Court granted SPF's motion to amend and allowed SPF to file the amended motion in opposition to summary only with respect to SPF's withdrawal of their argument that they did not generate more than $500,000 in AGI. (Docket No. 109). SPF, however, chose to take the opportunity to add facts, arguments, and citations not included in their original opposition and not related to the issue of AGI. In addition, SPF added seven exhibits not originally included with their memorandum of support. (Docket Nos. 86; 115).

The Court granted SPF's request *solely* to withdraw its argument as to AGI; this was not an opportunity for SPF to surreptitiously include facts, arguments, and citations it did not manage to include on its first try. Because the Court was unequivocal in its order as to the content to be amended—particularly in light of the many extensions SPF received—the Court disregards all alterations made by SPF in its amended opposition, with the exception of the withdrawal of SPF's argument that it did not generate more than $500,000 in AGI. Further, the Court will not consider any of the additional material presented in Docket Nos. 115-3-115-9.

## II.    Plaintiff's Objections to Defendants' Statements of Uncontested Facts

Plaintiff argues that Rivera and SPF failed to properly deny or controvert Plaintiff's statement of material facts and further, that they failed to properly support their own statements of material facts. (Docket Nos. 75 at 1-3; 101 at 1-4). The Court agrees.

At the summary judgment stage, parties must follow Local Rule 56. Section (c) states that "[a] party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts." L. Cv. R. 56(c). This statement "shall admit, deny or qualify the facts supporting the motion for summary judgment *by reference to each numbered paragraph of the moving party's statement of material facts*." Id. (emphasis added). Each denial and qualification must be supported by a record citation. Id.

In addition to allowing an opposing party to admit, deny, or qualify the moving party's facts, the opposing party may submit additional facts "in a separate section." Id. Section (e) provides that the Court may "disregard any statement of fact not supported by a specific citation to record material" and notes that the Court has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." L. Cv. R. 56(e).

If a party improperly controverts the facts, Local Rule 56 allows the Court to treat the opposing party's facts as uncontroverted; the First Circuit has consistently held that litigants disregard Local Rule 56 at their own risk. See Caban Hernandez v. Philip Morris USA, Inc., 486 F. 3d 1, 7 (1st Cir. 2007).

A. Defendant Rivera's Opposition

Rivera, in his opposition to Plaintiff's motion for summary judgment, fails to "admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." L. Cv. R. 56(c). Rivera's admissions, denials, and qualifications use a separate numbering system, with almost no reference to the numbered paragraphs in Plaintiff's statement of material facts. (Docket Nos. 55-3; 71-1).[3] Litigants ignore Local Rule 56 "at their peril." Caban Hernandez, 486 F. 3d at 7. This rule serves the enormously important purpose of "focusing a district court's attention on what is—and what is not—genuinely controverted." Calvi v. Knox County, 470 F.3d 422, 427 (1st Cir. 2006). The Court, in its discretion, finds that Rivera's failure to conform to this vital rule warrants deeming Plaintiff's statement of fact unopposed by Rivera, and accepting the stated facts as true.

The other additional facts submitted by Rivera in Docket No. 71-1—with the exception of paragraphs 49 and 50—are unsupported by record citations. Local Rule 56(e) allows the Court to "disregard any statement of fact not supported by a specific citation to record material," and that is precisely what the Court will do here. L. Cv. R. 56(e). All paragraphs except 49 and 50 of Rivera's additional statement of facts are hereby disregarded.

---

[3] In an odd twist, Rivera, accidentally it seems, manages to match the Plaintiff's paragraph numbers in his "additional facts" section. (see Docket Nos. 55-3 ¶¶ 60-66; 71-1 ¶¶ 60-66). Because the additional facts presented by Rivera are identical to the facts in the correspondingly numbered paragraphs in Plaintiff's statement of uncontested material facts, the Court will view these paragraphs as properly referenced admissions.

B. <u>Defendant SPF's Opposition</u>

SPF, in its amended opposition to Plaintiff's motion for summary judgment, also fails to "admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." L. Cv. R. 56(c). SPF's admissions, denials, and qualifications use a separate numbering system. (Docket Nos. 55-3; 115-1). The only paragraph that correctly references Plaintiff's statement of material facts is paragraph four—a paragraph which SPF does not dispute. (Docket Nos. 55-2 ¶ 4; 115-1 ¶ 4). The Court, in its discretion, finds that SPF's failure to conform to this vital rule warrants deeming of the rest of Plaintiff's statement of fact unopposed by SPF, and accepting its stated facts as true.

The additional facts submitted by SPF in Docket No. 115-1 require further discussion. As noted above, the Court will not entertain amendments—including the addition of citations—other than those related to SPF's withdrawal of its argument that it did not generate more than $500,000 in gross annual income. This being the case, the only un-amended paragraphs with proper record citations are paragraphs 53 and 54. (Docket Nos. 86-2 ¶¶ 54-55; 115-1 ¶¶ 53-54). Because Local Rule 56(e) allows the Court to "disregard any statement of fact not supported by a specific citation to record material," all paragraphs other than paragraphs 53 and 54 of SPF's additional statement of facts are hereby disregarded. L. Cv. R. 56(e).

These rules are critically important; they "ease the district court's operose task and . . . prevent parties from unfairly shifting the burdens of litigation to the court." <u>Caban Hernandez</u>, 486 F.3d at 8. Counsel for Rivera and SPF are admonished to adhere to them in future or risk consequences similar to those imposed here.

### III.    Relevant Factual Background

Plaintiff, Rivera, and SPF's statements of material uncontested facts,[4] credited only to the extent either admitted or properly supported by record citations in accordance with Local Rule 56 and viewed in the light most favorable to the nonmovants, reveal the following undisputed material facts:

SPF is a corporation duly organized under the laws of the Commonwealth of Puerto Rico with its principal office and place of business in Puerto Rico, where it engaged in the business of providing security services. (PSUMF ¶ 1). Rivera resided in Puerto Rico during the period covered by the complaint. (PSUMF ¶ 2). A substantial part of the events or omissions giving rise to the claims occurred in Puerto Rico. (PSUMF ¶ 3).

SPF regulated the employment of all persons employed by the corporation, and acted directly and indirectly in the corporation's interest in relation to the employees during the period covered by the Complaint. (PSUMF ¶ 4; SSUMF ¶ 4). SPF employed security guards who handled, sold, or otherwise worked on goods or materials that had been moved in or produced for commerce, such as firearms and vehicles. (PSUMF ¶ 5). SPF's annual gross volume of sales made or business done was not less than $500,000 for the period covered by the complaint. (PSUMF ¶ 6).

Sometime in 2007 or 2008, Rivera met Eric Resto, a licensed detective, who suggested they start a security guard company together. (PSUMF ¶ 7). Rivera "loved" the idea and agreed to provide the financial backing. (PSUMF ¶ 8). On January 7, 2009, Rivera signed and filed the paperwork incorporating SPF. (PSUMF ¶ 9). The Certificate of Incorporation for SPF identifies Rivera as the resident agent in charge of the office. (PSUMF ¶ 11).

---

[4] "PSUMF," "RSUMF," and "SSUMF," respectively.

On August 27, 2012, Rivera signed a corporate resolution as president and treasurer of SPF certifying that he was the owner and sole shareholder of the corporation "for all intents of relevant and legal purposes." (PSUMF ¶ 13). Rivera signed written proposals that were given to prospective clients of SPF. (PSUMF ¶ 15). He was the only individual authorized to sign checks for SPF, and all employee paychecks bore his electronic signature. (PSUMF ¶¶ 16-17). Rivera would sometimes help total the hours worked by employees when the payroll was done. (PSUMF ¶ 19). He also invested additional money into SPF whenever the company was having cash flow issues and the company would later reimburse him. (PSUMF ¶ 20).

In 2012, Rivera met with Jose Andujar and Jose Torres and decided to retain a week's wages from employees to help with SPF's cash flow deficits. (PSUMF ¶ 21). Some employees had to wait between a year and a year and a half before their money was returned. (Docket No. 56-16 at 36 ¶ 11). SPF's wage retention policy continued until July 2014. (PSUMF ¶ 24).

The U.S. Department of Labor, Wage and Hour Division ("WHD") began investigating SPF in late June 2014. Wage and Hour Investigator Myrta Negron-Quiles ("WHI Negron") determined that SPF violated the overtime requirements of the FLSA during the period of April 29, 2013 through December 1, 2014 by failing to pay its security guard employees overtime wages. (PSUMF ¶ 35). Rivera represented SPF at the meetings held with the WHD on July 1, August 12, September 15, 19 and December 5, 2014. (PSUMF ¶ 32).

A. Employee Pay Rates and Records

SPF admits it erroneously misclassified its security guard employees as independent contractors. (PSUMF ¶ 50). SPF set employees' regular hourly rates ("straight time") ranging from $7.25 to $8.00 per hour. (PSUMF ¶ 38). SPF kept track of hours worked by the security guards on sign-in sheets that were located at all of the client posts where the employees worked. (PSUMF ¶

39). Each workday, employees signed in when their shifts started and signed out when they left for the day. (PSUMF ¶ 40). Freddy De Jesus, Jonathan Andujar, or another supervisor would pick up the sheets and bring them back to the office. (PSUMF ¶ 41). De Jesus, Andujar, or Rivera would then add the hours on the sheets, writing the totals on pieces of paper that were given to the SPF accountant, José Torres. (PSUMF ¶ 42-43). Mr. Torres would then enter the total hours worked in that pay period into a payroll spreadsheet on the computer, which he used to generate paychecks for employees. (PSUMF ¶ 44).

The sign-in sheets and payroll spreadsheets are the only time and pay records the SPF have for their security guard employees. (PSUMF ¶ 46). The payroll spreadsheets contained: (1) employees' names listed in a column titled "Contratista O Empleado"; (2) workweek dates; (3) hourly rates of pay ("RPH"); (4) total hours worked each semi-monthly or bi-weekly pay period listed in a column titled "Horas"; (5) gross wages paid ("Gross"); (6) various deductions taken listed in columns titled "SS," "Others," "Rentencion Sem," "Disc." and "ITW 7%"; and (7) net wages paid ("Net"). (PSUMF ¶ 45).

From April 29, 2013 to July 14, 2014, SPF paid employees on a semi-monthly basis. (PSUMF ¶ 47). Employees were paid twice a month, on the 15th and on the last day of each month. Id. During that time period, SPF's payroll spreadsheets indicated only the total number of hours worked and the total wages paid for the fifteen-day pay period. (PSUMF ¶ 48). SPF did not maintain records of certain employees' updated addresses. (PSUMF ¶ 58). In certain workweeks, some employees employed as security guards worked between forty and sixty hours in a workweek but were compensated at their regular rate of pay regardless of the hours worked in excess of forty hours in a workweek. (PSUMF ¶ 36).

On July 1, 2014, WHI Negron informed SPF that it was required to pay employees time-and-a-half for time worked in excess of forty hours in one week; SPF, however, continued to pay employees their straight time rate for overtime hours worked through December 1, 2014. (PSUMF ¶ 51). After WHI Negron advised SPF it would make it easier to calculate overtime, on July 15, 2014, SPF did begin to pay its employees on a bi-weekly basis rather than a semi-monthly basis. (PSUMF ¶ 49).

### B.  Wage Retention

SPF's security guards were required to wear uniforms. (PSUMF ¶ 53). SPF deducted money from their wages to cover the cost of the uniforms to ensure that they were returned if employees quit or were fired. (PSUMF ¶ 54). SPF would return the money deducted if the employees returned the uniforms at the end of their employment. (PSUMF ¶ 55).

One week's worth of wages retained by SPF was entered on the payroll spreadsheets under the column titled "Retencion Sem." (PSUMF ¶ 52). Taking such deductions from employees' wages to pay for uniforms caused certain employees' hourly wages to fall below the required minimum wage of $7.25 per hour. (PSUMF ¶ 56).

### C.  Security Police Force Corp.

Licensed detective Eric Resto passed away in August 2014, and Rivera took on the responsibility of overseeing all administrative personnel. (PSUMF ¶¶ 25-26). In order for SPF to continue operations as a security guard company in Puerto Rico, it needed a licensed detective as a principal officer. (PSUMF ¶ 64; RSUMF ¶ 64). SPF began to lose clients and could not continue to operate without a licensed detective, so Rivera informed clients that SPF would cease operations on February 28, 2015. (PSUMF ¶¶ 27-28).

Rivera started a new company, Security Police Force Corp. ("Security"), because SPF was unable to find a licensed detective who was willing to join SPF as an officer in light of the WHD investigation. (PSUMF ¶ 65; RSUMF ¶ 65).

On December 22, 2014, Rivera signed a Certificate of Incorporation for Security. (PSUMF ¶ 60; RSUMF ¶ 60). Security was registered as a corporation by Puerto Rico on January 15, 2015. (PSUMF ¶ 61; RSUMF ¶ 61). The Certificate of Incorporation states that Security will "provide security services to homes, commerce and industry to protect life and property." (PSUMF ¶ 62; RSUMF ¶ 62).

Security's office is located in the same building as SPF's offices. (PSUMF ¶ 66; RSUMF ¶ 66). Rivera is the sole owner. (PSUMF ¶ 63; RSUMF ¶ 63). Jonathan Andujar, former general manager for SPF, has been working for Security since SPF ceased operations. (PSUMF ¶ 67). Freddy De Jesus, former supervisor for SPF, is the president of Security. (PSUMF ¶ 68). José Torres, former accountant for SPF, is the treasurer of security. (PSUMF ¶ 69). A number of SPF's employees went to work for Security after SPF ceased operations. (PSUMF ¶ 70).

## IV. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see FED. R. CIV. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, . . . and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted).

1   The moving party bears the initial burden of demonstrating the lack of evidence to support

2   the non-moving party's case. <u>Celotex</u>, 477 U.S. at 325. "The burden then shifts to the nonmovant to

3   establish the existence of at least one fact issue which is both genuine and material." <u>Maldonado-</u>

4   <u>Denis v. Castillo-Rodriguez</u>, 23 F.3d 576, 581 (1st Cir. 1994). The nonmovant may establish a fact

5   is genuinely in dispute by citing particular evidence in the record or showing that either the materials

6   cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse

7   party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). If the

8   Court finds that a genuine issue of material fact remains, the resolution of which could affect the

9   outcome of the case, then the Court must deny summary judgment. <u>See</u> <u>Anderson v. Liberty Lobby,</u>

10  <u>Inc.</u>, 477 U.S. 242, 248 (1986).

11  When considering a motion for summary judgment, the Court must view the evidence in the

12  light most favorable to the nonmoving party and give that party the benefit of any and all reasonable

13  inferences. <u>Id.</u> at 255. Moreover, at the summary judgment stage, the Court does not make credibility

14  determinations or weigh the evidence. <u>Id.</u> Summary judgment may be appropriate, however, if the

15  nonmoving party's case rests merely upon "conclusory allegations, improbable inferences, and

16  unsupported speculation." <u>Forestier Fradera v. Municipality of Mayaguez</u>, 440 F.3d 17, 21 (1st Cir.

17  2006) (quoting <u>Benoit v. Tech. Mfg. Corp.</u>, 331 F.3d 166, 173 (1st Cir. 2003)).

18  **V.    Discussion**

19  To succeed on a FLSA claim, Plaintiff must prove that (1) the workers in question were

20  employed by Defendants; (2) Defendants engaged in commerce or in the production of goods for

21  commerce ("enterprise coverage"); and (3) the workers were undercompensated for the work they

22  performed. 29 U.S.C. §§ 206(a); 207(a)(1); <u>Manning v. Boston Med. Ctr. Corp.</u>, 725 F.3d 34, 43

23  (1st Cir. 2013).

24

As a general rule, the FLSA imposes a two-year statute of limitations. See 29 U.S.C. § 255(a). This suit was filed on April 29, 2015, (Docket No. 1), putting the two-year statute of limitations at date at April 29, 2013. The dates of the alleged violations are from April 29, 2013 through December 1, 2014, so the complaint was filed within the two-year statute of limitations. As such, the Court finds the time period in question to be within the proper range.

A.  Workers Employed by Defendants

*1. SPF as Employer*

Under the FLSA, the term "employ" is defined as "to suffer or permit to work." 29 U.S.C. § 203(g). The FLSA further defines an "employee" as "any individual employed by an employer," and an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." Id. §§ 203(e)(1); (d). The First Circuit considers the "economic reality of the totality of the circumstances . . . ." Baystate Alternative Staffing, Inc. v. Herman, 163 F.3d 668, 675 (1st Cir. 1998) (citation omitted). To make a determination, the Court will consider four factors, namely whether the purported employer: "(1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." Id. (citation omitted).

Here, it is undisputed that SPF hired the employees, controlled their schedules, set their pay, and, at least to some degree, maintained employment records. (PSMUF ¶¶ 4, 5). SPF goes so far as to state that it "indeed regulated the 'employment of all persons employed by it and acted directly and indirectly in the corporation's interests in relation to its employees, and is thus an employer of its employees within the meaning of Section 3(d) of the [FLSA].'" (Docket No. 21 ¶ 5). As such, SPF is an employer of the workers in question for the purposes of the FLSA.

### 2. *Rivera as Employer*

Rivera argues that he is not personally liable as an employer within the meaning of the FLSA. (Docket No. 72 ¶ 47). The term "employer" under the FLSA is broadly defined. See Falk v. Brennan, 414 U.S. 190, 195 (1973) (noting "the expansiveness of the Act's definition of 'employer'"). "Under the FLSA, an 'employer' is 'any person acting directly or indirectly in the interest of an employer in relation to an employee.'" Chao v. Hotel Oasis, Inc., 493 F.3d 26, 33 (1st Cir. 2007) (quoting 29 U.S.C. § 203(d)).

When considering whether an individual is an employer within the meaning of the FLSA, "[t]he First Circuit has followed the Supreme Court's lead in interpreting this definition pursuant to an 'economic reality' analysis." Chao, 493 F.3d at 33-34 (quoting Donovan v. Agnew, 712 F.2d 1509, 1510 (1st Cir. 1983)). This means reviewing the liability of "corporate officers with a significant ownership interest who had operational control of significant aspects of the corporation's day-to-day functions, including compensation of employees, and who personally made decisions to continue operations despite financial adversity during the period of nonpayment." Donovan, 712 F.2d at 1514.

While personal liability does not extend to every "'corporate officer or other employee with ultimate operational control over payroll matters," the First Circuit has held that "'[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages.'" Chao, 493 F.3d at 34 (quoting Donovan, 712 F.2d at 1511-14). Factors to consider when determining whether an individual may be held personally liable include: (1) "the individual's ownership interest [in the corporation];" (2) the "degree of control over the corporation's financial affairs and compensation practices;" and (3) the "role in 'caus[ing] the

corporation to compensate (or not to compensate) employees in accordance with the FLSA.'" <u>Id.</u> (quoting <u>Baystate Alternative Staffing, Inc. v. Herman</u>, 163 F.3d 668, 678 (1st Cir. 1998)). The overarching question is whether the individual was personally responsible "'for making decisions about the conduct of the business that contributed to the violations of the [FLSA].'" <u>Id.</u> (quoting <u>Baystate</u>, 163 F.3d at 678). If so, "[t]he FLSA contemplates, at least in certain circumstances, holding officers with such personal responsibility for statutory compliance jointly and severally liable along with the corporation." <u>Id.</u> (citation omitted).

After careful review, it is not clear that Rivera falls within the FLSA's definition of employer. To be sure, he was the sole owner and president of SPF. (PSUMF ¶ 12). He signed a corporate resolution as president and treasurer of SPF certifying that he was the owner and only shareholder. <u>Id.</u> ¶ 13. He was singularly authorized to sign checks for SPF, and his electronic signature was included on all employee paychecks. <u>Id.</u> ¶¶ 16; 17. When SPF had financial issues, Rivera invested his own money and SPF would reimburse him later. <u>Id.</u> ¶ 20. Rivera would help total the hours listed on employee attendance sheets. <u>Id.</u> ¶ 42. Following Eric Resto's death, the licensed detective with whom Rivera had started SPF, Rivera oversaw all administrative personnel. <u>Id.</u> ¶¶ 7; 26. In 2012, Rivera and two others met and decided retain a week's wages from employees to address SPF's cash flow problem. <u>Id.</u> ¶¶ 21; 52. With all that said, Plaintiffs acknowledge that Rivera "did not run the day-to-day operations of SPF." (Docket No. 55-2 at 14). It is ambiguous whether he had "operational control" over SPF, and it is not absolutely plain that he was personally responsible "'for making decisions about the conduct of the business that contributed to the violations of the [FLSA].'" <u>Chao</u>, 493 F.3d at 33-34 (quoting <u>Baystate</u>, 163 F.3d at 678).

Considering the evidence in the light most favorable to Rivera and giving him the benefit of any and all reasonable inferences, <u>Liberty Lobby</u>, 477 U.S. at 255, the Court finds a genuine issue

of material fact as to Rivera's "ownership interest [in SPF], degree of control over [SPF's] financial affairs and compensation practices, and role in 'caus[ing] [SPF] to compensate (or not to compensate) employees in accordance with the FLSA.'" <u>Chao</u>, 493 F.3d at 34 (quoting <u>Baystate</u> 163 F.3d at 678). As such, Plaintiff's motion for summary judgment as to Rivera is hereby **DENIED**.

        B.  <u>Enterprise Coverage</u>

The FLSA covers employees who are either "engaged in commerce or in the production of goods for commerce," ("individual coverage") or "employed in an enterprise engaged in commerce or in the production of goods for commerce" ("enterprise coverage"). 29 U.S.C. § 207(a)(1). Commerce, for FLSA purposes, is defined as "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." <u>Id.</u> § 203(b).

> FLSA coverage triggered by the business activities of the employer (often called "enterprise coverage") requires a showing that the employer: "(i) has employees engaged in commerce or in the production of goods for commerce, or . . . has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and (ii) is an enterprise whose annual gross volume ['AGV'] of sales made or business done is not less than $500,000. . . ."

<u>Martinez v. Petrenko</u>, 792 F.3d 173, 175 (1st Cir. 2015) (quoting 29 U.S.C. § 203(s)(1)(A)).

Plaintiff avers that SPF "engaged in commerce or in the production of goods for commerce, including the employment of employees that handle, sell, or otherwise work on goods or materials that have been moved in or produced for commerce by any person, such as firearms and vehicles." (Docket No. 1 ¶ 11). SPF admits to this. (Docket No. 21 ¶ 11). Neither firearms nor vehicles are produced in Puerto Rico, meaning that they come from another state or "any place outside thereof." 29 U.S.C. § 203(b).

Because SPF has withdrawn its arguments that it did not generate more than $500,000 in gross income for the time period covered by the complaint, (Docket No. 94 at 1), and indeed, admits that it had an annual gross volume of sales for the period covered by the complaint, (Docket No. 21 ¶ 12), the Court finds no genuine issue of material fact as to the second prong.[5]

C. <u>Compensation for Work Performed</u>

1. *Record Keeping*

The FLSA requires employers to make and preserve certain records of employees' wages, hours, and other conditions and practices of employment. 29 U.S.C. § 211(c). The employer must maintain records of employees' home addresses and keep daily or weekly totals of employee hours worked. <u>See</u> 29 C.F.R. §§ 516.2(a)(2); 516.2(a)(7). In general, "the significance of recordkeeping requirements in FLSA cases is not in determining the proper measure of damages but in setting respective burdens of proof on liability." <u>Mills v. State of Me.</u>, 853 F. Supp. 551, 552–53 (D. Me. 1994) (citing <u>Secretary of Labor v. DeSisto</u>, 929 F.2d 789, 792 (1st Cir. 1991)). "An employee who proves that the relevant records kept by the employer are unreliable is held to a less stringent standard of proof in establishing damages for unpaid overtime compensation under the FLSA." <u>Andrews v. Weatherproofing Techs., Inc.</u>, 277 F. Supp. 3d 141 (D. Mass. 2017) (citation omitted).

Plaintiff avers that SPF failed to maintain accurate records of its employees' addresses. (Docket No. 55-2 at 15). SPF, for its part, admits that it failed to maintain up-to-date addresses for some of its former and current employees. (Docket No. 56-2 ¶ 31).

Plaintiff also contends that from April 29, 2013 to July 14, 2014, SPF failed to make and keep records of the total daily or weekly straight time wages for its employees. (Docket No. 55-2 at

---

[5] SPF appears to suggest that Plaintiff has not shown "individual coverage" under the FLSA, (Docket No. 115 ¶ 80); because Plaintiff has successfully argued that Defendants fall under FLSA's enterprise coverage, the Court will not address this contention.

14-15). Upon review, the spreadsheets provided by Plaintiff only cover periods from May 16, 2013 to May 31, 2013 and from February 1, 2014 to February 15, 2014. (Docket No. 57-1 at 1-11). In addition, Plaintiff presents samples of employee attendance sheets with daily hours worked for various dates ranging from May 16, 2013 to May 31, 2013, from August 16, 2013 to August 31, 2013, from February 1, 2014 to February 15, 2014, from May 16, 2014 to May 31, 2014, and from November 4, 2014 to November 17, 2014. (Docket No. 52-2). The presence of these attendance sheets with daily hours worked fly directly in the face of Plaintiff's argument that SPF did not make and preserve records of employee's daily hours worked. If SPF made and kept records such as these for the dates in question, they would not be in violation of the record keeping requirement of the FLSA

Considering the evidence in the light most favorable to SPF and giving it the benefit of any and all reasonable inferences, <u>Liberty Lobby</u>, 477 U.S. at 255, the Court finds a genuine issue of material fact as to SPF's record keeping practices. As such, Plaintiff's motion for summary judgment as to whether SPF violated FLSA's record keeping requirements is hereby **DENIED**.

*2. Other Methods of Determining Whether Employees were Undercompensated*

The FLSA states: "Every employer shall pay to each of his employees . . . not less than . . . $7.25 an hour." 29 U.S.C. § 206 (2013). Furthermore, employers must pay overtime wages for hours worked in excess of forty hours per week. <u>See</u> 29 § U.S.C. 207(a)(1). As a general rule, the FLSA establishes that an employer must compensate hourly employees at a rate not less than one and one-half times their regular rate for all overtime hours worked. <u>De Jesús–Rentas v. Baxter Pharmacy Servs. Corp.</u>, 400 F.3d 72, 74 (1st Cir. 2005). "A claim for unpaid overtime wages must demonstrate that the [workers] were employed 'for a workweek longer than forty hours' and that any hours worked in excess of forty per week were not compensated 'at a rate not less than one and one-half

times the regular rate.'" <u>Manning v. Boston Med. Ctr. Corp.</u>, 725 F.3d 34, 43–44 (1st Cir. 2013) (quoting 29 U.S.C. § 207(a)(1)).

SPF admits it misclassified and paid its employees as independent contractors when in fact they were employees and should have been paid as such. (PSUMF ¶¶ 4; 5; 50). SPF also admits that it deducted the cost of uniforms from certain employees' wages and that this brought their regular hourly rate of pay below the required rate of $7.25. (Docket No. 115 ¶ 6). Finally, it admits that it failed to pay proper overtime rates when employees worked more than forty hours in a single workweek. <u>Id.</u>

Acknowledging its admissions to the above violations, SPF raises the defense of good faith. <u>Id.</u> ¶¶ 7; 76. Under 29 U.S.C. § 259(a),

> No employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the [FLSA] . . . if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section [i.e., the Administrator of the Wage and Hour Division of the Department of Labor], or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged.

29 U.S.C. § 259(a).

SPF argues that this section applies because it acted in good faith and corrected the errors immediately upon notification. (Docket Nos. 115 ¶¶ 6-7; 88-90). It does not, however, provide any evidence from which the Court might find that its actions were "in conformity with and in reliance on any administrative regulation, order, ruling, approval, or interpretation" as outlined in § 259(a). 29 U.S.C. § 259(a). SPF cites to nothing to indicate it considered any other rules or regulations. Furthermore, once notified of the violations by WHI Negron, although SPF partially corrected the issue by changing from a semi-monthly to bi-weekly pay schedule, it continued to violate the

overtime provisions of FLSA by paying straight time even when an employee worked more than forty hours in one week. (Docket No. 57 ¶ 23). Based on the above considerations, the defense of good faith under § 259(a) is not available to SPF.

Finally, SPF argues[6] that upon WHI Negron's notification that it was violating the FLSA, it immediately corrected its behavior. (Docket No. 115 ¶¶ 7; 76). SPF asserts that it paid overtime due to all employees that could be reached, but presents no evidence to support such a conclusion. Id. ¶ 82. Furthermore, SPF does not dispute Plaintiff's calculations of overtime and minimum wage underpayment, noting instead that it "assumes the responsibility and expense of any and all disposition made by the Honorable Court." Id. ¶ 76. As such, the Court finds that no genuine issue of material fact exists as to whether SPF's workers were undercompensated for the work they performed.

### D. Requested Relief

Having found no genuine dispute as to material facts with respect to Plaintiff's minimum wage and overtime FLSA violation claims, the Court turns to Plaintiff's requested relief of unpaid minimum wage and overtime compensation, liquidated damages, and an injunction. (Docket No. 55-2 at 25-26).

#### 1. Overtime and Minimum Wage Calculations

"The FLSA requires employers to compensate employees for each hour worked in excess of forty hours during a workweek 'at a rate not less than one and one-half times the regular rate at which [they are] employed.'" Lalli v. Gen. Nutrition Centers, Inc., 814 F.3d 1, 2 (1st Cir. 2016)

---

[6] In what appears to be an argument against piercing the corporate veil, SPF also seems to aver that it should only be liable if there is a finding of gross negligence. (Docket No. 115 ¶¶ 60-63). Such a line of reasoning is inapposite. This is not a situation where Plaintiff seeks to impose personal liability, it has sued SPF directly. To the extent that SPF is making such an argument, the Court disregards it.

(alteration in original) (quoting 29 U.S.C. § 207(a)(1)). "[T]he regular rate refers to the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed." Id. (quoting Walling v. Youngerman–Reynolds Hardwood Co., 325 U.S. 419, 424 (1945)). Because SPF admits all its hourly employees were paid straight pay for all hours worked, (Docket No. 21 ¶ 27), employees who worked more than forty hours *in one workweek* are due the additional "half-time" amounts calculated by multiplying one-half their regular rate by the amount of overtime hours worked. 29 C.F.R. § 778.110(a). Because SPF paid employees on semi-monthly rather than bi-weekly basis for the period from April 29, 2013 to July 14, 2014, a determination as to how many hours an employee worked in each particular workweek must be made before it is possible to calculate how many, if any, hours of overtime an employee worked.

A workweek is defined as "a fixed and regularly recurring period of 168 hours," in other words, "seven consecutive 24–hour periods." 29 C.F.R. § 778.105. Such a workweek "need not coincide with the calendar week but may begin on any day and at any hour of the day." Id. Plaintiff's calculations incorrectly assume that employees only work on a five-day Monday-through-Friday schedule. (Docket No. 57 ¶ 17). The daily attendance sheets, however, show that employees worked on various days, including Saturdays and Sundays. (See e.g., Docket No. 57-2 at 2). For accurate calculations, the analysis must be done using the workweek as measured in 29 C.F.R. § 778.105.

Because SPF began recording its employees hours on a weekly basis starting on July 15, 2014, that will serve as the marker of a "workweek." Thus, from July 15, 2014 to July 21, 2014 constitutes one workweek and so on going forward. Going backwards, the same structure applies, meaning from July 8, 2014 to July 14, 2014 is one workweek, and from July 1, 2014 to July 7, 2014 is another. Where it is unclear in which workweek an employee's hours should be counted because the spreadsheets only give the total number of hours in any particular fifteen-day period, reference

shall be made to the daily attendance sheets. By cross-referencing the two, it is possible to determine which employee worked on which day and for how many hours. The workweeks, thus outlined, shall be used for the purposes of overtime calculation for the period of April 29, 2013 to July 14, 2014. For the period of July 15, 2014 to December 1, 2014 it is possible to determine from SPF's spreadsheets how many hours each employee worked in a workweek. With this as a starting point, if an employee worked more than forty hours in any workweek period, the hours over and above forty must be compensated "'at a rate not less than one and one-half times the regular rate at which [they are] employed.'" Lalli, 814 F.3d at 2 (quoting 29 U.S.C. § 207(a)(1)).

The computation of unpaid overtime compensation is relatively straightforward in this case. The parties shall confer as to the calculation of the amount of damages owed, using the payroll spreadsheets and daily attendance sheets for the dates in question and applying the methods described above. See Martin v. David T. Saunders Const. Co., 813 F. Supp. 893, 902 (D. Mass. 1992) (referring damage calculations to parties where the Court was unable to make such computations "with confidence in their accuracy" from materials submitted by the parties).[7]

In addition, because SPF impermissibly deducted the cost of certain employees' uniforms from their wages, causing the rate of pay per hour to fall below the minimum requirement, (PSUMF ¶ 54), employees from whom such a deduction was taken are due the amount necessary to bring their pay up to the minimum wage requirement of "not less than . . . $7.25 an hour." 29 U.S.C. § 206.

The test here is whether the deduction brought the employee's wage below minimum wage, so the first step is to look at the regular wage of the employee. If the employee was paid at minimum

---

[7] The data presented does not include all of the payroll spreadsheets and attendance sheets referenced in Plaintiff's calculations, so further computation by the Court is not possible at this point. For example, though Plaintiff indicated it used information from SPF's spreadsheets from July 1, 2013 through January 15, 2014, (Docket No. 56 ¶ 16), those spreadsheets have not been made available for the Court.

wage, that is to say, $7.25 an hour, then any deduction would cause a drop below the minimum requirement and must be refunded. If the employee was paid over minimum wage, it is necessary to determine how many hours that employee worked in the workweek when the deduction occurred (using the system outlined above), multiply those hours by the employee's wage, subtract the uniform deduction, and then divide the result by the hours worked. That number is then subtracted from the minimum wage of $7.25 and multiplied by the hours worked. The result is the amount owed to the employee.

For example, assume an employee makes $9 an hour, worked 25 hours in the week in question, and had $50 deducted from that week's wages for a uniform. The calculation would look like this: $9 (the rate per hour) x 25 (hours worked) = $225. $225 (week's wages) - $50 (uniform deduction) = $175 (total paid). $175 (total paid) / 25 (hours worked) = $7 (rate per hour). Thus, the employee was underpaid by $0.25 per hour and is due $0.25 (amount under minimum wage) x 25 (hours worked) = $6.25.[8] Using this method, the parties shall confer as to the calculation of the amount of minimum wage underpayment.[9]

### 2. *Liquidated Damages*

Plaintiff also requests liquidated (i.e. double) damages. (Docket No. 55-2 at 22). "The FLSA authorizes the Secretary of Labor to recover on behalf of employees unpaid wages and overtime compensation plus an equal amount in liquidated damages." Chao, 493 F.3d at 35 (citing 29 U.S.C. § 216(b), (c)). An award of liquidated damages is the norm rather than the exception, and it is left to the Court's discretion whether to depart from this standard. Id. (citations omitted). "The only way

---

[8] Depending on the individual employee's numbers, it is also possible that a uniform deduction from an employee paid over minimum wage would not result in her wages falling below minimum wage, in which case a refund would not be necessary.

[9] If any of the employees were previously reimbursed, (See Docket No. 57 ¶ 33), such reimbursements shall be taken into account as well.

an employer can escape liquidated damages is to 'show[] to the satisfaction of the court' that it acted in good faith and had reasonable grounds for believing that its acts did not violate the FLSA." Id. (quoting 29 U.S.C. § 260). "[I]t is the *employer's* burden to show good faith and objective reasonableness. Id. (emphasis in original) (citing 29 U.S.C. § 260A.

Citing to 29 U.S.C. § 260, SPF argues that it is not liable for liquidated damages because it "relied on Mr. Resto, Mr. Alvarado and Mr. De Jesus to adequately apply the FLSA to the employees of SPF." (Docket No. 115 ¶ 84-85).

Under 29 U.S.C. § 260, a good faith defense is available as to liquidated damages under 29 U.S.C. § 216(b)

> [i]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA], the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title [i.e., not to exceed double damages].

29 U.S.C. § 260.

In its opposition, SPF presents a Fourth Circuit case in which the judge found good faith on the employer's part where the employer relied and acted upon written advice concerning the FLSA from the company's attorney. (Docket No. 115 ¶ 91). In that case, the Court had fourteen letters and memoranda from the attorney advising the company to act in a particular way on which to base a finding of good faith. See Perez v. Mountaire Farms, Inc., 650 F.3d 350, 376 (4th Cir. 2011). No such evidence exists here. SPF's bare-bones contention that it "relied" on members of its staff to inform it about the FLSA, without more, is insufficient. (Docket No. 115 ¶ 84). SPF "alleges that [it] exercised good faith," (Id. at ¶ 93), but presents absolutely no evidence to prove such a statement.

SPF has not "'show[n] to the satisfaction of the court' that it acted in good faith and had reasonable grounds for believing that its acts did not violate the FLSA," indeed, quite the opposite.

<u>Chao</u>, 493 F.3d at 35 (quoting 29 U.S.C. § 260). In particular, the Court finds it salient that SPF continued to violate the overtime provisions of FLSA by paying straight time when an employee worked more than forty hours in one week, even after it was explicitly instructed to pay its employees overtime by WHI Negron. (PSUMF ¶ 51; Docket No. 57 ¶ 23). This indicates that SPF was aware that it was required by the FLSA to pay employee overtime and yet knowingly and willfully declined to do so. As "it is the *employer's* burden to show good faith and objective reasonableness," and as SPF has not done so here, the Court, in its discretion, awards liquidated damages to Plaintiff. <u>Chao</u>, 493 F.3d at 36 (emphasis in original) (citing 29 U.S.C. § 260).

### 3. *Injunction*

Plaintiff also seeks a prospective injunction. (Docket No. 55-2 at 23). Because SPF has, for all intents and purposes, ceased operations, Plaintiffs argue that the new company, Security, should be enjoined as well. <u>Id.</u> at 25.

Under the FLSA, a district court has discretion to issue injunctions against future violations. 29 U.S.C. § 217. When deciding whether a prospective injunction is appropriate, the Court considers the following factors:

> (1) the employer's prior and present conduct; (2) any pattern of repetitive violations; (3) an employer's intent to violate the FLSA; (4) the employer's good faith attempt to comply with the FLSA; (5) whether the employer complied once it became aware of the FLSA's requirements; (6) efforts to prevent recurrence; (7) the threat of violations in the future; and (8) absence of bad faith.

<u>Herman v. Hogar Praderas de Amor, Inc.</u>, 130 F. Supp. 2d 257, 269 (D.P.R. 2001) (citing cases).

Plaintiff has not presented any evidence that the new company, Security, is violating the FLSA. While true that many of its managing members were involved in SPF, the Court will not enjoin a completely separate company against violations of which there is no evidence.

To the extent that SPF may operate in the future, however, the Court finds that all the factors enumerated above weigh in favor of an injunction. SPF does not have any present conduct, but its prior conduct involved continued violation the FLSA, despite WHI Negron's explicit warning that it was not in compliance and her instructions to make changes to prevent further violations. The violations were ongoing from April 29, 2013 through December 1, 2014, just before SPF ceased operations. Particularly troubling are the violations between the time that WHI Negron informed SPF that it were noncompliant—July 1, 2014—and December 1, 2014. SPF's continued violation in the face of its knowledge that it was not in compliance indicate willfulness and bad faith. While true that SPF partially corrected the issue by changing from a semi-monthly to bi-weekly pay schedule, it continued to violate the FLSA overtime wage provisions. There is no indication that, had SPF continued to operate, it would have made a more serious effort to prevent a reoccurrence. Given SPF's blatant disregard of WHI Negron's advice, the threat violations in the future is high. Should SPF begin operations again, is hereby enjoined from future FLSA violations.

## VI.     Conclusion

For the reasons stated above, Plaintiff's motion for summary judgment at Docket No. 55 is **DENIED** as to Plaintiff's claims against Rivera, **GRANTED** as to Plaintiff's overtime and minimum wage claims against SPF, and **DENIED** as to Plaintiff's record keeping violations claims against SPF. Additionally, Plaintiff's request for liquidated damages is **GRANTED**, and Plaintiff's request for prospective injunction is **GRANTED in part** and **DENIED in part.** Further, the parties shall confer as to the calculation of the amount of damages owed. If the parties are able to reach an agreement, they may file a joint stipulation on or before **March 7, 2018**. If agreement is not possible, the parties may file separate submissions on or before the same date, **March 7, 2018**. This deadline is carved in New Hampshire granite and no extensions will be allowed. Failure by either

party to comply with this deadline will result in a determination of the amount without consideration of their submission.

**SO ORDERED.**

In San Juan, Puerto Rico this 20th day of February, 2018.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge