# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| THOMAS E. PEREZ, ET AL., | ) | CIVIL CASE NO. |
| Plaintiffs, | ) | 15-1506 (CVR) |
| | ) | |
| vs. | ) | Non-Jury Trial |
| | ) | |
| SPECIAL POLICE FORCE CORP., ET AL., | ) | |
| Defendants. | ) | |

TRANSCRIPT OF FIRST DAY OF NON-JURY TRIAL
HELD BEFORE THE HONORABLE MAGISTRATE JUDGE CAMILLE VELEZ-RIVE
SAN JUAN, PUERTO RICO
Wednesday, February 13, 2019

APPEARANCES:

For the Plaintiffs:          SUSAN B. JACOBS, ESQ.
                             U.S. Department of Labor
                             Office of the Solicitor
                             Region II
                             201 Varick Street, Room 983
                             New York, NY 10014


                             JASON E. GLICK, ESQ.
                             United States Department of Labor
                             Office of the Solicitor
                             201 Varick Street, Room 983
                             New York, NY 10014


For Defendant SPCF:          ISMAEL RODRIGUEZ-IZQUIERDO, ESQ.
                             Ismael Rodriguez Izquierdo Law Offc
                             Urb El Cerezal 1636 Guadiana
                             San Juan, PR 00926


Produced by mechanical stenography; computer-aided
transcription

```
 1

 2   For Defendant Rivera-Ortiz: BENJAMIN GUZMAN-GUZMAN, ESQ.
                                 Darlington Building, Suite 200
 3                               1007 Munoz Rivera Ave
                                 San Juan, PR 00925-27
 4

 5   For Defendant De Jesus:     ARTURO GUZMAN-GUZMAN, ESQ.
                                 Darlington Building, Suite 207
 6                               1007 Munoz Rivera Ave
                                 San Juan, PR 00925-27
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**I N D E X**

WITNESSES                                                          PAGE


ON BEHALF OF THE PLAINTIFFS:


**GLORIANA ORTIZ-CRUZ**

    Direct Examination by Mr. Glick                    20

    Cross-Examination by Mr. B. Guzman-Guzman          42

    Cross-Examination by Mr. Rodriguez-Izquierdo       62

    Cross-Examination by Mr. A. Guzman-Guzman          81

    Redirect Examination by Mr. Glick                  96

    Recross-Examination by Mr. Rodriguez-Izquierdo     97

**JOSE VAZQUEZ**

    Direct Examination by Mr. Glick                    99

    Cross-Examination by Mr. B. Guzman-Guzman          127

    Cross-Examination by Mr. A. Guzman-Guzman          141

    Cross-Examination by Mr. Rodriguez-Izquierdo       149

```
 1                    (PROCEEDINGS COMMENCED AT 9:05 A.M.)

 2

 3              THE CLERK:  Civil Case 15-1506, Thomas E. Perez

 4    versus Special Police Force Corp. and other Defendants for

 5    Non-Jury trial.

 6              On behalf of Plaintiffs are Attorneys Jason E.

 7    Glick and Susan B. Jacobs.

 8              On behalf of Defendants are Attorneys Arturo

 9    Guzman, Benjamin Guzman, and Ismael Rodriguez.

10              THE COURT:  Good morning to all.

11              MR. GLICK:  Good morning, Your Honor.

12              MR. RODRIGUEZ-IZQUIERDO:  Good morning, Your Honor.

13              THE COURT:  Would counsel please introduce

14    yourselves for the record.

15              MS. JACOBS:  Susan Jacobs for the Plaintiffs, R.

16    Alexander Acosta, Secretary of Labor.

17              THE COURT:  Good morning.

18              MR. GLICK:  Jason Glick, also for Plaintiffs,

19    Secretary of Labor.

20              THE COURT:  Okay.

21              MR. B. GUZMAN-GUZMAN:  Benjamin Guzman for

22    co-Defendant Hector Rivera.

23              MR. A. GUZMAN-GUZMAN:  This is Arturo Guzman on

24    behalf of Freddy De Jesus.

25              MR. RODRIGUEZ-IZQUIERDO:  Good morning, Your Honor.
```

1  Ismael Rodriguez-Izquierdo on behalf of co-Defendant SPF,

2  Special Police Force Corporation.

3          THE COURT:  Okay.  Perfect.

4          I requested that all witnesses be outside the

5  courtroom.  I believe that has been done.

6          Any housekeeping matters before we proceed, on

7  behalf of Plaintiffs?

8          MR. GLICK:  Yes, Your Honor.

9          We have, as Your Honor is aware, submitted all of

10  our exhibits.  There are a couple, Plaintiff's Exhibits 2 and

11  3, that have a handful of words in Spanish.  So we have

12  prepared, if the Court would prefer, a translation of just

13  those portions, which we are happy to present copies of and

14  circulate it to counsel.  If it turns out that the witnesses

15  are able to testify directly from the documents, then we

16  wouldn't necessarily need to introduce these translations,

17  but I think we just wanted --

18          THE COURT:  They have to be introduced for appeal

19  purposes.  I cannot admit any exhibit without having the

20  certified translation.

21          MR. GLICK:  We have prepared a translation that is

22  not certified but, pursuant to local Rule 5(g), has been

23  signed by a translator, and we have exchanged it with

24  counsel.  And if there is no objection, we would ask that

25  those translations of those portions be accepted.

```
 1              THE COURT:  Okay.

 2              Any objection as to that, as to the translations

 3    from counsel for Defendants?

 4              MR. RODRIGUEZ-IZQUIERDO:  We haven't seen the

 5    documents.

 6              THE COURT:  You haven't seen the translations?

 7    Okay.

 8              Basic rule, I have three counsel for three

 9    Defendants.  I need you, every time that you are going to

10    address the Court, identify yourself.  Okay?  For purposes of

11    the record.

12              MR. RODRIGUEZ-IZQUIERDO:  Very well.

13              THE COURT:  Any objection, Mr. Rodriguez, on your

14    behalf?

15              MR. RODRIGUEZ-IZQUIERDO:  We have no objection,

16    Your Honor.

17              THE COURT:  Okay.  Mr. Benjamin Guzman?

18              MR. B. GUZMAN-GUZMAN:  No objection at the moment.

19              THE COURT:  Mr. Arturo Guzman?

20              MR. A. GUZMAN-GUZMAN:  We want to see the

21    translation of the document.

22              THE COURT:  You haven't seen them?

23              MR. A. GUZMAN-GUZMAN:  I haven't seen them.

24              THE COURT:  Can they be shown, counsel?

25              MR. GLICK:  Absolutely.
```

1              May I?

2              THE COURT:  Yes, go ahead.

3              MR. GLICK:  I just want to make sure I am bringing

4    the right copies.

5              MR. A. GUZMAN-GUZMAN:  I mean by email.

6              MR. GLICK:  Yes, that's correct.

7              MR. A. GUZMAN-GUZMAN:  Okay.

8              MR. GLICK:  And I have copies for the Court.

9              THE COURT:  Okay.  Yes.

10             Once we address that exhibit, you can submit the

11   translations.  Let me have those.  I will review those.

12             MR. A. GUZMAN-GUZMAN:  We have no objection.

13             THE COURT:  No objection presented.  They can be

14   submitted once we get to that exhibit.

15             MR. GLICK:  Thank you, Your Honor.

16             THE COURT:  Anything else?

17             Any other housekeeping matter?

18             No?  Okay.

19             So, Ms. Jacobs, are you ready?

20             MS. JACOBS:  Yes, Your Honor.

21             THE COURT:  Okay.  Go ahead.

22             MS. JACOBS:  Good morning, Your Honor.

23             THE COURT:  Good morning.

24             MS. JACOBS:  Your Honor, the facts in this case are

25   not in dispute.  Sometime in 2008, Defendant Hector

1   Rivera-Ortiz decided he wanted to start a security guard

2   business.  He invested all the money to start Special Police

3   Force Corporation, and signed and filed all the incorporation

4   paperwork with the Commonwealth in early 2009.

5         Special Police Force was the security guard company

6   that placed its employees at various client posts on the

7   island.  During the relevant period of this case, April 2013

8   through February 2015, Mr. Rivera was the sole owner,

9   president and treasurer of Special Police Force.

10         The economic reality in this case makes it clear

11   that Mr. Rivera was an employer of employees as broadly

12   defined in the Fair Labors Standards Act.  He had operational

13   control over Special Police Force.

14         Mr. Rivera had the authority to hire and fire

15   employees, supervise, and control workers' conditions of

16   employment, and determine their rates of pay.  He invested

17   additional money into the company when needed and was the

18   only individual authorized to sign checks drawn on the

19   corporation's bank accounts.

20         During the relevant period, Mr. Rivera had an

21   active role in running Special Police Force.  Although he

22   also worked at the Puerto Rico Electric Power Authority for

23   part of the relevant period, he was in Special Police Force's

24   office regularly.

25         He had an active role in processing the payroll,

1    and his signature was on all paychecks given to employees.

2              Starting in June 2014, Mr. Rivera directly oversaw

3    the company's office employees after he retired from the

4    Electric Power Authority, until he made the decision for

5    Special Police Force to cease operations in February 2015.

6              Your Honor will see that Mr. Rivera made key

7    decisions on business and employment issues.  As an example

8    of Mr. Rivera's authority over pay practices, starting in

9    2012, Mr. Rivera made the decision to start retaining one

10   entire week's worth of wages from all employees to help with

11   the company's cash flow issues.

12             Defendant Special Police Force has admitted that

13   Mr. Rivera made this decision.

14             Mr. Rivera's decision to put the company's finances

15   ahead of paying workers was a clear violation of both the

16   minimum wage and overtime requirements of the FLSA.

17             Many of the workers had to wait up to a year and a

18   half to receive their withheld pay.  This retention scheme

19   continued until July 2014, when the Department of Labor

20   informed Mr. Rivera that the scheme violated the FLSA.

21             This decision to adopt unlawful pay practices

22   should lead to the determination that Mr. Rivera meets the

23   standard for individual liability for the wage violations.

24             Mr. Rivera is going to argue that in order to apply

25   for a license to open a security guard business in

1    Puerto Rico, a principal executive officer must have a

2    private detective license.

3           He will further argue that because he was not a

4    licensed private detective, he should not be held

5    individually liable for the wage and recordkeeping

6    violations.  This argument has no bearing on the issue of

7    whether Mr. Rivera was an employer as defined by the FLSA.

8           Mr. Rivera was the sole owner, president, treasurer

9    of the company, exercised significant operational control of

10   the business, and personally made the decision to withhold

11   employees' wages in order to stem cash flow issues.

12          All of these facts will clearly establish that

13   Mr. Rivera had authority over his employees' employment and

14   was an employer under the FLSA, and is, therefore, jointly

15   and severally liable for the back wages and liquidated

16   damages previously ordered by the Court.

17          In addition, because Mr. Rivera currently owns and

18   operates another security guard business under a different

19   corporate entity, he should be enjoined from future

20   violations of the FLSA.

21          Further, Defendant Freddy De Jesus was also an

22   employer as defined by the FLSA.

23          It is well settled that there could be multiple

24   employers in a company who can be liable for FLSA compliance.

25          The evidence will show that during the relevant

1    period, Mr. De Jesus was the supervisor and a head of

2    operations who had the authority to and did, in fact, hire,

3    fire, and discipline employees.

4          Your Honor will hear evidence that Mr. De Jesus was

5    the top supervisor of the security guards, assigned guards to

6    their posts, scheduled the guards' hours and helped run the

7    day-to-day operations of Special Police Force.

8          Mr. De Jesus scheduled many of the security guards

9    to work more than 40 hours every work week, thereby creating

10   the obligation that they would be paid proper overtime under

11   the FLSA.  Therefore, Mr. De Jesus should also be held

12   jointly and severally liable for the back wages and

13   liquidated damages.

14         In addition, because Mr. De Jesus is currently the

15   president of Mr. Rivera's new security guard business, he

16   should also be enjoined from future violations of the FLSA.

17         Lastly, Defendants violated various recordkeeping

18   requirements of the FLSA.  The evidence will show that

19   Defendants failed to keep records of the total hours worked

20   by employees each 7-day work week, failed to keep records of

21   employees' total straight time wages due --

22         THE COURT:  I saw two interpreters coming in with a

23   lady.  I am not sure whether she is a witness.

24         MS. JACOBS:  She is a witness, Your Honor.

25         THE COURT:  Okay.  She has to be excluded from the

1  courtroom.

2          MS. JACOBS:  Sorry, Your Honor.

3          THE COURT:  Okay.  Go ahead.

4          MS. JACOBS:  I will restart my sentence on

5  recordkeeping.

6          The evidence will show that Defendants failed to

7  keep records of the total hours worked by employees each

8  7-day work week, failed to keep records of employees' total

9  straight time wages due by 7-day work week, and failed to

10 maintain records of all employees' home addresses as required

11 by the recordkeeping regulations.

12         Thank you.

13         THE COURT:  Mr. Rodriguez.

14         MR. RODRIGUEZ-IZQUIERDO:  Your Honor, the issues

15 concerning the corporation are limited to the fact that they

16 failed to keep the recordkeeping policies and practices.  As

17 to that regard, our position would be that that was not a

18 continued -- that that did not occur all the time.  There was

19 a period of time when that did not occur, and particularly we

20 understand that the Plaintiffs must establish that beyond a

21 reasonable doubt, that that did occur.

22         That would be our position.

23         THE COURT:  Beyond a reasonable doubt?

24         MR. RODRIGUEZ-IZQUIERDO:  I mean by a preponderance

25 of the evidence.  I am sorry, Your Honor.

```
1              THE COURT:  Okay.

2              MR. RODRIGUEZ-IZQUIERDO:  And that's our position,

3    basically.

4              THE COURT:  Okay.

5              Mr. Benjamin Guzman.

6              MR. B. GUZMAN-GUZMAN:  For the record, Benjamin

7    Guzman for Hector Rivera.

8              Your Honor, we have heard the Department of Labor.

9    We have inconsistencies or very difference of opinion with

10   the Department of Labor on the classification that the

11   Department's issues on Hector Rivera as an employer.

12             The evidence is -- the Department of Labor has no

13   evidence that Hector Rivera was the day-to-day cooperator of

14   the Special Police Force Corporation.  Hector Rivera is an

15   investor.  He is a shareholder.  He invested with Mr. Eric

16   Resto, who was a licensed detective, who was the Chief

17   Executive Officer of the cooperation.  His assistant was

18   Jonathan Andujar, who is present in the court today.

19             His assistant, who also ran day-to-day operations,

20   is not included --

21             THE COURT:  Mr. Andujar is not a witness?

22             MR. B. GUZMAN-GUZMAN:  No.  He is a representative

23   of the corporation today.

24             THE COURT:  And he will not testify?

25             MR. B. GUZMAN-GUZMAN:  He will testify.
```

1        THE COURT:  But he is a representative.  Okay.

2        MR. B. GUZMAN-GUZMAN:  And he is a representative.

3        THE COURT:  What's his capacity?

4        MR. B. GUZMAN-GUZMAN:  Actually --

5        MR. RODRIGUEZ-IZQUIERDO:  Chief manager of the

6   corporation.

7        MR. B. GUZMAN-GUZMAN:  The corporation is --

8        MR. RODRIGUEZ-IZQUIERDO:  I am sorry, Your Honor.

9   I am sorry, Your Honor.

10       THE COURT:  The question was to Mr. Guzman, if he

11  is able to answer that.

12       MR. B. GUZMAN-GUZMAN:  Yes, Your Honor.

13       The corporation right now is not operational, but

14  he is the last CEO of the corporation, along with Eric Resto,

15  before Eric Resto passed away.

16       THE COURT:  Okay.

17       MR. B. GUZMAN-GUZMAN:  So he is a representative of

18  the corporation today.

19       THE COURT:  Okay.

20       MR. B. GUZMAN-GUZMAN:  Mr. Andujar is not a

21  Defendant in this case, to my surprise, because he was there

22  since the beginning.

23       Mr. Rivera met with Andujar and Eric Resto and

24  formed the corporation.  Mr. Rivera is an electrician who

25  worked for PREPA in Puerto Rico, Puerto Rico Power Authority,

1    retired from PREPA and was looking for an investment.  He did

2    act directly or indirectly in the interest of the company as

3    a shareholder.

4            He was not in control of the day-to-day operations,

5    was not in control of the post, was not in control of the

6    employees, did not establish any hours, and did not establish

7    policy for the corporation.  Again, Mr. Rivera was a

8    shareholder.

9            When considering whether an individual is an

10   employee within the meaning of the Federal Labor Standards

11   Act, the First Circuit has followed the Supreme Court's lead

12   in interpreting this definition person to an economic reality

13   analysis.  This means, reviewing the liability of corporate

14   officers with a significant ownership/interest who had

15   operational control of the significant aspects of the

16   corporation's day-to-day functions, including compensation of

17   employees, and who personally made decisions to continue

18   operating despite financial adversities during the period of

19   nonpayment.

20           That's on page 13 of document 125, with a partial

21   judgment issued in this case.

22           That applies in this case strictly to Mr. Rivera.

23   He was a shareholder who did not have control of the

24   day-to-day operations.  Day-to-day operations were handled by

25   Eric Resto, by Andujar, and a series of supervisors who

1  supervised posts.

2          THE COURT:  Mr. Arturo Guzman.

3          MR. A. GUZMAN-GUZMAN:  Good morning.  For the

4  record, this is Arturo Guzman on behalf of Freddy De Jesus.

5          Your Honor, Freddy De Jesus, as a drop in this

6  case, and he was just a supervisor of a company with no

7  discretion over as to hire employees, to fire employees, no

8  discretion for the salaries of the employees, neither the

9  payroll.

10          It's our understanding that the Department of Labor

11  will not be able to establish that Mr. Freddy De Jesus was an

12  employee -- excuse me -- an employer as pursuant of section

13  3(d) as alleged in the lawsuit.

14          As an employee, you got -- he was in charge of

15  supervising the guard posts and for filling that void of

16  supervision needed and required in order to keep the services

17  that were being given to the clients.  That means just went

18  to the post, seeing that the guard was there, taking the

19  signature of each guard at the time of post.

20          Besides that, no other function in the corporation

21  from Mr. De Jesus is directed or will establish that he was

22  an employer.

23          That would be all.

24          THE COURT:  Thank you.

25          Ms. Jacobs, are you ready for the first witness?

Joe Reynosa, CSR, RPR
Official Court Reporter

```
 1                MS. JACOBS:  Yes, Your Honor.  She is in the

 2    witness room.

 3                THE COURT:  Yes.

 4                MR. GLICK:  Your Honor, if I may approach to return

 5    my papers.

 6                THE COURT:  Yes.

 7                MR. GLICK:  Thank you very much.

 8                Your Honor, Plaintiff calls as our first witness

 9    Ms. Gloriana Ortiz-Cruz, who will testify through an

10    interpreter.

11                THE COURT:  Yes.

12                MR. GLICK:  May I pass a binder of the exhibits to

13    the witness.

14                THE COURT:  The only issue that I have with the

15    whole binder -- I would rather do them individually, because

16    some will be presented as an ID first, I am assuming, then

17    have to be authenticated, or are they all stipulated?

18                MR. GLICK:  Not all are stipulated, Your Honor.

19                THE COURT:  Okay.  Individually.

20                MR. GLICK:  Understood, Your Honor.

21                I will pass the exhibits one at a time.

22                THE COURT:  Yes.

23                MR. B. GUZMAN-GUZMAN:  Attorney Benjamin Guzman,

24    for the record.

25                THE COURT:  Is this an issue with this particular
```

1   witness?

2           MR. B. GUZMAN-GUZMAN:  Yes.

3           THE COURT:  Please approach.

4           (Whereupon, the following proceedings were held at

5   sidebar:)

6           THE COURT:  Yes.

7           MR. B. GUZMAN-GUZMAN:  It's not a substance issue,

8   but when the employees were announced, when the witness were

9   announced in document 134, Employees Witnesses, "The

10  Secretary may call approximately 5-10 former employees to

11  testify regarding their employment with Special Police Force.

12  The scope of Mr. Rivera-Ortiz" --

13          THE COURT:  Which page are you on?

14          MR. B. GUZMAN-GUZMAN:  Page 13, No. 6, Employee

15  Witnesses.

16          But since they did not disclose the names of the

17  employees who are going to testify during the address, I

18  would like to have the opportunity to ask my client who these

19  employees are, because we never saw the employees, had their

20  names.

21          THE COURT:  How many employees are you presenting?

22          MR. GLICK:  We are presenting one employee,

23  Your Honor.

24          If I may add, we disclosed the name of Ms. Ortiz in

25  approximately early to mid-December by email.

```
 1            MR. B. GUZMAN-GUZMAN:  No, this is not Emma Ortiz.

 2            THE COURT:  Gloriana Ortiz-Cruz.

 3            MR. B. GUZMAN-GUZMAN:  Ms. Emma Ortiz was deposed.

 4   We know about Emma, and it's Ms. Emma Garcia, but we never

 5   received any notification of this witness.

 6            THE COURT:  Do you have the email?

 7            MR. GLICK:  If I may open my phone, Your Honor.

 8            THE COURT:  Yes.

 9            Did you all receive an email?

10            MR. B. GUZMAN-GUZMAN:  I do not recall.

11            THE COURT:  This is not an issue of recalling.  Did

12   you, or did you not?  It's simple.

13            MS. JACOBS:  We also -- Mr. Glick turned over her

14   statement to counsel I believe a few days ago.

15            MR. GLICK:  Which is a document we do not plan to

16   introduce as an exhibit.

17            Your Honor, may I show you my phone?

18            MR. A. GUZMAN-GUZMAN:  We received the statement of

19   the interview.

20            THE COURT:  It's there.

21            MR. B. GUZMAN-GUZMAN:  All right.  We withdraw

22   the --

23            THE COURT:  Okay.

24            MR. B. GUZMAN-GUZMAN:  It will take me less than a

25   minute to ask my client.
```

1          THE COURT:  You can do it now.

2          (Back on the record.)

3          THE COURT:  Objection has been withdrawn.

4          Mr. Glick, you may start your direct.

5          We will take the oath.

6

7                    **GLORIANA ORTIZ-CRUZ,**

8              after having been first duly

9          sworn or affirmed upon oath, was examined

10                  and testified as follows:

11

12                  <u>**DIRECT EXAMINATION**</u>

13  BY MR. GLICK:

14  Q    Good morning, Ms. Ortiz.

15  A    Good morning.

16  Q    I would like to start by asking you, did you ever work

17  at a company called Special Police Force?

18  A    Yes.

19  Q    When was that?

20  A    2000 -- 2006 to 2014.

21  Q    What was your position at that company?

22  A    At the beginning, at the Pine Grove Condominium, I

23  started as a supervisor when they did the transition from one

24  company to another.

25  Q    After that time, did you have any other responsibilities

1    at Special Police Force?

2    A    Much later.

3           I was assigned installation of data entry and

4    programs, and sometimes I was assigned personnel in the

5    office for recruitment of personnel because the

6    administration required us to do that.

7    Q    Now, I would like to go back to ask you, how did you

8    come to work at Special Police Force, in the first place?

9    A    I worked for another company at the Pine Grove

10   Condominium, and the administration decided to change the

11   company that I worked for, and they informed us guards that

12   they were going to be changing companies, and that several

13   companies would be coming to submit quotes for them to decide

14   as the administration.  Among those companies was Special

15   Police Force.

16   Q    Do you know if Special Police Force, in fact, received

17   that contract?

18   A    I don't know because that's done by the administration,

19   not us, the guards.

20   Q    Who at the administration explained that to you?

21   A    The president at the time, Mr. Roberto Bustillo.

22           MR. B. GUZMAN-GUZMAN:  For the record, Attorney

23   Benjamin Guzman.

24           I will ask -- would like to ask, who was the

25   administration, whose administration, because it hasn't been

```
 1   identified, and it's confusing.  Is it Special Police Force,

 2   or is it the condominium administration?

 3            MR. GLICK:  I could ask that foundation,

 4   Your Honor.

 5            THE COURT:  Okay.

 6   BY MR. GLICK:

 7   Q    Ms. Ortiz, are you explaining something about -- which

 8   administration were you just testifying about?

 9   A    The administration of the condominium, Pine Grove.

10   Q    Did you later learn anything from the administration

11   about who or what company would take over the security

12   operations?

13   A    Subsequently we were informed that there was going to be

14   this change of companies, and that they had asked the company

15   that they had selected --

16            MR. A. GUZMAN-GUZMAN:  Objection, Your Honor.

17   Hearsay.

18            THE COURT:  And your name?

19            MR. A. GUZMAN-GUZMAN:  For the record, this is

20   Attorney Arturo Guzman.  I am sorry.  I am very sorry because

21   I didn't follow the rules.

22            We object because of hearsay.

23            THE COURT:  Mr. Glick.

24            MR. GLICK:  Your Honor, I believe the witness was

25   testifying about something told to her.
```

```
1              I can ask a different question.

2              THE COURT:  Okay.

3              Objection is sustained.

4              Please rephrase.

5              The answer is stricken.

6              MR. GLICK:  If I could ask, if it's possible for

7    the witness to finish the answer so we could sometimes hear

8    the --

9              THE COURT:  No, because I upheld the objection.

10   BY MR. GLICK:

11   Q    Did you attend any meetings with the administration of

12   the condominium?

13             MR. A. GUZMAN-GUZMAN:  For the record, this is

14   Attorney Arturo Guzman on behalf of Freddy De Jesus.

15             We understand that the attorney is leading the

16   witness.

17             THE COURT:  Overruled.

18             "Did she attend any," that's not leading.

19             You may answer?

20             THE WITNESS:  When they informed us about the

21   change, the administration of the Pine Grove Condominium

22   informed us that the companies were going to change and that

23   some of us who formed part of the group who worked for the

24   previous company were going to remain.  We had been selected

25   to stay.  Among those people was I.
```

1   BY MR. GLICK:

2   Q    Who was at that meeting with the administration of the

3   condominium?

4   A    Well, the first time that they informed us, it was not

5   really in the form of a meeting, but upon exiting,

6   Mr. Bustillo informed us, and that subsequently the Special

7   Police Force company would be coming with the required

8   documentation for us to begin working with them.

9   Q    Did you attend any meetings with the administration

10  after that?

11  A    The administration arrived, came to the office and

12  delivered to us in the presence of Mr. Andujar, and

13  Mr. Andujar gave us the job application, the documents

14  required for us to start working with them, which was the job

15  application.  And then they asked us to bring in -- they told

16  us we had to bring in a certificate of good conduct, a

17  picture ID, Social Security, and if we had a resume, to

18  present it for the file.

19  Q    Was anyone else at that meeting?

20  A    Not at that meeting, no, but subsequently we met

21  Mr. Hector Rivera.

22  Q    When did you meet Mr. Hector Rivera?

23  A    Several days later, when he came and introduced himself

24  as the owner of Special Police Force company, and he had a

25  meeting with the administration.  On that occasion,

```
1    Mr. Jonathan Andujar was also with him.

2    Q    Where was that meeting?

3    A    The condominium's administration office.

4    Q    What, if anything else, did Mr. Rivera explain at that

5    meeting?

6    A    Could you repeat?

7    Q    Yes.

8              What, if anything else, did Mr. Rivera explain at

9    that meeting?

10   A    Are you asking about me, as to me?

11   Q    Did you hear Mr. Rivera explain anything else at that

12   meeting?

13             MR. B. GUZMAN-GUZMAN:  Objection, Your Honor.  The

14   witness testified --

15             THE COURT:  Your name, and then you give me the

16   objection.

17             MR. B. GUZMAN-GUZMAN:  Benjamin Guzman on behalf of

18   Hector Rivera.

19             The objection is regarding the witness testified

20   that she saw Hector come by and he was going to a meeting

21   with Andujar and the administration of the condominium.  She

22   did not testify that she took part in that meeting.

23             THE COURT:  The question was whether she heard

24   Mr. Rivera saying anything else.  So it's not comprised to a

25   meeting.  That's how I understood the question.
```

```
 1            MR. B. GUZMAN-GUZMAN:  Okay.

 2            THE COURT:  Correct?

 3            MR. GLICK:  I can certainly ask that question, if I

 4  didn't.

 5  BY MR. GLICK:

 6  Q    Did you hear Mr. Rivera explain anything else that day?

 7  A    No.

 8  Q    Now, I would like to talk to you more about your job

 9  duties when you worked for Special Police Force.  So, first

10  regarding your work at Pine Grove itself, once Special Police

11  Force took over, what were your responsibilities?

12  A    Repeat the question.

13  Q    At Pine Grove specifically, what responsibilities did

14  you have when you worked for Special Police Force?

15  A    I was in charge of the security booth, in charge of the

16  guards through the company.  I did the rosters, passed them

17  on for approval to the director of operations, and we entered

18  and took out data when a resident moved in or out.  We would

19  ask for documents when required because we had ran out.  And

20  all extraordinary responsibilities in extraordinary cases, as

21  they can arise, I would call the directors of operations.

22  Q    Who were the directors of operations or director of

23  operations?

24  A    At the beginning it was Mr. Jonathan Andujar, and

25  subsequently it was Mr. Freddy De Jesus.
```

1   Q      What do you mean by any kind of extraordinary

2   circumstances or extraordinary responsibilities?

3   A      Well, if the administration of Pine Grove was not

4   pleased with any type of situation pertaining to the guards,

5   or any situation that came up in the area of security that

6   they were not pleased with and needed to be improved, well,

7   then, the administration would come to me because I was in

8   charge of the security booth.  I would do the report and

9   contact the director of operations and would inform him of

10  what was happening.

11  Q      And at that time, who was the director of operations?

12  A      At the beginning, it was Mr. Jonathan Andujar and,

13  subsequently, Mr. Freddy De Jesus.

14  Q      Could you give us an example of some kind of

15  extraordinary circumstance when you wrote a report, as you

16  just described.

17  A      I remember one that was the one that gave us quite a lot

18  of work.  It was a breaking and entering in the condominium,

19  and we had to maintain communications at all times.  At the

20  time the director of operations was Mr. Freddy De Jesus.  He

21  was kept informed of everything at all times.

22          The administration decided to file charges against

23  the two people who broke and entered into the condominium.

24  And I had to attend court proceedings on behalf of Special

25  Police Force to represent them in the proceedings.

1    Q    I just want to make sure I understand.  There was some

2    kind of crime committed; is that right?

3    A    In the Pine Grove Condominium, yes.

4    Q    Did you have a role in reporting that to someone?

5    A    Yes.

6              MR. A. GUZMAN-GUZMAN:  For the record, Attorney

7    Arturo Guzman on behalf of Freddy De Jesus.

8              I believe that the question was already asked and

9    answered.

10             THE COURT:  Overruled.

11             Go ahead.

12   BY MR. GLICK:

13   Q    Did you have a role in reporting that incident to

14   someone?

15   A    Yes.

16   Q    To whom did you report that incident?

17   A    As soon as that situation occurred, I contacted the

18   president, the administration, and quickly the director of

19   operations of the company.

20   Q    Which director of operations was that?

21   A    At the time Mr. Freddy De Jesus.

22   Q    Why did you report this to the director of operations

23   Freddy De Jesus?

24   A    Because I worked for the Special Police Force company.

25   I had to make all the necessary efforts, take all the

1   necessary steps with regard to the situation and go through

2   the entire police process and contact administration, the

3   president, and supervisor on duty, the director of

4   operations.  So I have to inform the company that I work for.

5   Q    During the times you worked at Pine Grove, did you ever

6   contact Mr. Hector Rivera directly about anything?

7   A    Yes.

8   Q    Can you give us an example of that.

9   A    Yes.  When the administration told us that during the

10  transition they had requested a security camera system,

11  installation of signs, the one in charge of doing such work

12  was Mr. Hector Rivera, and I would follow up on this as per

13  the request of the administration of Pine Grove.

14  Q    Could you explain what the installations of signs

15  involved.

16  A    Yes.  The installation of signs was a small sign

17  indicating that the area was under camera surveillance.

18  Q    Were there surveillance cameras at Pine Grove?

19  A    In different areas.

20  Q    Who maintained those security cameras?

21  A    That was decided by administration.

22  Q    Were there any -- ever any problems with the security

23  cameras at Pine Grove?

24  A    There were some problems where the system would fail.

25  Q    When those problems happened, who was involved in fixing

1   them?

2   A    Well, that was decided by the administration.  Because

3   after the cameras were installed, the installation of some

4   cameras, once the company came in, if I am not mistaken, it

5   was four or five cameras, then the administration would

6   decide, after receiving quotes, which company they were going

7   to assign the maintenance of the cameras to.

8   Q    When you worked at Pine Grove, did you any role in

9   dealing with the security cameras?

10  A    Yes.

11  Q    What was your role?

12  A    To monitor them and to make sure they were up working,

13  and also make sure it had surveillance of the back and the

14  front areas through the cameras.  And then whenever a visitor

15  license plate was going to be registered, to register that,

16  or also residents without beepers.

17  Q    Did you ever see anyone repair the security cameras when

18  you worked there?

19  A    Yes.

20  Q    Who did you see repair security cameras?

21  A    Several people.

22  Q    Who did that include?

23  A    There were several companies that the administration had

24  decided were going to be checking the cameras.  And most of

25  the time there was a maintenance employee who was taught to

1  deal with them.  And after that, the cameras continued to

2  give problems.  And that's when I was told to call Hector

3  Rivera to explain to him what was happening.

4  Q    Did you ever call Hector Rivera to say anything about

5  the security cameras at Pine Grove?

6           MR. B. GUZMAN-GUZMAN:  Objection to the

7  translation.  The question was, "Did you ever call," and the

8  interpreter interpreted, "Did you communicate."  A

9  communication call and communication is different.

10           THE COURT:  Okay.

11           For the record, that was Benjamin Guzman.

12           THE WITNESS:  Yes.

13  BY MR. GLICK:

14  Q    How often?

15  A    It was not that often.

16  Q    Why was it that you called Hector Rivera about the

17  cameras instead of someone else?

18  A    Because the cameras that Mr. Hector Rivera was called

19  about were the cameras that he had installed.

20  Q    That was at Pine Grove?

21  A    Yes.

22  Q    Now, I would like to go back and ask you about some of

23  the other responsibilities you mentioned during your work at

24  Special Police Force.

25           The recruiting of personnel that you had mentioned

1   before, what did that involve?

2   A    Okay.  Well, when Special Police Force started at the

3   Pine Grove Condominium, the administration of the Pine Grove

4   Condominium told us that they wanted to remove any persons

5   who were not going to be remaining with the Special Police

6   Force company.  And so at the time it was decided, because I

7   have been working at that condominium for so long, the vice

8   president of the condominium, Attorney Maria Elisa Santiago,

9   told me to contact the Special Police Force company, at all

10  times Mr. Hector Rivera, and inform him of the concern that

11  they wanted the personnel to be recruited through me for the

12  Pine Grove Condominium.

13          After I contacted Mr. Hector Rivera, I was told

14  there was no problem at all, and that personnel will be

15  coordinated to then go forward with the recruitment.

16  Q    Did you then have any recruitment responsibilities or

17  roles with Special Police Force?

18  A    I would interview the person.  After interviewing the

19  person, I would meet with the director of operations, and I

20  would let him know whether the person qualified or not.  But

21  the decision was made by the director of operations.

22  Q    Which director of operations was that?

23  A    At the time Mr. Freddy De Jesus.

24  Q    Did Mr. Hector Rivera have any role in that recruitment

25  that you were involved in?

1    A    At the time I contacted Mr. Hector Rivera, which is what

2    I mentioned earlier, Hector Rivera told me, "Contact Freddy

3    De Jesus."  And that's what I did.

4    Q    The interviews that you mentioned, where did those take

5    place?

6    A    At the offices of Special Police Force.

7    Q    Where were those offices?

8    A    On Martinez Nadal Avenue.

9    Q    During the time that you had that role with the

10   interviews, about how often did you go to those offices?

11   A    About three or four times.

12   Q    I just want to make sure I understand.  Was it three or

13   four times ever?

14   A    Yes, for purposes of the recruitment process.

15   Q    During what period of time was that, approximately?

16   A    That was for an average of time of about a month, month

17   and a half.  At the most, two months.  Because we had to make

18   sure that the personnel selected was the proper or

19   appropriate personnel for the administration of the

20   condominium to be satisfied with the services.

21   Q    For the people that were hired, do you know who assigned

22   them to a post?

23   A    Well, again, I will repeat that for the Pine Grove

24   Condominium, recruitment was for the Pine Grove Condominium,

25   and I will explain.  There were some open shifts, and those

1    were the open shifts that had to be covered at the Pine Grove

2    Condominium.

3    Q    During the times that you went to the offices of Special

4    Police Force, who else was at the office?

5    A    Mr. Freddy De Jesus; the secretary, if I am not mistaken

6    her name was Franchesca; sometimes Mr. Hector Rivera would

7    come in and out.  And there was another gentleman whose name

8    I can't remember, but he was the company's accountant, and

9    also sometimes there were field supervisors.  And, obviously,

10   the people summoned for interviews with me.

11   Q    During the times that you saw Hector Rivera at those

12   offices, what time of day was that?

13   A    I could see Mr. Hector Rivera at any time of day after I

14   got out of work at the Pine Grove Condominium because he is

15   the owner of the company.

16   Q    You were just testifying about -- would you see him at

17   Pine Grove or the offices or somewhere else?

18   A    Outside of Pine Grove.

19   Q    Did you sometimes see him at Special Police Force

20   offices?

21   A    Sometimes.

22   Q    Now, I believe you mentioned some kind of data system

23   where the addresses or other information of the building

24   residents was entered.  Do I understand that correctly?

25   A    Yes.

1  Q     Did someone teach you to use that system?

2  A     Yes.

3  Q     Who was that?

4  A     The company's programmer.

5  Q     Was anyone else involved in teaching you how to use that

6  system?

7  A     Not as far as I can remember.

8              MR. B. GUZMAN-GUZMAN:  Objection.  Attorney

9  Benjamin Guzman, for the record.

10             THE COURT:  It's late, the objection.  She already

11 answered.

12             Next question.

13 BY MR. GLICK:

14 Q     Do you know who taught that person how to use the data

15 entry system?

16             MR. B. GUZMAN-GUZMAN:  Objection.  Benjamin Guzman,

17 for the record.  We would like to -- counsel to offer what's

18 the pertinence of this line of questioning.  I don't believe

19 she is talking about Special Police Force.  I believe she is

20 talking about the names and address of the people -- the

21 residents of the condominium.  That's not pertinent to

22 Special Police Force.

23             THE COURT:  She is talking about a company

24 programmer who taught her to use the system.  That's all I

25 know.

1    MR. B. GUZMAN-GUZMAN:  No.  But before, she -- the

2  witness testified that she would write down in the system the

3  names and addresses of the residents of Pine Grove.  I would

4  like to have that pertinent to Special Police Force business.

5    MR. GLICK:  I am happy to lay further foundation or

6  see if the witness has such information.

7    THE COURT:  Go ahead, please.

8  BY MR. GLICK:

9  Q    Could you remind me, what was the title of the person

10  who taught you how to use that computer system?

11  A    The programmer.

12  Q    Do you know what company the programmer worked for?

13  A    No.

14  Q    Do you know who taught the programmer about that data

15  system?

16    MR. A. GUZMAN-GUZMAN:  Your Honor, this is Arturo

17  Guzman, for the record.  We have an objection.  Since she

18  doesn't know who the programmer was --

19    THE COURT:  No.  She doesn't know for which company

20  he worked for.  The question was, whether she knows who

21  taught him to use the program.

22    MR. A. GUZMAN-GUZMAN:  Who taught him, but she

23  doesn't know who he is.

24    THE COURT:  She knows who he is.  She doesn't know

25  for what company he works for, and the question is if she

```
 1    knows who taught him.

 2              I will allow it, if she has personal knowledge.

 3              THE WITNESS:  No.

 4    BY MR. GLICK:

 5    Q    Where were you when you learned how to use that computer

 6    system?

 7    A    The first time I went to the office.

 8    Q    Which office was that?

 9    A    Special Police Force's office.

10    Q    Did you learn how to use the computer system for the

11    first time in Special Police Force's office?

12    A    Yes.

13    Q    And after that, did you have further training on the

14    computer system?

15              MR. A. GUZMAN-GUZMAN:  Objection, Your Honor.

16              For the record, this is Arturo Guzman.

17              The question is misleading.  She didn't said that

18    she received any training.

19              THE COURT:  "The use of the program."  Let's

20    rephrase and not use the word "training."  Let's use "use of

21    the program."

22              MR. GLICK:  Understood, Your Honor.

23    BY MR. GLICK:

24    Q    After that time in Special Police Force's office, did

25    anyone teach you anything else about how to use that data or
```

1   program?

2   A    On the day I was given the training, since this was

3   really not complicated, I literally learned everything about

4   it.  This programmer put the program on a pen drive for me.

5   And then after I completed the training and I was given this

6   data entry system program, I contacted Hector Rivera.  And I

7   told him that I had learned quite a lot about this data entry

8   program to enter or install information of residents and

9   visitors.  And then he told me later that we were going to be

10  working with the installation of visitor and resident data,

11  and that he would be informing me when administrations, who

12  were going to be using that program, gave him the information

13  for me to work with.

14  Q    And that person you were just describing, who was that?

15  A    My boss, Mr. Hector Rivera.

16  Q    During the time that you worked for Special Police Force

17  at Pine Grove, how did you record your hours, if at all?

18  A    With a payroll sheet.

19       MR. GLICK:  Your Honor, at this time I would like

20  to show the witness an exhibit, which I believe has been

21  admitted -- counsel has stipulated is in evidence, Exhibit 3,

22  along with the translation that I described to the Court

23  earlier this morning.

24       THE COURT:  No objection as to Exhibit 3 from

25  counsel for Defendants?

 1           MR. A. GUZMAN-GUZMAN:  This is Arturo Guzman.  On

 2    behalf of Freddy De Jesus, no objection.

 3           MR. RODRIGUEZ-IZQUIERDO:  Speaking on behalf of

 4    SPF, Your Honor, Ismael Rodriguez.  No objection to the

 5    document.

 6           THE COURT:  Okay.  So admitted as Exhibit 3 with

 7    the translation.

 8           MR. GLICK:  May I approach with the translation

 9    page?

10           THE COURT:  Yes.  And let's get the...

11           MR. GLICK:  May I pass to the Court this exhibit --

12    translation page.

13           THE COURT:  Okay.  You can put it with the

14    original.

15           MR. GLICK:  Okay.

16           THE COURT:  And then they will both be clipped

17    together as Exhibit 3.

18           MR. GLICK:  Understood.  I just didn't know if the

19    Court wanted a copy for its --

20           THE COURT:  No.  Not for now.  Thank you.

21    BY MR. GLICK:

22    Q    Ms. Ortiz, I am showing you what has been admitted in

23    evidence as Exhibit 3.

24           Do you recognize this document, Exhibit 3?

25           THE COURT:  Mr. Glick, for the benefit of all

1    present, we can use the projector, or the Elmo, and the

2    witness can see it from there, and I can see it as well.

3              MR. GLICK:  I apologize, Your Honor.

4              THE COURT:  Do you understand how to use it?

5              MR. GLICK:  I have not used it before.

6    BY MR. GLICK:

7    Q    Ms. Ortiz, do you recognize this document, Exhibit 3?

8    A    Yes.

9    Q    Is this the kind of sheet that you used to record your

10   hours when you worked in Pine Grove?

11   A    This sheet was the one that was submitted along with the

12   tally of hours, because there was also a payroll sheet, an

13   individual payroll sheet for each employee that was used.

14   Q    What information do you record on that payroll sheet?

15   A    On the one for Pine Grove, you would enter the name, the

16   start time, the break time, the exit time or end time, and

17   signature.  And you would identify it with the letters C or

18   R.  At least in my condominium, we would use C for the

19   Spanish word *caseta*, the guard booth, because there were no

20   rounds.

21   Q    Other than the information you just mentioned, did you

22   record any other information on those sheets that you would

23   turn in?

24   A    For the Pine Grove Condominium, no.

25   Q    And you were just telling about -- testifying about "for

1    Pine Grove."  Was that for the time that you worked for the

2    company Special Police Force at the location Pine Grove?

3    A    Repeat the question.

4    Q    When you explained that the timekeeping was for Pine

5    Grove, was that during the time you worked for Special Police

6    Force at the Pine Grove location?

7    A    The payroll sheet, yes.

8    Q    Now, I would like to ask, when did you stop working for

9    Special Police Force?

10   A    2014.

11   Q    Why did you stop working there?

12   A    Because I found a job opportunity in the field I

13   studied.

14   Q    Did you inform Special Police Force that you were

15   leaving?

16   A    I contacted Mr. Hector Rivera and explained to him that

17   Attorney Maria Elisa Santiago had offered me a job position

18   in administration, and that I was going to accept it.

19   Q    Why was Mr. Hector Rivera the person that you

20   communicated that to?

21   A    Because he is the owner of the company and the boss.

22          MR. A. GUZMAN-GUZMAN:  Your Honor, objection as to

23   the characterization.

24          THE COURT:  Overruled.

25          MR. GLICK:  Your Honor, I have no further questions

1    at this time.

2            THE COURT:  Okay.  Let's take a five-minute break,

3    and then we will resume with the cross-examination.

4            Ma'am, you remain under oath during the break.  It

5    will be five to ten minutes.  Please do not discuss your

6    testimony with anyone during the break.

7

8            (PROCEEDINGS SUSPENDED AT 10:15 A.M.)

9            (PROCEEDINGS RESUMED AT 10:45 A.M.)

10

11           THE COURT:  You may be seated.

12           Cross.

13           MR. B. GUZMAN-GUZMAN:  For the record, Attorney

14   Benjamin Guzman on behalf of Hector Rivera.

15                         **CROSS-EXAMINATION**

16   BY MR. B. GUZMAN-GUZMAN:

17   Q    Ms. Ortiz, good morning.

18   A    Good morning.

19   Q    Mr. Hector Rivera has been included in this complaint in

20   his personal capacity in an allegation --

21           MR. GLICK:  Objection, Your Honor.

22           THE COURT:  Please approach.

23           (Whereupon, the following proceedings were held at

24   sidebar:)

25           THE COURT:  I will not allow --

1          MR. B. GUZMAN-GUZMAN:  The introduction --

2          THE COURT:  Hold on.

3          -- the coaching a witness.  I will not allow it.

4    Get to the question.  It has no bearing, and it is totally

5    irrelevant in what capacity he is or he is not.

6          MR. B. GUZMAN-GUZMAN:  Okay.

7          (Back on the record.)

8          THE COURT:  The previous statements by Attorney

9    Guzman are stricken from the record.

10          MR. B. GUZMAN-GUZMAN:  Permission to continue,

11   Your Honor.

12          THE COURT:  Yes.

13          MR. B. GUZMAN-GUZMAN:  Attorney Benjamin Guzman for

14   the record.

15   BY MR. B. GUZMAN-GUZMAN:

16   Q    Ms. Ortiz, you testified that you began working in what

17   year?

18   A    For Pine Grove Condominium in 2004, more or less.

19   Q    Do you remember when you started working for Special

20   Police?

21   A    Special Police Force did their transition in 2006 or

22   2007, as I testified earlier.  If I recall correctly, it was

23   between 2006 or 2009.

24   Q    I am confused about the last part of your answer.  Is it

25   2007 or 2009?

1    A    I don't recall.

2    Q    If I were to show you a Certificate of Incorporation for

3    Special Police Force, would it be correct if the same was

4    filed in 2009?

5           MR. GLICK:   Objection.

6           THE COURT:   Sustained.

7    BY MR. B. GUZMAN-GUZMAN:

8    Q    Do you know when Special Police Force began operations?

9    A    I don't recall.

10   Q    You do recall that around 2009, Special Police Force

11   started operating the security part of condominium Pine

12   Grove; correct?

13   A    As I stated earlier, I had worked in Pine Grove

14   Condominium since 2004.  It's not entirely clear to me.  I

15   don't recall exactly when the transition took place, whether

16   it was 2007 to 2009.

17   Q    One last question in that regard.  About how many years

18   were you employed -- you had been employed by Pine Grove

19   before you started working for Special Police?

20   A    I don't recall a specific date, but I had been there

21   quite a while.

22   Q    Would it be correct to say it was more than five years

23   or less than five years?

24   A    I can't answer that because I don't recall what date

25   more or less or how much time.

1    Q    Would it be fair to say that you had -- that the -- I am

2    sorry.  I am going to rephrase that.

3              Would it be fair to say that the administration had

4    a lot of confidence in you?

5              THE COURT:  Which administration?

6              You were asked to clarify that before.

7    BY MR. B. GUZMAN-GUZMAN:

8    Q    The Pine Grove administration.

9    A    What do you mean by trust?

10   Q    By confidence I mean in a sense that they trust you to

11   make decisions on their behalf and they accepted your

12   recommendations.

13             MR. GLICK:  Objection.

14             THE COURT:  Sustained.

15             MR. B. GUZMAN-GUZMAN:  I am going to rephrase it,

16   Your Honor.

17   BY MR. B. GUZMAN-GUZMAN:

18   Q    Trust that they will accept your recommendations.

19   A    Would you please repeat the question.

20   Q    Trust that they will accept your recommendations in

21   terms of security or security issues in the condominium.

22   A    Trust is not the correct word.  They would consult me

23   regarding any type of situation involving security, and I

24   would give them my opinion, but it was their decision.

25   Q    Let me ask you another question.  What's your academic

1   preparation?

2   A    I studied business administration, and I took courses in

3   invoicing, and security and protection.

4   Q    Specifically, do you have any specific degrees in those

5   areas?

6   A    Yes.

7   Q    What are the degrees that you have?

8   A    I have an associate's degree and a bachelor's, and the

9   security and protection courses are certified upon

10  completion.

11  Q    Did the Pine Grove administration consult you in

12  administrative issues?

13  A    No.

14  Q    Who approached you -- we are going to the time where a

15  transition was made to Special Police Force.  Who asked you

16  to recruit personnel for the openings that were available for

17  the posts?

18          MR. GLICK:  I heard two questions without a

19  response.

20          THE COURT:  "Who asked you to recruit" was the

21  question.

22          You may answer.

23          THE WITNESS:  Please repeat the question.

24  BY MR. B. GUZMAN-GUZMAN:

25  Q    Who asked you to recruit personnel for the available

1   posts at Pine Grove?

2   A    (No interpretation of the answer was allowed by Defense

3   Counsel.)

4   Q    Which criteria --

5               THE COURT:  Please wait.

6               MR. B. GUZMAN-GUZMAN:  I am sorry.

7               THE WITNESS:  A little earlier I testified that

8   this attorney, Maria Elisa Santiago, asked me to notify

9   Mr. Hector Rivera what they were thinking about, and I told

10  him that, to tell Hector Rivera that the personnel for

11  Special Police Force, who were coming to Pine Grove, I should

12  interview them so that then the condominium could feel

13  satisfied with that.

14  BY MR. B. GUZMAN-GUZMAN:

15  Q    From your answer, does Ms. Santiago, from the

16  administration of Pine Grove, establish the criteria for

17  which employees to hire?

18  A    She was the vice president of Pine Grove Condominium.

19              MR. B. GUZMAN-GUZMAN:  I will ask the witness to be

20  responsive.  The question was very specific.

21              THE COURT:  I agree.

22              Please answer the question.

23              The question was, did Ms. Santiago establish the

24  criteria of which employees to hire for Pine Grove?

25              THE WITNESS:  When Ms. Maria Elisa Santiago decided

1    to assume the position of president, decided that -- that

2    determined the controlled access that was decided by the

3    board, which is president, vice president.

4                THE COURT:  Okay.  Let's get a translation, but the

5    answer was nonresponsive.

6                THE WITNESS:  Well, when she became president, in

7    that process, and when the board changed, which changes on a

8    yearly basis, and then we -- when I say "we," I am referring

9    to Special Police Force -- through me, were going to be

10   recruiting the guards for Pine Grove because there had been

11   some problems with operational situations.

12               THE COURT:  Ma'am, you are now on

13   cross-examination.  Mr. Guzman has a right to make questions

14   which may require, for example, yes or no, and no explanation

15   after that, because Mr. Glick will have a chance later on

16   redirect to clarify.

17               The answer you just provided did not respond to the

18   question.  The question was whether Ms. Santiago established

19   the criteria of which employees to hire for Pine Grove.

20   Please answer that question.

21               THE WITNESS:  Yes.

22   BY MR. B. GUZMAN-GUZMAN:

23   Q    When the transition was made from the previous security

24   company to Special Police Force at Pine Grove, Mr. Andujar

25   was the one who showed up to a meeting.

```
1    A    Yes.

2    Q    He was the one who made the first contact; correct?

3    A    Yes.

4    Q    After the company was hired, it was that you first saw

5    Hector Rivera; correct?

6    A    Yes.

7    Q    Will it be fair to say that Security Police Force did

8    not recruit you?

9              MR. GLICK:  Objection.

10             THE COURT:  Overruled.

11             MR. GLICK:  Your Honor, may I?  The name of the

12   company that --

13             THE COURT:  Special Police Force.  Mr. Guzman

14   provided another name.

15             MR. B. GUZMAN-GUZMAN:  I am sorry, Your Honor.

16   BY MR. B. GUZMAN-GUZMAN:

17   Q    I am sorry, Ms. Ortiz.  I meant, would it be fair to say

18   that Special Police Force did not recruit you?

19   A    No, that would not be correct because they did recruit

20   me.

21   Q    In your first statement you told us that you were

22   already working at that post.

23   A    I worked for the previous company.  And when the

24   transition took place, Mr. Andujar is the one who brought in

25   the applications, which included the good conduct
```

1   certificate, Social Security, and driver's license.

2   Q    Ms. Ortiz, you testified previously that the

3   administration informed you that there was going to be a

4   change in company; is that correct?

5   A    I testified earlier that the Pine Grove Condominium

6   informed us that there was going to be a change in company

7   and that they had decided to keep a number of employees who

8   had been chosen.  And I was one of the chosen ones.

9   Q    If you were to say who recruited you, who would that be?

10  A    At the time that we were given the application, it was

11  Mr. Andujar who handed them out.

12  Q    Mr. Andujar was the decision-maker -- I am going to

13  rephrase.

14       Mr. Andujar was the person who made the decision

15  that you stay at that post for Special Police; correct?

16  A    No, because when the condominium administration met to

17  request the change in company, they requested that a group of

18  us remain, and the board said that a group of us would be

19  remaining after the change.

20       MR. B. GUZMAN-GUZMAN:  The witness was not

21  responsive.  I asked her if Mr. Andujar was the person who

22  decided that she stays in that post.  Is that correct, yes or

23  no?

24       THE COURT:  Give me a second.

25       And she answered, no, and then she gave an

1   explanation.

2           MR. B. GUZMAN-GUZMAN:  Okay.

3           THE COURT:  So the question was answered.

4           MR. B. GUZMAN-GUZMAN:  Permission to continue.

5           THE COURT:  Yes.

6   BY MR. B. GUZMAN-GUZMAN:

7   Q    Mr. Hector Rivera did not assign you to that post

8   whatsoever.

9   A    When we made the transition, I was already working

10  there.

11  Q    I am going to interrupt.  The answer is yes or no.

12          Mr. Hector Rivera positioned you at that post at

13  any time.

14  A    I don't know because when the transition took place, I

15  didn't know Hector Rivera.  The one who I knew was

16  Mr. Andujar, when I saw him.

17  Q    You previously answered that the Pine Grove

18  administration did not consult you on any administrative

19  matters.

20          MR. GLICK:  Objection to the characterization of

21  the testimony.

22          THE COURT:  Pardon?

23          MR. GLICK:  I don't agree that that was the

24  witness' exact testimony.

25          THE COURT:  Okay.  Please rephrase.

1  BY MR. B. GUZMAN-GUZMAN:

2  Q    Pine Grove administration did not consult you in their

3  administrative matters.

4  A    No, they did not.

5  Q    Then you did not have any personal knowledge of what was

6  included in the contract between Pine Grove administration

7  and Special Police Force.

8  A    Not until that point.

9  Q    I ask you if you have any personal knowledge whether the

10  installation of cameras, security cameras, were a part of the

11  Special Police Force contract with Pine Grove afterwards?

12  A    I was told that Mr. Hector Rivera was going to be coming

13  by to present a quote for some cameras and their installation

14  because -- that was not at the time that the transition was

15  taking place.  That was afterwards, after we were already

16  working with Special Police Force, for us to be on the

17  lookout as to whether the monitor that there was, whether it

18  was working, whether it had the capability, and to show them

19  the area where the previous cameras had been installed for a

20  long time.

21  Q    I am going to ask you again because I got confused with

22  your answer in various parts.

23          My question -- my first question is, did you have

24  personal knowledge if the camera system was included in the

25  deal for -- the security deal with Special Police Force?

```
 1   A    (No translation because Defense Counsel did not allow

 2   it.)

 3   Q    My question is yes or no.

 4   A    At the time of the recruitment when the transition took

 5   place, no.

 6             THE COURT:  Mr. Guzman, when you pose a question

 7   that you want a yes or no, please pose the question as such.

 8             MR. B. GUZMAN-GUZMAN:  Sorry, Your Honor.

 9   BY MR. B. GUZMAN-GUZMAN:

10   Q    I am going to ask you a simple question.  Did you have

11   personal knowledge if the camera system was included in the

12   security contract that Special Police Force held with Pine

13   Grove Condominium; yes or no?

14   A    No.

15   Q    After the transition took place --

16   A    We were informed --

17             THE COURT:  Excuse me.

18             What's the question?

19   BY MR. B. GUZMAN-GUZMAN:

20   Q    What's your knowledge about the cameras after the

21   transition?

22   A    We were told that they were going to install new cameras

23   to check the ones that were out of order, and that some other

24   personnel, Mr. Hector Rivera in this case, was going to come

25   by to check and to present a quote, and I should grant him
```

1    access to the monitors and the cameras and to show him where

2    things were.

3              THE COURT:  Excuse me, counsel.  I do not allow

4    someone in the public to interrupt the proceedings and tell

5    you something.  That's basic court ^.  Okay?

6              MR. B. GUZMAN-GUZMAN:  Sorry, Your Honor.  That was

7    my represented party.  I needed some clarification.  It will

8    not happen again.

9    BY MR. B. GUZMAN-GUZMAN:

10   Q    Ms. Ortiz, did you ever see any quote for the camera

11   installations?

12   A    No.

13   Q    Did you ever have personal knowledge of a quote for the

14   camera installations?

15   A    That was left in an envelope, in a sealed envelope in

16   the guard booth.

17   Q    You did not know what was in the envelopes; correct?

18   A    No.

19   Q    The job duties at the beginning of your relation with

20   Special Police was strictly to be a guard, a security guard

21   at a post; correct?

22             MR. GLICK:  I object to the characterization of the

23   testimony.

24             THE COURT:  Sustained.

25             That's not what she testified before.

```
 1    BY MR. B. GUZMAN-GUZMAN:

 2    Q    When you were working at the post, you had a director of

 3    operations; yes or no?

 4    A    Yes.

 5    Q    That director of operations was Andujar; yes or no?

 6    A    At the beginning, yes.

 7    Q    That director of operations was never Hector Rivera;

 8    correct?

 9    A    I always knew him to be the owner of the company.

10    Q    My question is director of operations to which you

11    report.

12    A    I reported to the operations director Andujar.  That was

13    at the beginning.  And then afterwards, I reported to

14    Mr. Freddy De Jesus.

15    Q    I am not clear.  Would you please clarify.  If at any

16    time you became a supervisor yourself for Special Police.

17    A    For the Pine Grove Condominium.

18    Q    In that duty at Pine Grove Condominium, who set the

19    hours for the guards?

20    A    The schedules had been set since forever.  It was three

21    shifts.

22    Q    Who recruited -- no.  I am sorry.  Let me rephrase.

23         Who made the decision whom will be at that

24    particular post at any of the shifts?

25    A    Please repeat the question.
```

1  Q    Who made the decision as to what guard will be at a Pine

2  Grove post in any of those three shifts?

3  A    When an open slot was covered, whatever shift was open

4  would be covered, whether it was from 2:00 to 10:00, 5:00 to

5  1:00.

6  Q    My question is --

7         THE COURT:  The answer was nonresponsive.

8  BY MR. B. GUZMAN-GUZMAN:

9  Q    -- with regard to the -- who sent the guard to that

10 particular -- who assigned the posts?

11        MR. GLICK:  Objection to the form.

12        MR. B. GUZMAN-GUZMAN:  I am sorry.

13 BY MR. B. GUZMAN-GUZMAN:

14 Q    Who assigned a specific guard to a specific post in Pine

15 Grove?

16 A    I did, as the supervisor.  Afterwards, I would consult

17 with the director of operations and inform him, this open

18 occurred, this guard can cover, this other one can't.

19 Q    Ms. Ortiz, you testified previously about entering a

20 criminal incident in the condominium.  Now I ask you, if

21 there was a problem with the security guard, you were the one

22 who dealt with that particular security guard; yes or no?

23 A    When I make reference to the incident --

24 Q    No, no, no.  Different from that incident, if there is a

25 problem with a security guard from Special Police at Pine

1    Grove, you were the one who dealt with that problem; correct?

2    A    I would make the report, and the information would be

3    forwarded to the operations director.  And the decision was

4    taken by the director, not by me.  What I did was present the

5    situation that had been presented to me by the administration

6    and/or the board of directors.

7    Q    Mr. Hector Rivera was not involved in any discipline --

8    was not involved in the application of discipline measures to

9    security guards; correct?

10              MR. GLICK:  Objection.

11              THE COURT:  Sustained.

12              Don't answer.

13   BY MR. B. GUZMAN-GUZMAN:

14   Q    Did you ever see Mr. Hector Rivera at your post handling

15   disciplinary matters?

16   A    No.

17   Q    Earlier you testified multiple times that you called

18   Hector Rivera directly.  My question is, were you following

19   instructions for the condominium administration; yes or no?

20   A    Yes.

21   Q    I need you to clarify one issue for me.  When you

22   interviewed security guard prospects, the one who accepted

23   them on behalf of Special Police was Jonathan Andujar; yes or

24   no?

25              MR. GLICK:  Objection to the characterization of

1    the testimony.

2              THE COURT:  Is this based on what she testified

3    before?

4              MR. B. GUZMAN-GUZMAN:  Yes.

5              MR. GLICK:  I believe the witness' answer before

6    does not lend itself to a yes-or-no form.

7              THE COURT:  Mr. Andujar was there at the beginning,

8    not at all times, so we need to set a time frame as well.

9              MR. B. GUZMAN-GUZMAN:  I am talking to her when she

10   did the interviews to recruit.  So I am talking about the

11   beginning.

12             THE COURT:  At the beginning?

13             MR. B. GUZMAN-GUZMAN:  Yes.

14             THE COURT:  Okay.  Please rephrase.

15   BY MR. B. GUZMAN-GUZMAN:

16   Q    At the beginning of the relationship when you

17   interviewed prospects, the person who approved them on behalf

18   of Special Police was Jonathan Andujar; yes or no?

19   A    No.

20   Q    Was it the Pine Grove administration?

21   A    That depended on what candidate was sent.

22   Q    But on behalf of Special Police, was it Andujar?

23   A    Could you please repeat the question.

24   Q    The new recruits who worked for Special Police --

25   A    For the first time?

1    Q     First time.  When you interviewed the first couple of

2    people to fill out those openings.

3    A     You mean when I did it?

4    Q     Correct.

5    A     That process was carried out with Mr. Freddy De Jesus.

6    Mr. Jonathan Andujar was never involved in that process.

7    Q     Do you remember what year that process took place?

8    A     No, I don't recall.

9    Q     Was that before 2012; correct?

10   A     I don't recall.

11   Q     But it was at the beginning of the relationship between

12   Pine Grove and Special Police.

13   A     I don't recall.

14   Q     In one of your answers to brother counsel, you testified

15   that you knew Hector Rivera from outside of Special Police.

16   A     Yes.

17   Q     Would it be fair to say that you had confidence to call

18   Hector Rivera directly for any issue?

19   A     The word "confidence" is not the proper word.

20         When I was assigned entry of the residents'

21   information into the data system, that's when I had direct

22   communication with Hector in order to assign which groups or

23   complexes were going to be worked on.

24   Q     But when you testified about your job responsibilities,

25   they were strictly with Pine Grove; correct?

```
 1              THE COURT:  For Pine Grove under the

 2   administration?  Under the contract with Special Police

 3   Force, or...

 4              MR. B. GUZMAN-GUZMAN:  With Special Police when she

 5   described her responsibilities or her duties, that's what I

 6   am referring to.

 7   BY MR. B. GUZMAN-GUZMAN:

 8   Q    Your duties were performed for the Pine Grove complex.

 9              THE COURT:  Don't answer.

10              I did not understand the question, so please

11   rephrase.

12              MR. B. GUZMAN-GUZMAN:  I am going to withdraw the

13   question.

14   BY MR. B. GUZMAN-GUZMAN:

15   Q    You referred to Mr. Hector Rivera as "el jefe", as the

16   boss; that's correct?

17   A    Yes.

18   Q    He was the boss because he was the owner of the company;

19   correct?

20   A    Yes.

21   Q    Did you ever receive any training as a security guard

22   from Special Police?

23   A    What do you mean by "training"?

24   Q    Training as a security guard.  Training for your duties

25   for Special Police as a security guard at Pine Grove.
```

1    A    There is no training of that type ever carried out with

2    Special Police Force.

3    Q    The training you received was about the computer

4    programming; correct?

5    A    Regarding the data entry program for residents and

6    visitors.

7    Q    That program was offered by Special Police to Pine

8    Grove; correct?

9    A    I don't know.

10   Q    Hector Rivera personally never gave you any type of

11   training; correct?

12   A    What do you mean by Hector Rivera never gave me any type

13   of training?

14   Q    Any training related to your duties at Special Police,

15   personally did not give you any training.

16   A    No.

17   Q    To the best of your knowledge, Hector Rivera did not

18   have a contract to service the computers at Pine Grove

19   Condominium; correct?

20           MR. GLICK:  Objection.

21           THE COURT:  Sustained.

22   BY MR. B. GUZMAN-GUZMAN:

23   Q    Do you know if Hector Rivera had any contract to service

24   the computers with Pine Grove?

25           MR. GLICK:  Objection.  Asked and answered.

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  I don't know.

 3   BY MR. B. GUZMAN-GUZMAN:

 4   Q    You said you went to another job at 2014.  Do you

 5   remember the month?

 6   A    I think it was in July.

 7   Q    You said that you called Hector Rivera to inform of that

 8   situation; correct?

 9   A    Yes.

10   Q    But at the time you had a field -- a director of

11   operations; correct?

12   A    Yes.

13   Q    And that director of operations was not Hector Rivera;

14   correct?

15   A    No, he wasn't.

16   Q    The reason you made that phonecall to Hector Rivera was

17   because you had a trust relationship with him.

18   A    No.

19   Q    Do you recall if he ever loaned you any money?

20              MR. GLICK:  Objection.  Outside the scope.

21              THE COURT:  Sustained.

22              MR. B. GUZMAN-GUZMAN:  No more questions.

23                      **CROSS-EXAMINATION**

24   BY MR. RODRIGUEZ-IZQUIERDO:

25   Q    Good morning, ma'am.
```

1   A    Good morning.

2          MR. RODRIGUEZ-IZQUIERDO:  May it please the Court,

3   Your Honor.

4          THE COURT:  Yes.

5   BY MR. RODRIGUEZ-IZQUIERDO:

6   Q    Ma'am, going back to the time when -- in Los Pinos

7   complex --

8          THE COURT:  Pine Grove.

9          MR. RODRIGUEZ-IZQUIERDO:  Pine Grove complex.

10  BY MR. RODRIGUEZ-IZQUIERDO:

11  Q    Going back to the time when Special Police came into

12  play, you started doing the recruitment of the new candidates

13  for the guard police at Pine Grove, you mentioned that the

14  person who set the criterias for selecting those candidates

15  was Mrs. -- was the attorney for the Board of Directors of

16  Pine Grove, Attorney Maria -- I am sorry.  Did you mention

17  her name?

18  A    Maria Elisa Santiago.

19  Q    Okay.  So would it be correct that she was the one who

20  set up --

21          MR. GLICK:  Your Honor, objection to the form.

22          THE COURT:  Yes.  Counsel, it's convoluted.

23          MR. RODRIGUEZ-IZQUIERDO:  Okay.  I will make the

24  question again.

25          THE COURT:  Please rephrase.

```
 1   BY MR. RODRIGUEZ-IZQUIERDO:

 2   Q    Would you agree with me that you mentioned a while ago

 3   that the one who set up the criterias for selecting those

 4   candidates was the attorney for the Board of Directors?

 5   A    She, along with the administrative board, because it is

 6   a board.

 7   Q    And you were appointed by her to make the interviews of

 8   those candidates, were you not?

 9   A    When it was pertinent.

10   Q    Is that a yes or no --

11             THE COURT:  No.  Excuse me.

12             "When she was the president."

13             THE INTERPRETER:  The interpreter stands corrected.

14   BY MR. RODRIGUEZ-IZQUIERDO:

15   Q    Is that a yes or a no to my question?

16   A    Yes.

17   Q    And that was because she had -- she wanted to make sure

18   that those candidates were the ones needed for the posts.

19             MR. GLICK:  Objection.  Speculation.

20             MR. RODRIGUEZ-IZQUIERDO:  No.  She testified during

21   her -- sorry, Your Honor.

22             THE COURT:  I agree.  Objection is overruled.

23             THE WITNESS:  Please repeat the question.

24             THE COURT:  That she wanted to make sure the

25   candidates were appropriate for the posts.
```

1          THE WITNESS:  I don't know what her reasoning was,

2    what she wanted to make sure of.  She designated people, in

3    this case me, for the security area for the guardhouse.

4    BY MR. RODRIGUEZ-IZQUIERDO:

5    Q    And you were the one to hold interviews with those

6    candidates.

7    A    I was asked to do that afterwards, and I did it.

8    Q    Do you recall what those criterias were that she

9    required you to make sure that those candidates had in order

10   to become guards?

11   A    When you say "her," you mean referring to the attorney?

12   Q    Yes.  The attorney who was the president of the board.

13   A    I don't know if that's what she wanted, but based on the

14   time that I had been working with the condominium, that's my

15   understanding of what she wanted to happen at the time.

16          THE COURT:  Ma'am, the question was, which was the

17   criteria that Attorney Santiago was looking for, period.

18          THE WITNESS:  She wanted them to have knowledge

19   about security.  She wanted the duties and responsibilities

20   to be carried out with excellence.  She wanted the duties of

21   each shift to be carried out.  And she wanted the rules and

22   regulations of each area to be followed in excellence.

23   BY MR. RODRIGUEZ-IZQUIERDO:

24   Q    Very well.  And as part of that, you did hold the

25   interviews and make the corresponding recommendations for the

```
 1   posts, did you not?
 2            MR. GLICK:  Objection.
 3            THE COURT:  It's a compound question.
 4            Sustained.
 5   BY MR. RODRIGUEZ-IZQUIERDO:
 6   Q    Did you, in effect, make those interviews?
 7   A    Of the candidates that were assigned to me from Special
 8   Police Force.
 9   Q    Is that a yes or a no?
10   A    Yes.
11   Q    So you did the interviews.  And would it be fair to say
12   that, following those interviews, you made the corresponding
13   recommendations?
14            MR. GLICK:  Objection.  Vague.
15            THE COURT:  Pardon?
16            MR. GLICK:  I object.  The phrase "corresponding
17   recommendations" as vague.
18            MR. RODRIGUEZ-IZQUIERDO:  I will withdraw the
19   "corresponding."  I will just leave it with the
20   "recommendations."
21            THE COURT:  Okay.
22            THE WITNESS:  Yes.  I would forward the information
23   to the operations director.
24   BY MR. RODRIGUEZ-IZQUIERDO:
25   Q    Did you not forward those recommendations to the
```

1  attorney who gave you the criterias for selecting those

2  employees?

3  A    That was forwarded weekly to a record that was prepared

4  because the board does not meet continuously.

5  Q    Ma'am, to whom did you recommend the appointments -- the

6  candidates?

7  A    When they were assigned to me from Special Police Force,

8  I forwarded them to the operations director.

9  Q    And that would be Andujar.

10 A    At the time that I was assigned that task, the

11 operations director was Mr. Freddy De Jesus.

12 Q    Ma'am, if I were to tell you that Mr. Freddy De Jesus

13 began working for Special Police Force in 2012, would you

14 still hold your position that you are testifying now, that it

15 was Mr. De Jesus at that time who was the operation officer?

16            MR. GLICK:  Objection.  Argumentative.

17            THE COURT:  Sustained.

18 BY MR. RODRIGUEZ-IZQUIERDO:

19 Q    Your recommendations, were they effectively followed for

20 the appointment, for the selection of the candidates?

21 A    Sometimes they did.  And sometimes Mr. Freddy De Jesus,

22 when he saw the candidate, and he said, "This is going to

23 cause us a problem."

24 Q    So it would be fair to say that sometimes they would

25 effectively follow your recommendations?

```
 1   A     Sometimes.

 2   Q     Let's say of ten candidates that you offered

 3   recommendations, would it be fair that they would follow your

 4   recommendations in eight cases?

 5   A     No.  We never reached ten candidates.

 6   Q     My question would be how many candidates were

 7   recommended?

 8   A     Of those during that period of time that that was done,

 9   which was about a month, a month and a half, we didn't even

10   reach six candidates because the open shifts were only two.

11   Q     And how many were named, appointed?

12   A     I don't recall.

13   Q     But of those named, some of those you recommended

14   effectively.

15   A     Yes.

16   Q     And they were, in fact, appointed.

17             MR. GLICK:  Objection.  Characterization of her

18   testimony.

19             THE COURT:  Sustained.

20   BY MR. RODRIGUEZ-IZQUIERDO:

21   Q     Were they appointed --

22             MR. GLICK:  Same objection.

23             THE COURT:  Overruled.

24   BY MR. RODRIGUEZ-IZQUIERDO:

25   Q     -- those that you recommended.
```

1  A    Could you repeat the question.

2  Q    Of those that you mentioned you recommended, do you know

3  if they were appointed to the post?

4  A    Sometimes they did.

5  Q    Did you also supervise employees at Pine Grove, the

6  guards?

7  A    What do you mean by supervise?  Because the supervision

8  position and supervising are two different things.

9  Q    Did you follow their day-to-day work and make sure that

10  they were doing the work correctly?

11  A    When my shift came, I would check each shift, and would

12  send the reports to the administration, pursuant to the

13  instructions.

14  Q    Assuming somebody complained about how a guard was

15  conducting his work there, would you be the person to go and

16  make the claim?

17  A    No.  Many times it was the residents, or visitors that

18  had arrived and complained.  Or sometimes they wanted to come

19  visit somebody, and if the guard was doing his job, they

20  would become uncomfortable with that or be upset about that,

21  and then would want to write up a report.

22  Q    And they would complain to you?

23  A    Many times they would come to me.  On other occasions

24  they would go to the board of directors, and the board of

25  directors would then forward that information to security.

 1   And there a detailed report of the complaint would be

 2   drafted, and, obviously, that was forwarded to the director

 3   of operations, and he would be notified of what was going on.

 4   Q    And you would be the person to prepare that report,

 5   would you not?

 6   A    Not necessarily.

 7   Q    But you did occasionally prepare the report, did you

 8   not?

 9   A    If the complaint came to me directly, I would draft it.

10   And if the person complained to me, I would tell them to put

11   it in writing, and then it would be forwarded.

12   Q    And in that report you also made recommendations as to

13   what type of discipline should be imposed.

14   A    No.

15   Q    You never engaged in any process of imposing

16   disciplinary measures to an employee that was under your

17   supervision?

18   A    That would be consulted with the operations director,

19   and the responsibility was his.  And he would decide whether

20   the person would be given a written warning, whether he would

21   be suspended, or summoned to the office after I had submitted

22   the report and the details of the situation.

23   Q    I would like to call your attention, ma'am, to Exhibit 3

24   of the Plaintiffs.

25             MR. RODRIGUEZ-IZQUIERDO:  If we can show the

1   witness the document.

2            THE COURT:  Use the Elmo, please.

3            MR. RODRIGUEZ-IZQUIERDO:  May I publish it?

4            THE COURT:  Yes.

5   BY MR. RODRIGUEZ-IZQUIERDO:

6   Q    Ma'am, are you familiar with this document?

7   A    I said earlier that this was like the record sheet that

8   was used to close off the payroll.

9   Q    So that's a lookalike?

10  A    Similar.

11  Q    But that is not the document of the sheet -- of the

12  attendance sheets for Pine Grove complex.

13  A    No.

14  Q    As a matter of fact, you don't have personal knowledge

15  of anything that is contained in that document.

16  A    No.

17            THE COURT:  Excuse me.  There is an objection.

18            MR. GLICK:  The objection is the characterization

19  of the testimony.  I believe the witness testified before

20  that that was the type of information recorded in time

21  sheets.

22            THE COURT:  And she said she did recognize the

23  document.

24            And your question, Mr. Rodriguez, is if she has

25  personal knowledge as to those signatures.

1           MR. RODRIGUEZ-IZQUIERDO:  And the content of that

2   document, yes, and the employees, and the site, and the

3   dates, everything.

4           THE COURT:  Mr. Rodriguez, the objection is

5   overruled.  If you want, you can go column by column, but you

6   have to be specific.

7           MR. RODRIGUEZ-IZQUIERDO:  All right.

8   BY MR. RODRIGUEZ-IZQUIERDO:

9   Q    Going to the document -- let's go to the beginning of

10  the document.  It says, name of the post, right at the top,

11  at the left side.  So in page 2 of Exhibit 3 -- page 1, I am

12  sorry, of Exhibit 3, what is the name of the site or the

13  post?

14  A    Of the document that I am looking at?

15  Q    Correct.

16  A    It's says, name of the post, Villa Venezia.

17  Q    Did you have any familiarity with Villa Venezia post

18  during the time you worked for Special Police?

19  A    I was familiarized when I was doing data entry for

20  several positions, but I don't recall each one.

21  Q    But you did not work as a security guard at Villa

22  Venezia, nor did you supervise employees.

23  A    No.

24  Q    So let me then go now to the names of the officials

25  there.  Are you familiar with those employees?

1          MR. GLICK:  I object regarding the scope of -- this

2    is not -- this line of examination precedes the scope of the

3    witness' testimony regarding this document.  She didn't

4    testify about the names and has already just testified that

5    she wasn't familiar with --

6          THE COURT:  The document, the whole document was

7    admitted.  No limitations were requested.  The signatures are

8    there.  So I think that -- and there was no objection to the

9    admission of the document, so I think that

10   Mr. Rodriguez-Izquierdo can get into the content.

11          Overruled.

12          Do you know the names, ma'am?

13          THE WITNESS:  I don't recall -- I don't recognize

14   anyone with that name.

15   BY MR. RODRIGUEZ-IZQUIERDO:

16   Q    And you don't have person knowledge of this document in

17   terms of when it was made and those entries were made there.

18   A    No.

19   Q    And you don't recognize either -- I will withdraw that

20   question.

21          I call your attention now, ma'am, to page 4 of

22   Exhibit 3?

23          THE COURT:  You have to publish it.

24          MR. RODRIGUEZ-IZQUIERDO:  I am sorry, Your Honor.

25

1  BY MR. RODRIGUEZ-IZQUIERDO:

2  Q    Would it be the same for this document as I asked to you

3  in the other documents about the names and the familiarity

4  with that document?

5  A    Yes.

6  Q    And would that be the same also, ma'am, for page 6 of

7  Exhibit 3?

8  A    Yes.

9  Q    How about this document, page 8 of Exhibit 3?

10 A    I can't see the bottom clearly.

11        Yes.

12 Q    And we are talking there about Cooperativa San

13 Francisco, would that be correct?

14 A    It says, name of the post, Cooperativa San Francisco.

15 Q    Very well.  I will withdraw this document.

16        And, lastly, witness, how about this document, page

17 11, would be the same question.

18 A    I can't see the edge properly.

19        Yes.

20 Q    I would like you to show you -- you have the entire

21 document with you.

22        MR. RODRIGUEZ-IZQUIERDO:  Can I show the witness so

23 that she can review it, and I would ask her a question

24 about --

25        THE COURT:  You have to give it to her.

1          MR. RODRIGUEZ-IZQUIERDO:  Okay.

2          THE COURT:  Let's use the exhibit which is marked,

3    which was provided by the courtroom deputy.

4          MR. RODRIGUEZ-IZQUIERDO:  That one that I have?

5          THE COURT:  Yes.

6          MR. RODRIGUEZ-IZQUIERDO:  Can I have a minute?  I

7    took them out of order, Your Honor.  I am sorry.  I need like

8    a minute.  I don't know how I did -- put them out of order.

9          THE COURT:  The pages are not numbered?

10         MR. RODRIGUEZ-IZQUIERDO:  Yes, but I just got them

11   out of order, and now I am -- just a second.

12   BY MR. RODRIGUEZ-IZQUIERDO:

13   Q   Ma'am, I want to show you the entire document, the

14   document consisting of 12 pages.  I went through some of

15   those pages, but I would like now for you to take a look at

16   the entire document, and I would like you to tell us if any

17   of those documents, you do -- contrary to the other ones that

18   I asked you, if you do recognize that?

19         MR. GLICK:  I would just object to the form.  If we

20   could clarify more specifically or break it down.

21         THE COURT:  When the document was introduced, and

22   only the first page was shown on the Elmo, she was asked

23   whether she recognized the document, and she said yes.  Page

24   1 was the only one which was shown.  Okay?

25         So now I am not sure as to whether what her answer

1    meant.  If it was only one page.  Now we know that it has 12

2    pages.  So we need to clarify that.

3              And what is that, Mr. Rodriguez, exactly what you

4    are looking for?

5              MR. RODRIGUEZ-IZQUIERDO:  Let me see if I can try

6    again.

7    BY MR. RODRIGUEZ-IZQUIERDO:

8    Q    When you testified awhile ago to this -- let me publish

9    this document?

10             THE COURT:  The first page?

11             MR. RODRIGUEZ-IZQUIERDO:  The first page of

12   Exhibit 3.

13             THE WITNESS:  I can't see it completely.

14   BY MR. RODRIGUEZ-IZQUIERDO:

15   Q    You did mention that you were familiar with this

16   document, or was it that it was a lookalike of what you are

17   familiarized?

18   A    Similar.

19   Q    So now I ask you now, in connection with the entire

20   document, if your familiarity was the same as due to the fact

21   that it is a lookalike of what you know?

22             THE COURT:  Please approach.

23             I want to see the document.

24             (Whereupon, the following proceedings were held at

25   sidebar:)

1          THE COURT:  None pages of Exhibit 3 refer to find

2     it.  None of them.  So I am assuming that what Mr. Rodriguez

3     is looking for is if she has any knowledge as to these 12

4     pages which do not relate to find of where is the location

5     where she worked.

6          MR. RODRIGUEZ-IZQUIERDO:  That's the purpose.

7          MS. JACOBS:  That's not our position.

8          THE COURT:  That's not how the question was posed.

9     I interpreted, when the first page was shown, she was asked

10    whether she recognizes it, and she said, yes, period.  There

11    was no questions as to -- and she said that it was code for

12    the name of the official, the hour, when the person came in,

13    came out, the dates.  But no questions were posed as to the

14    content.

15          So your position is that it was presented only as

16    to the format.

17          MR. GLICK:  Yes, I agree with the witness'

18    testimony regarding the information she recorded about her

19    hours, the company.  She described having entered --

20          THE COURT:  A blank document was presented instead,

21    and it has 12 pages.  Why do we need 12 pages to show.

22          MR. RODRIGUEZ-IZQUIERDO:  Your Honor --

23          MS. JACOBS:  First of all, you don't have blank.

24    These are the records that were provided to us by the

25    Defendants.  There were no blank forms.  This is a sample of

1    a different post, covering the relevant period of time.

2              This witness is not --

3              THE COURT:  So it was for the limited purpose only?

4              MS. JACOBS:  In regards to this witness, yes.

5              THE COURT:  Okay.  Can we stipulate then that she

6    has no personal knowledge as to content of these documents?

7              MR. RODRIGUEZ-IZQUIERDO:  I have no problem with

8    that.

9              THE COURT:  Just say bunch of signatures and

10   persons who were there.

11             MS. JACOBS:  It's just to show her the format.

12             THE COURT:  It was not specific when we introduced

13   the document, and it was limited to the format of the

14   document.  Twelve pages with signatures is very different for

15   the limited purpose and for the content of the document, so I

16   am trying to clarify that.

17             MR. GLICK:  I appreciate Your Honor, and we intend

18   to use this same exhibit with the other witness regards the

19   records.

20             THE COURT:  I understand.  So you can use it then

21   later.  But my question is whether you are willing to

22   stipulate, all of you, as to this witness having no knowledge

23   as to the handwritten parts.

24             MR. GLICK:  Yes, Your Honor.

25             THE COURT:  Is that okay?

1          MR. RODRIGUEZ-IZQUIERDO:  Yes.

2          MR. A. GUZMAN-GUZMAN:  Your Honor, she didn't

3    testify exactly about this document.  She testified about

4    another document with the hour and the rates and the payment

5    of the payroll.

6          THE COURT:  Remember, you will have your chance in

7    cross to verify that.

8          MR. A. GUZMAN-GUZMAN:  If she didn't specifically

9    have any knowledge of this document, familiarity of the

10   document, and it's not same that she saw, not even the

11   format, why won't it be stricken from the testimony as an

12   exhibit in this case?  Because she doesn't have any knowledge

13   of it.

14         THE COURT:  I asked you three whether you have an

15   objection to that document, and you said no.  So it was

16   admitted already.  That's water under the bridge.

17         MR. RODRIGUEZ-IZQUIERDO:  Your Honor, in

18   reconsideration, it's that the document -- the probative

19   value of the document does not --

20         THE COURT:  I will not reconsider that, counsel.

21   You were provided the document before that.  I asked you, "do

22   you have any objection to the admission?"  The document is

23   admitted.

24         There is a stipulation that this witness doesn't

25   know or has personal knowledge as to the handwritten

1  portions, period.  That's my ruling.

2          It's five past noon.  I see some people here which

3  are related to my duty matter.  I informed you that I was on

4  criminal duty, so I have to take care of that.

5          Would it be a good moment to take the lunch recess

6  now?

7          MR. RODRIGUEZ-IZQUIERDO:  I believe so, Your Honor.

8          MR. GLICK:  The witness intends to go back to work.

9  She needs to be here for as long as it takes, but we would

10  like to finish as soon as possible.

11          THE COURT:  I have Mr. Rodriguez to conclude.  I

12  have another cross to conclude, and you have redirect.  And I

13  have duty matters.

14          MR. GLICK:  Understood.

15          THE COURT:  So there isn't much I can do.

16          MR. GLICK:  Sure.

17          MR. RODRIGUEZ-IZQUIERDO:  What time will we be

18  back?

19          THE COURT:  1:30.

20          MR. RODRIGUEZ-IZQUIERDO:  I finished with my cross,

21  Your Honor, so I don't --

22          THE COURT:  Do you want to finish now?  How long

23  will that be?

24          MR. RODRIGUEZ-IZQUIERDO:  No, no.  That was my

25  last --

 1          THE COURT:  Oh, you are done?

 2          MR. RODRIGUEZ-IZQUIERDO:  The thing about the

 3   documents --

 4          THE COURT:  Perfect.

 5          Let's continue till 12:30.  See if we can finish by

 6   12:30.  That's the most I can do, and then we will resume at

 7   1:30.

 8          (Back on the record.)

 9          THE COURT:  Mr. Rodriguez, you concluded with the

10   cross; right?

11          MR. RODRIGUEZ-IZQUIERDO:  That's correct.  I have

12   no further questions, Your Honor.

13          Permission to withdraw.

14          THE COURT:  Cross then by Mr. Arturo Guzman.

15          Go ahead.

16          MR. A. GUZMAN-GUZMAN:  For the record, this is

17   Attorney Arturo Guzman on behalf of Freddy De Jesus.

18                      **CROSS-EXAMINATION**

19   BY MR. A. GUZMAN-GUZMAN:

20   Q    Good afternoon.

21   A    Good afternoon.

22   Q    Ms. Ortiz, I am kind of confused about the date that you

23   start working with Special Police Force because you testified

24   about a couple of dates, but we want to be clear on those.

25          You said that in 2006 you started working at the

1   post on Pine Grove?

2              THE COURT:  That's not what she testified.

3              If my memory doesn't fail, she gave another date.

4              MR. A. GUZMAN-GUZMAN:  Well, that was, Your Honor,

5   the first question that was made by brother counsel, and her

6   answer was from 2006 to 2014.

7              THE COURT:  Okay.  It may be that I am mistaken.

8              Go ahead.

9              MR. GLICK:  Your Honor, I agree.  There was

10  testimony regarding another date, and I believe the witness

11  answered the question about her dates to the best of her

12  knowledge.

13             THE COURT:  Let's try to clarify it.

14  BY MR. A. GUZMAN-GUZMAN:

15  Q    You were working at the Pine Grove post in 2004; yes or

16  no?

17  A    For another company, yes.

18  Q    2005, you were working at the Pine Grove post; right?

19  A    For the other company, yes.

20  Q    You continued working until 2014 in that post; is that

21  correct?

22  A    I was working for the Pine Grove Condominium till

23  approximately 2014.

24  Q    This is what I get confused.  You were working for the

25  Pine Grove Condominium, or you were working for Special

1  Police?

2  A    I was working at the Pine Grove Condominium

3  subcontracted by Special Police, when Special Police came to

4  the condominium.  Prior to that --

5  Q    Answer my question.  I am going to make you another

6  question now?

7          MR. GLICK:  If the witness could finish her answer.

8          THE COURT:  No.  She answered the question.  You

9  may ask on redirect.

10         Next question.

11 BY MR. A. GUZMAN-GUZMAN:

12 Q    There was mention when the Special Police did the

13 transition, on what year was that?

14 A    As I said earlier, I don't recall.

15 Q    Okay.  You told me a few minutes ago, you remember that

16 from 2000 -- I asked you each year, 2004, 2005, 2006.  You

17 told me that you worked for another company in Pine Grove

18 until 2006.  You remember that?

19 A    You asked me when I worked at Pine Grove, and I said --

20 you asked about 2004 and 2005, and I worked at Pine Grove for

21 another company at that time.

22 Q    Okay.  How about 2006?  Were you working for another

23 company; yes or no?

24 A    I don't recall the specific date in which the transition

25 occurred from one company to the other.

1          THE COURT:  Let's move on because that has been

2    asked and answered many times, and she has been consistent in

3    her answer.

4          MR. A. GUZMAN-GUZMAN:  Your Honor, we were getting

5    close.  We got until 2006.

6    BY MR. A. GUZMAN-GUZMAN:

7    Q    To all brother counsels, did you or did you not, in your

8    answer, state that you were the supervisor of the Pine Grove

9    post?

10   A    Yes.

11   Q    In regard to the questions made by all brother counsels,

12   you mentioned a criteria for interviews when the transition

13   occurred; is that correct?

14   A    What are you talking about?

15   Q    You indicated to this Court, you stated that Attorney

16   Maria Elisa Santiago established the criteria for the

17   interviews to fill the openings on Pine Grove; is that

18   correct?

19   A    Yes.

20   Q    I ask you, did Ms. Maria Elisa Santiago handed you a

21   questionnaire to do the interview; yes or no?

22   A    I don't recall.

23   Q    Did you -- let me rephrase that.

24          Did you did those interviews by yourself; yes or

25   no?

1    A    (No translation because counsel didn't allow for

2    translation.)

3            MR. A. GUZMAN-GUZMAN:  Your Honor, the witness is

4    not answering the question.

5            THE COURT:  Ma'am, yes or no.

6            THE WITNESS:  Please repeat the question.

7    BY MR. A. GUZMAN-GUZMAN:

8    Q    Did you did those interviews by yourself; yes or no?

9    A    No.

10   Q    So, for me to understand, at the same time that you were

11   doing the interview, was another person there with you

12   interviewing the candidate?

13   A    No.

14   Q    How many security guards were posted at Pine Grove while

15   you were the supervisor there?

16   A    There were three guards, me included, and one in case

17   there was an absence.

18   Q    When you mean runners, you mean these persons or

19   personnel that will cover in case there is an absence?

20   A    Yes.

21   Q    My question was in the beginning that how many were

22   posted, and I mean -- I am going to rephrase that.

23            How many were posted at the same time?  Just one

24   guard?  Two guards?  How many?

25   A    It was a total of five because we had three that would

 1  cover the fixed shifts, and then two for days off.

 2  Q    I think my question was not understand.

 3          At the same time, supposed it's 12 o'clock, how

 4  many guards are working at 12 o'clock?

 5  A    One per shift.

 6  Q    You explained to brother counsel that in the assistant

 7  sheet that you mentioned, that it's not the same as we saw

 8  before, that there was a part there to say if the guard was

 9  on route or runs or these are Rs; is that correct?  It's

10  marked with an R if they were on routes or runs?

11  A    I said that in my case, for my position, when I was

12  asked a question, since it was the guard booth, there was no

13  rounds.  So it was only used guard booth.

14  Q    Thank you for the answer.

15          MR. A. GUZMAN-GUZMAN:  I am trying to be as concise

16  as I can, Your Honor.  Trying to finish fast.

17  BY MR. A. GUZMAN-GUZMAN:

18  Q    So when you mentioned that you were a supervisor at Pine

19  Grove, what were your duties as a supervisor?

20  A    I was in charge of the documentation and requesting that

21  it be filled out.  I was in charge of making sure that the

22  shifts were covered in excellent fashion, that the visitors

23  register was kept, and that the duties were carried out in

24  excellent fashion and that the cameras were operating.

25  Q    And you were doing those functions on behalf and

```
 1    interest of the condominium, of Pine Grove?

 2              THE COURT:  Don't answer.

 3              MR. GLICK:  The phrase "for the interest" strikes

 4    me as a legal framing.  That is a problem.

 5              THE COURT:  It does.

 6              And I have an issue with the way the question is

 7    formed, so please refrain.

 8              Objection sustained.

 9    BY MR. A. GUZMAN-GUZMAN:

10    Q    When you were working for Special Police in Pine Grove,

11    do you follow the criteria of --

12              THE COURT:  The criteria was for recruitment, and

13    the question you posed now was when she was working.

14              MR. A. GUZMAN-GUZMAN:  May I approach the bench,

15    Your Honor?

16              THE COURT:  Yes.

17              (Whereupon, the following proceedings were held at

18    sidebar:)

19              MR. A. GUZMAN-GUZMAN:  Your Honor, I think she has

20    mentioned, and in every interrogatory done before me, the

21    directs or cross, that she followed criteria of the

22    condominium, that she followed the interest --

23              THE COURT:  For the interviews of the candidates.

24    The word "criteria" was not used for that purpose.

25              MR. A. GUZMAN-GUZMAN:  Exactly.  I was trying to
```

1    answer your question because she has been establishing that

2    she was trying in all ways to please the condominium.  The

3    condominium just gave her work after -- or at least I

4    understand that, and that is my direction on the

5    interrogatory.  I want to know who hired her, and she

6    established it was the same Maria Elisa.

7              THE COURT:  It's a subcontractor.  Her testimony is

8    that she was employed by Special Police Force, and that

9    company was subcontracted by the condominium, provided

10   service.  That happens every day.  She was there providing a

11   service, and she was employed by someone else.

12             MS. JACOBS:  I am a little confused as to this

13   because I don't know if she is on the Special Police payroll.

14   Are they trying to claim she didn't work for Special Police

15   Force?

16             THE COURT:  No.

17             I think maybe you should sue her as to that, as

18   part of the --

19             MR. A. GUZMAN-GUZMAN:  We are learning about this

20   right now.

21             THE COURT:  You should have sued her as well.

22             MR. A. GUZMAN-GUZMAN:  I withdraw the question,

23   Your Honor.

24             (Back on the record.)

25             THE COURT:  She is an employee, period.

```
1    BY MR. A. GUZMAN-GUZMAN:

2    Q    You stated before that there were at the beginning one

3    director of operations; is that correct?

4    A    There always has been one, yes.

5    Q    I ask you if Jonathan Andujar has always been the

6    director of operations of Special Police?

7              MR. GLICK:  Objection.

8              THE COURT:  Sustained.  Mischaracterizes her

9    testimony.

10             She has said, at the beginning it was Andujar, and

11   then it was Freddy De Jesus.

12             MR. A. GUZMAN-GUZMAN:  I will rephrase the

13   question.

14             THE COURT:  That has already been covered.

15   BY MR. A. GUZMAN-GUZMAN:

16   Q    When Freddy De Jesus was the director of operations, as

17   you stated before, what was the position of Jonathan Andujar?

18             MR. GLICK:  Objection.  Foundation.

19             THE COURT:  Please repeat the question.

20   BY MR. A. GUZMAN-GUZMAN:

21   Q    As you stated before, when Freddy De Jesus -- I want to

22   specify at the second time, she stated two times -- was the

23   director of operations, what was the position of Freddy

24   De Jesus?

25             THE COURT:  Overruled.
```

1          Please answer?

2          THE WITNESS:  I don't know because Mr. Andujar

3     stopped going to the complex.  I never saw him again.

4     BY MR. A. GUZMAN-GUZMAN:

5     Q    The Exhibit 3 that you already took a look

6     substantially, and you described that it's familiar to you,

7     at the end of the table, it says, the total of work hours,

8     was signed by somebody?

9          THE COURT:  We already stipulated that she has no

10    knowledge as to the content, handwritten portions of that

11    document, so she cannot testify as to that.

12         MR. A. GUZMAN-GUZMAN:  May I approach the bench,

13    Your Honor, please?

14         THE COURT:  No.  Please rephrase the question,

15    simply as to the columns.  Not as to a specific portion

16    handwritten there.

17         MR. A. GUZMAN-GUZMAN:  Your Honor, we are not going

18    to the specifics of that document.  The documents that she is

19    familiar with, we are laying our foundation for our next

20    question.

21         I am going to rephrase the question.

22    BY MR. A. GUZMAN-GUZMAN:

23    Q    Did the supervisor in any way sign or initial or set his

24    initial on that document, on the assistant record?

25    A    When they run a supervisor post, they would sign the

1  payroll as if having been attended and -- as having been

2  present, and then would fill out the book as having visited

3  the post.

4  Q    Okay.  You just said the supervisor of the shift; is

5  that right?

6  A    Yes.  Let me explain.

7          MR. A. GUZMAN-GUZMAN:  Your Honor, may I have

8  Exhibit 3?

9          THE COURT:  Yes.  It's almost 12:30, and we need to

10  take a break very soon.

11          MR. A. GUZMAN-GUZMAN:  Well, if the Court will

12  allow me just one last question.

13          THE COURT:  Yes.

14          MR. A. GUZMAN-GUZMAN:  Then we can break.

15  BY MR. A. GUZMAN-GUZMAN:

16  Q    I am going to show you page 1 as an example of the shift

17  that you just said that you were familiar with?

18          MR. GLICK:  Your Honor, I would just hope that we

19  are getting beyond page 1 very quickly after this foundation

20  is laid.

21          THE COURT:  I don't know.

22  BY MR. A. GUZMAN-GUZMAN:

23  Q    Whose initials are there at the end?

24          THE COURT:  She cannot testify as to that.  She

25  doesn't know.

1          You can ask her what she did in those documents

2    when she had -- if she had to sign them, but not as to this.

3    She cunt know.

4          MR. A. GUZMAN-GUZMAN:  Let me rephrase the

5    question.

6          THE COURT:  Please.

7    BY MR. A. GUZMAN-GUZMAN:

8    Q    There are initials there at the end.  What position in

9    the company will be the person who makes those initials?

10          THE COURT:  Don't answer.

11          Grounds?

12          MR. GLICK:  If I understood the form of the

13    question, it was so related to the particular page 1, but --

14    I withdraw the objection.

15          THE COURT:  Please answer.

16          THE WITNESS:  Could you please repeat the question.

17          (Whereupon, the interpreter repeated the

18    question.)?

19          THE WITNESS:  I can't answer about a document

20    that's not familiar to me.

21    BY MR. A. GUZMAN-GUZMAN:

22    Q    You told this Court that you were familiar with that

23    document.  You described it as your document.

24    A    In my payroll sheets at Pine Grove -- in my payroll

25    sheets and attendance sheets as Pine Grove, which were

1   specific, because they had to be made new because they --

2   many of them were made as new documents.  There was a space

3   there that said "supervisor's signature."  I would sign.  And

4   if I didn't sign because I was off, then the field supervisor

5   would sign.  He is the one that would cover the various

6   routes.

7   Q    Now I am confused again?

8            THE COURT:  Okay.  We are going to take the break

9   now.

10           Ms. Ortiz, you remain under oath during the lunch

11   break.  I tried to accommodate the request that you be

12   released after lunch, but it has been impossible, as you have

13   seen.  So we will be resuming at 1:30.

14           Please do not discuss your testimony in anyone

15   during the break.  If you need an appearance by the Court

16   certifying that you were here, it will gladly be prepared for

17   you.

18

19           (PROCEEDINGS SUSPENDED AT 12:30 P.M.)

20           (PROCEEDINGS RESUMED AT 1:50 P.M.)

21

22           THE COURT:  Let's continue with the

23   cross-examination of Ms. Ortiz.

24           You can take the stand.

25           Good afternoon.

1          Go ahead.

2          MR. A. GUZMAN-GUZMAN:  Good afternoon.

3          For the record, this is Attorney-at-law Arturo

4     Guzman on behalf of Freddy De Jesus.

5     BY MR. A. GUZMAN-GUZMAN:

6     Q    Last question was in regard to the assistance document

7     that you had at Pine Grove, that you told us that was

8     different from the one shown at Exhibit 3, shown to you

9     before as Exhibit 3; is that correct?

10    A    Yes.

11    Q    The last question you testified that on the document

12    from Pine Grove, there wasn't a space for the supervisor; is

13    that correct?  There wasn't a space, a blank.

14          You testified that -- because it has a space for

15    the supervisor to sign; is that correct?

16    A    Yes.

17    Q    Who were the persons or person to sign in that

18    supervisor space?

19    A    There were several supervisors.

20    Q    Okay.  I am going to ask you that question, you as the

21    supervisor, did you ever sign your name in that space?

22    A    When the route supervisor did not attend the shift to

23    supervise, then, yes.

24    Q    What were the names of the other supervisors that you

25    said also signed that space?

1    A    Again, I will repeat that there were several field

2    supervisors.  I do not remember exactly all of their names,

3    but there were several.  There were gentlemen, and I remember

4    there was also one lady.  I can't remember their last names.

5    Q    You don't remember the last name of none of them?

6    A    Of the supervisors who went to the field, there were

7    several of them.  I can't remember.  I don't remember.

8    Q    You testified before that you interviewed some person on

9    the first instance for people to be hired for Pine Grove,

10   security guards; right?

11           We know that Special Police hired those persons or

12   most of the persons that you recommended; is that correct?

13           MR. GLICK:  Objection.  The characterization of the

14   relationships between companies is becoming -- I think

15   stating a conclusion.

16           THE COURT:  And I believe the question

17   mischaracterizes the testimony that the witness gave

18   previously, because I don't think her answer was that on most

19   occasions they were hired.

20           So, please rephrase.

21           Objection sustained.

22           And she is not here to draw any legal conclusion.

23           MR. A. GUZMAN-GUZMAN:  I withdraw the question.  I

24   will rephrase it.

25

```
1   BY MR. A. GUZMAN-GUZMAN:

2   Q    When there was the transition of the companies, you

3   interviewed personnel for Special Police; is that correct?

4   A    No.

5         MR. A. GUZMAN-GUZMAN:  I have no further questions,

6   Your Honor.

7         THE COURT:  Redirect.

8                    REDIRECT EXAMINATION

9   BY MR. GLICK:

10  Q    Good afternoon, Ms. Ortiz.

11  A    Good afternoon.

12  Q    I will try to be very brief.

13        The period of time that you interviewed people for

14  Special Police Force, was that sometime after the transition

15  to Special Police Force or --

16        UNIDENTIFIED COUNSEL:  Objection, Your Honor.  This

17  is attorney.

18        THE COURT:  He hasn't even finished posing the

19  question, so it's premature.

20        UNIDENTIFIED COUNSEL:  Sorry.

21  BY MR. GLICK:

22  Q    The period of time that you interviewed people for

23  Special Police Force, was that at the time of the transition

24  to Special Police Force or sometime later?

25  A    It was sometime after.
```

1    Q    Do I understand correctly that your testimony was that

2    it was approximately one month to one and a half months that

3    you were doing that interviewing role?

4    A    Yes.

5    Q    In relation to the time that you resigned from Special

6    Police Force, can you describe how long before that you were

7    doing that one to one and a half months of recruiting.

8    A    By the time with respect to the process of interviews,

9    quite some time had passed by the time I resigned.

10   Q    Now, during your testimony you used the phrase "director

11   of operations" from time to time.  Was the term "director of

12   operations" ever used to refer to someone at Pine Grove, or

13   was it always Special Police Force, or some combination?

14   A    Special Police Force.

15   Q    Always Special Police Force?

16   A    Yes.

17         MR. GLICK:  I have no further questions at this

18   time.

19         THE COURT:  Okay.

20         Any recross, Mr. Izquierdo, based on those

21   questions?

22                    **RECROSS-EXAMINATION**

23   BY MR. RODRIGUEZ-IZQUIERDO:

24   Q    Witness, referring to the position of director of

25   operations --

1          THE COURT:  I will not allow now questioning about

2     the director of operations.  It was very simple.  If it was

3     from Pine Grove or Special Police Force.  That's it.  I will

4     not allow anything beyond that.  Mr. Glick was very concise.

5          MR. RODRIGUEZ-IZQUIERDO:  I have no further

6     questions.

7          THE COURT:  Okay.

8          Mr. Benjamin Guzman?

9          MR. B. GUZMAN-GUZMAN:  No questions.

10          THE COURT:  Mr. Arturo Guzman?

11          MR. A. GUZMAN-GUZMAN:  No questions.

12          THE COURT:  You are excused, ma'am.  Thank you.

13          (Witness excused.)

14          THE COURT:  I have some arrests that I have to take

15     care of.  I have a complaint that I have to redo in chambers

16     and some search warrants, so bear with me.  I am going to

17     take care of that.

18          Who would be the next witness?

19          MR. GLICK:  The Plaintiff would next call Mr. Jose

20     Vazquez.

21          THE COURT:  Okay.

22          MR. GLICK:  And it will take some time, I expect.

23          THE COURT:  Okay.  So let me take care of the

24     matters, and then I will be back, and we will resume with the

25     testimony.

1        MR. GLICK:  Thank you, Your Honor.

2        THE COURT:  Thank you.

3

4        (PROCEEDINGS SUSPENDED AT 2:00 P.M.)

5        (PROCEEDINGS RESUMED AT 2:30 P.M.)

6        THE COURT:  So the witness will be?

7        MR. GLICK:  Mr. Jose Vazquez.

8        THE COURT:  Please take the witness stand.

9

10                      **JOSE VAZQUEZ,**

11            after having been first duly

12        sworn or affirmed upon oath, was examined

13              and testified as follows:

14

15        THE COURT:  Go ahead.

16        MR. GLICK:  Thank you, Your Honor.

17                  **DIRECT EXAMINATION**

18  BY MR. GLICK:

19  Q    Good afternoon, Mr. Vazquez.

20  A    Good afternoon.

21  Q    Could you start by letting us now where are you

22  currently employed?

23  A    I am currently employed by the U.S. Department of Labor,

24  Wage and Hour Division, for the Caribbean District Office.

25  Q    What geographic area does the Caribbean District Office

1    cover?

2    A    We cover Puerto Rico and the U.S. Virgin Islands.

3    Q    What is your position?

4    A    I am the district director.

5    Q    And, just generally speaking, what are your

6    responsibilities as a district director at the Wage and Hour

7    Division?

8    A    I am in charge of minding all the compliance,

9    enforcement and education, and components of the Wage and

10   Hour Division.

11   Q    And could you tell us a little bit about what

12   enforcement involves.

13   A    Enforcement, basically we go to the field.  We do

14   investigations, check in for compliance of the different laws

15   that we enforce.

16   Q    What are the laws that the Wage and Hour Division

17   enforces?

18   A    We enforce a large number of our laws, but mainly we do

19   the Fair Labor Standards Act, and we also enforce the Family

20   Medical Leave Act.  We also work with the Migrant Seasonal

21   Workers Protection Act, and the Service Contract Act.

22   Q    Now, specifically for Fair Labor Standards Acts

23   investigations, what kinds of issues do those investigations

24   look into?

25   A    Well, basically we cover three areas.  The first one is

```
 1   section 6, minimum wage violation; section 7, overtime

 2   violation; and section 11, recordkeeping violations.

 3   Q    About how many investigations does your office conduct

 4   in an average year?

 5   A    Here in Puerto Rico, we conduct around 180 to 200 for

 6   the same investigations per year.

 7   Q    Now, I would like to ask some questions specifically

 8   about this case.  Were you ever involved in an investigation

 9   regarding a company called Special Police Force?

10   A    Yes, I was involved.

11   Q    What was your role?

12   A    At that point in time I was the direct supervisor of the

13   investigator that was doing the investigation.

14   Q    What did that involve as a direct supervisor on the

15   investigation?

16   A    At that point, basically I had to check that everything

17   that is going on in the investigations is corresponding to

18   law.  I have to check the file and attend meetings, depending

19   on situations.

20   Q    How much contact, if any, did you have with the

21   investigator in that case as a direct supervisor?

22   A    Well, we have a common practice in the office that every

23   time an investigator goes to field for an initial conference,

24   at the end of the day, the investigator should go back to the

25   office and report to the direct supervisor.
```

1   Q     In this case involving Special Police, who was the

2   investigator?

3   A     The investigator was Ms. Myrta Negron.

4   Q     Does Ms. Myrta Negron still work at the Wage and Hour

5   Division?

6   A     No.  She retired back in December 2017.

7   Q     As an investigator, what was Ms. Negron's role in the

8   investigation into Special Police Force?

9   A     Well, the main role as an investigator is to check for

10  compliance, and they go to the field.  And they do

11  investigations, and they check for compliance with the law.

12  Q     In this investigation, once the investigation was

13  opened, do you know what -- what was the first thing that

14  happened in the investigation?

15  A     Well, the first thing that happens on any investigation

16  in our office, the investigator has, basically, two ways to

17  start an investigation.  They do an appointment and visit the

18  employer or visit the firm.  Or they just walk in as a...

19  Q     Do you know which of those happened in this case?

20  A     In this one, she made an appointment with the firm.

21  Q     And in this investigation, do you know what happened

22  after that appointment was made?

23  A     She made an appointment, and she went ahead with the

24  initial conference after two days.  She made the initial

25  appointment.

1   Q     Do you know when the initial conference took place in

2   this case?

3   A     The initial conference was July 1st, 2014.

4   Q     What happens at an initial conference, generally

5   speaking?

6   A     We basically meet with the responsible person in the

7   firm, and we get information about the general operations of

8   the firm.  We usually ask for records.  We usually ask for

9   information about who is the president, who are the Board of

10  Directors, and if they have any branches, how many employees

11  they have.  And we usually ask for the profile work week of

12  records.  And that's basically the initial conference.

13  Q     In this case, do you know where the initial conference

14  took place?

15  A     At the establishment of Private Police.

16  Q     Which establishment?

17  A     At the main office.

18  Q     Were you personally present at the initial conference?

19  A     No, I wasn't.

20  Q     Are you familiar with some of the details of the initial

21  conference in this case?

22  A     Yes, I am familiar.

23  Q     How is it that you are familiar?

24  A     I am familiar because I was in charge of that

25  investigator at that point.  As I told you before, we usually

1    meet after the initial conference.  And I also have to review

2    the file for correctness, so I was familiar with it.

3    Q    Can you tell us more about what a file involves at the

4    Wage and Hour Division.

5    A    Every complaint action or investigation has a file, and

6    where we keep all the information, and we prepare a case

7    diary.  We keep a case narrative.  We keep all the records

8    that we received from the employer.  And we also keep all the

9    interviews that were made on that investigation.

10   Q    Is it the regular practice of the Wage and Hour Division

11   to maintain a case file with those documents?

12   A    Yes.  That's our regular practice.

13   Q    Is there a case narrative in this case?

14   A    There is one case narrative, of course.

15   Q    What about a case diary?

16   A    There is one also.

17   Q    And are there any other documents in the case file for

18   this case?  What kinds of documents, if any?

19   A    Usually investigators, they take notes at the initial

20   conference, and they have a special form for taking notes.

21   And we also have all the notes that investigator took at the

22   initial conference.

23   Q    In this case involving Special Police Force, did the

24   investigator take notes at the initial conference?

25   A    Yes, she did.

1    Q    Are those notes maintained in the case file?

2    A    Those are in the case file, correct.

3    Q    Did the investigator, Ms. Negron, take those notes as a

4    regular practice, as part of her duties at the Wage and Hour

5    Division?

6    A    Yes.  That's our regular personal cases, of course.

7    Q    Is it the Wage and Hour Division's practice to maintain

8    those notes as part of the case file?

9    A    Yes.

10   Q    Have you reviewed those initial conference notes?

11   A    Yes, I did.

12   Q    Now, in this case, what, if anything, do you know about

13   what transpired at the initial conference?

14   A    At the initial conference, she met with the president of

15   the company, Mr. Rivera.  At that meeting there was also the

16   accountant of the firm, Mr. Torres.  They basically went over

17   the questions that we usually perform or do.  They answer all

18   the questions.  We receive a payroll profile and pay period

19   profile also.  The regular things that we do on an initial

20   conference.

21   Q    I want to go back to something for just one moment.  Do

22   you know in this case specifically whom Ms. Negron contacted

23   to set up the initial conference?

24   A    Mr. Rivera.

25   Q    Specifically, what did the Wage and Hour Division learn

1  at the initial conference involving Special Police Force

2  about the company or its payroll practices, generally?

3  A    Well, at the initial conference we learned that the sole

4  proprietor was Mr. Rivera of the company.  Of course, the

5  accountant, Mr. Torres.  We also received some profile pay

6  period, profile -- yes, it was one week of profile pay

7  period, and we also found just by looking at those profile

8  pay period that there were some violations in terms of

9  overtime work.

10  Q    I may come back to that last point, but I want to ask,

11  did the Wage and Hour Division learn anything during the

12  initial conference about the size of the business?

13  A    Obviously, we have to establish our jurisdiction.  So,

14  yes, we ask questions regarding interstate commerce, and we

15  ask questions about the annual dollar volume.

16  Q    And what did the Wage and Hour Division learn at the

17  initial conference about the annual dollar volume of Special

18  Police Force?

19  A    It was more than half a million dollars, so we have

20  jurisdiction.

21  Q    Who reported that information at the initial conference?

22  A    Mr. Torres and Mr. Rivera were in the initial

23  conference.

24  Q    Did the Wage and Hour Division learn at the initial

25  conference who prepared Special Police Force's payroll?

1    A    Yes.  That was one of the questions that we usually ask

2    in the initial conference.  And the answer was that

3    Mr. Rivera, Mr. Torres were in charge of the payroll records.

4    Q    Now, I believe you testified that the company provided

5    some records at the initial conference such as profile work

6    week records.  Did the Wage and Hour Division request any

7    additional records at the initial conference?

8    A    Yes.  We usually request two years of records.

9    Q    And what about specifically at this initial conference,

10   do you know if that request was made?

11   A    Yes, the request was made.

12   Q    Now, I would like to ask some more questions

13   specifically about the payroll records of Special Police

14   Force.  At any time subsequent to the initial conference, did

15   Special Police Force provide additional records to the Wage

16   and Hour Division?

17   A    Yes, they did.  I believe Ms. Negron made another call

18   at some point during that month of July 2014 and requested

19   more records, and I -- we received those records, of course.

20   Q    What kinds of records did Special Police Force provide?

21   A    We basically received payroll records and payroll and

22   attendance sheets for the last two years at that point.  From

23   that point back.

24   Q    Now, based on your understanding of the recordkeeping

25   requirements of the Fair Labor Standards Act, was any

1   information missing from the records that Special Police

2   Force provided?

3   A     Yes.  There was a lot of information missing from those

4   records.

5   Q     What was missing?

6   A     First of all, we looked at the payroll registers.  They

7   didn't have any addresses of the employees, and they didn't

8   have any overtime work recorded.  There were no overtime pay

9   premium recorded on those records.  And there was no

10  segregation of weeks as the recordkeeping regulations

11  establish.

12  Q     Can you explain more about what you mean by segregation

13  of weeks as required.

14  A     Yes.  For the Fair Labor Standards Act, each week stands

15  by itself.  So the Fair Labor Standards Act establishes that

16  if you work over 40 hours a week, you are entitled to

17  overtime pay premium.  So you have to segregate each work

18  week.

19  Q     I apologize if this question is obvious, but when you

20  say work week, how long is a work week?

21  A     Work week is a 7-day consecutive workdays.

22  Q     And why is it that the Wage and Hour Division looks for

23  records to be segregated by work week during an

24  investigation?

25  A     In order to establish if there was overtime work in

1    excess of law, work on excess of 40 hours in a week.

2         MR. GLICK:  At this time I would like to show

3    Mr. Vazquez Exhibit 2, which I believe the -- Defense Counsel

4    has previously stated they have no objection to, but

5    obviously...

6         THE COURT:  Are there no objections to Exhibit 2

7    being admitted?

8         Mr. Rodriguez?

9         MR. RODRIGUEZ-IZQUIERDO:  No, no objection,

10   Your Honor.

11        THE COURT:  None from Mr. Arturo Guzman and

12   Mr. Benjamin Guzman?

13        MR. A. GUZMAN-GUZMAN:  No, Your Honor.

14        This is Arturo Guzman, for the record.  No, no

15   objection.

16        THE COURT:  Mr. Guzman.

17        MR. B. GUZMAN-GUZMAN:  Just give me a second,

18   Your Honor.

19        THE COURT:  Okay.

20        MR. B. GUZMAN-GUZMAN:  No objection, Your Honor.

21        THE COURT:  Admitted as Exhibit 2.

22        MR. GLICK:  Thank you, Your Honor.

23   BY MR. GLICK:

24   Q    Mr. Vazquez, do you recognize this document, Exhibit 2?

25   A    Yes.  That's a payroll record from Special Police Force

1    Corporation.

2    Q    Now, do you see in the bottom right corner of Exhibit 2,

3    where it says page 1 of 22?

4    A    Yes, I do.

5    Q    Do you know whether Special Police Force provided more

6    than 22 pages of payroll spreadsheets during the

7    investigation?

8    A    Yes, they did, of course.

9    Q    Is it fair to say that this is an excerpt of those

10   payroll spreadsheets?

11   A    Correct.

12   Q    Now, ideally I would ask you to look at pages 1 through

13   5, and then ask some questions.

14         MR. GLICK:  May I approach the witness for those

15   five pages?

16         THE COURT:  Sure.

17         MR. GLICK:  Thank you.

18   BY MR. GLICK:

19   Q    Now, Mr. Vazquez, regarding pages 1 through 5 of

20   Exhibit 2, what information do these spreadsheets pages have

21   about employees hours?

22   A    Well, this is a payroll record from the week of May 16

23   to May 31st of 2013.  We have the regular pay rate.  We have

24   the hours worked.  We have the gross payment and the net

25   payment of hours worked.

1   Q     How long of a period is May 16th through May 30th?

2   A     That's a 15-day period or semi-monthly pay period.

3   Q     I apologize.  I want to repeat the question.  I

4   misspoke.

5             The period from May 16th to May 31st, how long is

6   that period?

7   A     It's a 15-day pay period.

8   Q     Now, from this page of Exhibit 2, are you able to tell

9   whether employees worked overtime during this period?

10  A     From a simple -- taking a look at simple -- yes.  Yes.

11  Q     And how is it that you are --

12  A     This is overtime work because in a 15-day period or a

13  semi-monthly pay period, if you work more than 80, 88, or 96

14  hours, probably there will be overtime.

15  Q     Are there employees, according to page 1, who worked

16  more than 96 hours during that period, May 16th to May 31st?

17  A     Yes.

18  Q     Could you give us an example?

19  A     The first one, Anel Gotai (phonetic).

20  Q     Which column is it that you are looking at?

21  A     Anel Gotai is on the first line, the fourth column,

22  under hours.

23  Q     How many hours did he work?

24  A     112 hours.

25  Q     Is there anywhere in Exhibit 2 that breaks down the

1   hours employees worked, up to 40 hours in a work week, or

2   above 40 hours?

3   A    No.

4   Q    Does Exhibit 2 have any information -- from the pages

5   that you reviewed of Exhibit 2, does Exhibit 2 have any

6   information about the total wages due to employees?

7   A    Yes.  At gross pay and the net pay.  Under gross pay and

8   net pay.

9   Q    Do these pages of Exhibit 2 have any information

10  specifically about the wages due for just the first 40 hours

11  worked in a given work week?

12  A    No, they don't have any information.

13  Q    What about the wages due specifically for the straight

14  time hours worked each day?

15  A    No, there is no information about that neither.

16  Q    In pages 1 through 5 of Exhibit 2, does it contain any

17  information about employees' home addresses?

18  A    No, there is no information about addresses.

19            MR. GLICK:  Now I would like to take a moment to

20  show the witness the rest of Exhibit 5, pages 6 through 22.

21            UNIDENTIFIED COUNSEL:  Exhibit 2 or Exhibit 5?

22            MR. GLICK:  Exhibit 2.  I apologize.

23  BY MR. GLICK:

24  Q    So let me next ask, have you had an opportunity,

25  Mr. Vazquez, to review those remaining pages, or do you need

1   more time?

2   A    No.  It's okay.  I have been able to review them.

3   Q    Do any of the remaining pages of Exhibit 2 have any

4   information about employees' home addresses?

5   A    No, there is no information on employees' home

6   addresses.

7   Q    What about the total hours worked in a work week, do any

8   pages of Exhibit 2 have that information?

9   A    Yes.

10  Q    Is there a particular page that you are referring to?

11  A    Page 12.  On page 12 we see that the employer did

12  segregate the weeks in two weeks, two pay period.  Week 7/29,

13  that's July 29, to August 4 of 2014, and the week of August 5

14  to August 11 of 2014.  Those -- at that point on -- okay.  At

15  that point there were two weeks on the records.

16  Q    Do I understand correctly that from approximately

17  July 29th, 2014, on, the pages of Exhibit 2 do begin to

18  contain information about hours specifically broke down by

19  work week?

20  A    Right, yes.

21  Q    Now, do any pages of Exhibit 2 have information about

22  the wages due specifically for hours worked in excess of 40

23  in any given work week?

24  A    No, there is no information about hours worked in excess

25  of 40 per work week.

1  Q    What about the wages due specifically for hours in

2  excess of 40?

3  A    No, there is no information about wages due.

4  Q    Any information about wages due specifically for the

5  first 40 hours in a given work week?

6  A    Yes.  There is regular pay rate and the hours -- the sum

7  of the hours.

8  Q    Is there any information on the face of Exhibit 2 about

9  the total amount due for those hours, specifically the hours

10 up to 40 in a work week?

11         MR. B. GUZMAN-GUZMAN:  Objection, Your Honor.

12         Attorney Benjamin Guzman.

13         It's broad.

14         THE COURT:  Identify yourself, and then.

15         MR. B. GUZMAN-GUZMAN:  Attorney Benjamin Guzman.

16         The objection, it's on the grounds that the

17 question is broad because the document, Exhibit 2, has 22

18 pages.  And already we know that from page 12 on they are

19 different, they have a different column.  And he is asking

20 for the whole document on this particular question.

21         THE COURT:  So you want him to go page by page

22 after 12?

23         MR. B. GUZMAN-GUZMAN:  To identify which pages he

24 is referring to in the question, before July 29th or after

25 July 29th, which he identified on page 12 as the date of the

1    change.

2            MR. GLICK:   Could I ask another question,

3    Your Honor?

4            THE COURT:   Yes.

5    BY MR. GLICK:

6    Q    From page 12 through page 22, is there any information

7    about the total pay employees are due specifically for the

8    first 40 hours worked in a work week?

9    A    Yes, we have information about that, about the first 40

10   hours worked within a pay period.

11   Q    And what information is that?

12   A    We have the hours worked.  We have the regular rate of

13   pay.  We have the total hours worked and the gross pay.  All

14   hours worked were paid straight time.

15   Q    Is the gross pay broken down in any way?

16   A    No.  No, there is none.

17   Q    If I could call your attention to page 17 of Exhibit 2.

18            What period of time does page 17 of Exhibit 2

19   correspond to?

20   A    This first week is November 18 to November 24; that's

21   the first week.  Second week is November 25th to December

22   1st, 2014.

23   Q    Now, from page 17, can you tell if employees of Special

24   Police Force worked in any excess of 40 hours in a work week?

25   A    Yes.  From this record, we can see that in some

1   instances, there are employees that worked more than 40 hours

2   on a given week.

3   Q    How can you tell?

4   A    If we look at, for example, the column under week 11/18

5   to the 24, you can see that for Angel Ayala, for example, we

6   see that he worked 48 hours that week.

7           MR. GLICK:  Excuse me one moment, Your Honor.

8   BY MR. GLICK:

9   Q    Now, Mr. Vazquez, can you explain why it's important or

10  why it's required, based on your understanding, for an

11  employer to break out the hours up to 40 and over 40 on the

12  payroll records?

13  A    Yeah, because the law basically states that in excess --

14  if you work in excess of 40 hours a week, you are entitled to

15  overtime pay.

16  Q    Now, I would like to turn next to Exhibit 3.

17          MR. GLICK:  May approach the witness to retrieve

18  these pages?

19          THE COURT:  Yes.

20  BY MR. GLICK:

21  Q    Now, Mr. Vazquez, I am showing you what's been marked as

22  Exhibit 3.  Can you tell from the first page what Exhibit 3

23  is?

24  A    That's an attendance sheet for Special Police Force

25  Corporation -- the name of the post is Villa Venecia -- from

1    May 16 to the 31st of 2013.

2    Q    And what information does Exhibit 3 contain about

3    employees' hours?

4    A    We got the name of the employee.  We got the hour of the

5    beginning of the shift.  We got the hour of the end of the

6    shift.  We have the date and signature of the employee and

7    the total hours worked on that day.

8    Q    From the first page of Exhibit 3, is there any

9    information about the total hours each employee worked in a

10   7-day work week?

11   A    No, there is no information about the total hours worked

12   in a 7-day pay period.

13            MR. GLICK:  Your Honor, may I approach the witness

14   to show additional pages of Exhibit 3, the first three pages?

15            THE COURT:  Yes.

16   BY MR. GLICK:

17   Q    Mr. Vazquez, I am now showing you the first three pages

18   of Exhibit 3.

19            Can you tell if those pages correspond to the same

20   post, or are they from different posts?

21   A    No.  It's basically the same post.

22   Q    Is it the same dates or different dates?

23   A    Same dates.

24   Q    Is there any information on the first three pages of

25   Exhibit 3 about the total hours each employee worked in a

1   7-day work week?

2   A    No, there is no information on it.

3   Q    Do those three pages contain any information about

4   employees' pay?

5   A    No.  There is no information about the employees' pay.

6   Q    What about home addresses?

7   A    No home addresses neither.

8          MR. GLICK:  Now I would like to show the witness

9   the remaining pages of Exhibit 3, four through twelve.

10          THE COURT:  Yes.

11  BY MR. GLICK:

12  Q    Mr. Vazquez, if you could take a few moments or as much

13  time as you need to review the remaining pages of Exhibit 3,

14  pages 4 through 12, and I am going to ask you some of the

15  same questions about those pages.

16          The remaining pages of Exhibit 3, pages 4 through

17  12, do they have any information about the total hours worked

18  by employees in a given work week?

19  A    No, there are no information about the hours worked on a

20  work week.

21  Q    What about employees' pay?  Any information about that?

22  A    No, there is no information about the pay rate.

23  Q    What about the total pay due?

24  A    No, there is no information about the total pay due.

25  Q    Any information about pay due?

```
 1   A     No.

 2   Q     What about employee addresses?

 3   A     No, there is no employee addresses.

 4   Q     Now, during the investigation, did Special Police Force

 5   provide any documents containing employees' home addresses?

 6   A     Yes, they did.

 7   Q     Was that information for all employees or some or...?

 8   A     Investigator Negron asked for those records, and she

 9   received partial records of employees' addresses.

10   Q     What do you mean by partial?

11   A     We received -- based on the number of employees that the

12   company has at that moment, we received a few addresses from

13   them.

14   Q     Do I understand correctly that it was for some employees

15   but not all employees?

16   A     For some employees, that's correct.

17         MR. GLICK:  May I approach to retrieve Exhibit 3,

18   Your Honor?

19         THE COURT:  Yes.

20   BY MR. GLICK:

21   Q     Now, you began to mention some additional conversations

22   between Investigator Negron and the company during the

23   investigation.  I would like to ask a little bit more about

24   that.

25         Do you know how many further conversations
```

 1   Ms. Negron had with any representatives of the company after

 2   the initial conference?

 3             UNIDENTIFIED COUNSEL:  Objection, Your Honor.

 4   There are no grounds for that.  He doesn't testify whether he

 5   had any personal knowledge of how many times she --

 6             THE COURT:  Well, he testified that he was the

 7   direct supervisor of the investigator, that they met daily

 8   every day, that there is a record kept in the regular course

 9   of business, so the objection is overruled.

10             Please answer.

11   BY MR. GLICK:

12   Q    After the initial conference, do you know if

13   Investigator Negron had additional conversations with

14   representative representatives of Special Police Force?

15   A    Yes, she did, of course.

16   Q    Do you know about how many additional conversations?

17   A    Maybe between six -- five or six times.

18   Q    What period of time was that during?

19   A    That was between the initial conference and the last

20   meeting that we had on December.

21   Q    December of what year?

22   A    Of 2014.

23   Q    How, if at all, were records or notes made of those

24   conversations between Ms. Negron and representatives of the

25   company?

1  A    As I said before, we keep what we call a case diary.

2  Every time an investigator does anything regarding the case,

3  she has to go into the system and make a notation.

4  Q    Do you know whom Ms. Negron contacted to obtain those

5  additional employee addresses that you mentioned?

6  A    The main point of contact was Mr. Rivera.

7  Q    Do you know approximately what date Ms. Negron contacted

8  Mr. Rivera to request that information?

9  A    From the case diary, at some point during the end of the

10 month of July, she made contact with Mr. Rivera to ask for

11 the records.

12 Q    Do you know how he responded?

13 A    I believe positive, because we received the records at

14 some point later.

15 Q    Do you remember the dates or any other details, or are

16 you familiar with any other dates or details of Ms. Negron's

17 contacts with Mr. Rivera during the investigation?

18           Let me start by asking about phone conversations.

19 A    I believe that they had a couple of phone conversations,

20 of course.

21 Q    What about any other meetings, specifically between

22 where Ms. Negron and Hector Rivera were present?

23 A    At some point, the end of July, beginning of August, we

24 had what we call pre-final conference, and we met -- I was

25 present at that meeting.  We met with Mr. Rivera, Mr. Torres,

1    and at that point they hired a legal representation, I

2    believe his name was Mr. Santiago.

3    Q    Where did that meeting take place?

4    A    We had a meeting at the district office.

5    Q    What was discussed at that meeting?

6    A    At that meeting, we discussed basically the preliminary

7    findings in the case.  We discussed the issue of the

8    overtime.  We discussed the computation that we already have

9    done regarding the debt in terms of the overtime that was

10   owed to the employees.  At that meeting we discussed the

11   financial situation of the company.  And I believe at that

12   meeting we also handed them a copy of the computations that

13   we had done.

14   Q    When you testified about the issue of the overtime, can

15   you explain more about what that issue was or what the

16   findings were regarding the issue of overtime?

17   A    Well, we find during our investigation that the -- all

18   the employees were paid straight time for overtime, that no

19   overtime was paid on excess of 40 hours per week.  So we

20   basically went and did the computations for all the hours

21   worked in overtime, and we presented those findings.

22         We also -- at that point when we entered, we

23   discussed about the situation -- the financial situation of

24   the company.  And we also discussed the regular practice here

25   in Puerto Rico.

1    Q     Let me ask a question.  Who said something about the

2    regular practice in Puerto Rico that you just mentioned?

3    A     Well, at that point I am not clear if Mr. Rivera or

4    Mr. Torres, they were discussing -- they --

5                MR. B. GUZMAN-GUZMAN:  Objection, Your Honor.

6                Attorney Benjamin Guzman.

7                The witness is not being responsive.  You asked who

8    was the person that mentioned the regular practice in

9    Puerto Rico, and he is not sure if it was Rivera or somebody

10   else.

11               THE COURT:  No.  He said he wasn't sure if it was

12   Rivera or Santiago; correct?

13               THE WITNESS:  That's correct.

14               THE COURT:  So he knows.  One or the other.

15               MR. B. GUZMAN-GUZMAN:  That would be the answer,

16   one or the other.

17               THE COURT:  No.  The answer was that he believed

18   that it was Hector Rivera or Santiago.

19               THE WITNESS:  No, Mr. Torres.

20               THE COURT:  And he is not sure which.

21               THE WITNESS:  Mr. Torres.

22               THE COURT:  Torres.  I am sorry.

23   BY MR. GLICK:

24   Q     Now, what was it that one of those people said or

25   discussed about that -- the general situation?

1    A    We were discussing that in order to be in business, in

2    order to have a security guard company in Puerto Rico and to

3    be in business, the regular practice here is to pay straight

4    time for overtime for all hours worked.

5         There is a lot of competition in the industry, and

6    they have to try to get the best rates available to be able

7    to compete in the field.

8    Q    That was an explanation that either Mr. Rivera or

9    Mr. Torres provided?

10   A    That was the explanation why they incurred in the

11   violation of the overtime.

12   Q    Now, subsequent to that meeting, did you personally

13   attend any other meetings during the course of this

14   investigation with representatives from Special Police Force?

15   A    Yes, I did.

16   Q    When was the next meeting?

17   A    We had a meeting maybe a couple of weeks later, at the

18   beginning of August or at the middle of August of 2014.  In

19   that meeting, we basically discussed the alternative of a

20   payment plan in order to cover for the debt.

21   Q    Where did that meeting take place?

22   A    In our district office.

23   Q    Who attended that meeting?

24   A    In that meeting the investigator; in that meeting

25   Mr. Santiago, the attorney for the company; Mr. Rivera and

1    Mr. Torres.

2    Q    And what was the outcome of that meeting?

3    A    We discussed a possible payment plan.  They were

4    requesting a three-year payment plan.  At that time we were

5    not able to give them a three-year payment plan.  Our limit

6    at that point is three years.

7            So, in order for us to give them special treatment,

8    in order to give them an extension of a payment plan, we

9    requested some financial documents.

10   Q    Were there any meetings that you participated in

11   subsequent to that meeting?

12   A    After that meeting, we met at the final conference.

13   Q    When was the final conference?

14   A    December of 2014.

15   Q    Where did that take place?

16   A    At the district office.

17   Q    Who was present?

18   A    Present in that meeting, the attorney for the firm,

19   Mr. Santiago; Mr. Torres was in that meeting; Mr. Rivera and

20   Mr. De Jesus.

21   Q    What was the outcome of that conference?

22   A    That conference, we informed the company that we were

23   able to give them an extensive payment plan for three years,

24   but at the same time they have to sign what we call an

25   enhanced compliance agreement.

```
1    Q    At that meeting, was an agreement signed?

2    A    No.

3    Q    Did you participate in any meetings after that final

4    conference with Special Police Force?

5    A    No.

6    Q    Now, Mr. Vazquez, other than the payroll records that

7    you have looked at today on the stand and the attendance

8    sheets you have looked at on the stand, did Special Police

9    Force provide any other kinds of records to Wage and Hour

10   Division during the investigation?

11   A    I believe we received some financial records.

12   Q    Any other kinds of payroll records?

13   A    No.

14   Q    Any other kinds of time records?

15   A    No.  Only the time sheets and the payroll records.

16   Q    The kinds that we looked at today, or some other kinds?

17   A    No.  The ones that we look at today.

18         MR. GLICK:  Your Honor, I have no further questions

19   at this time.

20         THE COURT:  Cross?

21         MR. GLICK:  The Exhibits 2 and 3, shall I return

22   them?

23         THE COURT:  Yes.

24         Cross, Mr. Rodriguez?  Or who is going to cross

25   first?
```

1          MR. RODRIGUEZ-IZQUIERDO:  Your Honor, I believe

2     that brother counsel Benjamin will be conduction the first.

3               THE COURT:  Okay.

4

5                       **CROSS-EXAMINATION**

6     BY MR. B. GUZMAN-GUZMAN:

7     Q     Good afternoon, Mr. Vazquez.

8     A     Good afternoon.

9     Q     How long have you been at the U.S. Department of Labor

10    division that you conduct -- that you direct?

11    A     I have been a district director for the past 11 years.

12    Q     You have testified that you had over 180

13    investigations -- I did not catch -- was that a year or a

14    month?

15    A     A year.

16              THE COURT:  Is it 180 or 280?

17              THE WITNESS:  180 to 200.

18              THE COURT:  Okay.

19    BY MR. B. GUZMAN-GUZMAN:

20    Q     And were you the supervisor of all those investigations?

21    A     No.

22    Q     You talked about the work of Ms. Myrta Negron.  Am I

23    correct, Myrta Negron?  She was the field investigator in

24    this case.

25    A     Exactly.

```
 1   Q    The first thing she did was to make an appointment, as

 2   you stated before.  And you also stated that she called

 3   Mr. Rivera.  Why didn't she not call Mr. Eric Resto?

 4             MR. GLICK:  Objection.  Foundation.

 5             MR. B. GUZMAN-GUZMAN:  If you have personal

 6   knowledge.

 7             THE COURT:  I will allow it, if he knows.

 8             THE WITNESS:  I don't know.

 9   BY MR. B. GUZMAN-GUZMAN:

10   Q    This was a security agency corporation; correct?

11   A    Security guard corporation.

12   Q    Security guard corporation.  It was a corporation under

13   the laws of Puerto Rico; am I correct?

14   A    Yes.

15   Q    And it's registered as a corporation under the laws of

16   Puerto Rico; correct?

17   A    All right.

18   Q    At that time of 2014, was this corporation operational.

19   A    Yes.

20   Q    Did you know if the corporation had an operating license

21   as a security agency?

22   A    They should.

23   Q    They should?

24   A    Yeah.

25   Q    And why do you assume that?
```

1    A    Because in order to have a security guard corporation in

2    Puerto Rico, you need a license to operate.

3    Q    Are you familiar with the requirements to obtain that

4    license?

5    A    I do know some of the requirements, correct.

6    Q    Who if somebody is capable of obtaining that license for

7    a security agency services -- I am going to rephrase that

8    question?

9              THE COURT:  I think we are getting outside the

10    scope of the direct.  This line of questioning was not part

11    of the direct.  The questions were limited to the

12    investigation conducted, so whatever circumstances of the

13    company were not covered on direct.

14              MR. B. GUZMAN-GUZMAN:  Well, Your Honor, the thing

15    is that my client's, Hector Rivera, daily operations or daily

16    contact with the corporation are in question here.  We are

17    contesting that he did not work -- was not there on the

18    day-to-day operations.

19              THE COURT:  You will have a chance to -- your

20    client will have a chance to prove that with his witnesses

21    and his testimony.

22              MR. B. GUZMAN-GUZMAN:  Yes, but in his testimony,

23    he is testifying that everything was done through my client

24    Rivera.

25              THE COURT:  Not that everything was done.  He was

```
 1   asked as to different things, and the witness testified that
 2   it was Mr. Rivera.
 3            MR. B. GUZMAN-GUZMAN:  No.  The intermission from
 4   Myrta Negron was directly with Mr. Rivera, and he was at
 5   every meeting, he was at every contact, he was the person
 6   that they first contacted.  That's where I am getting at.  I
 7   want to differentiate, make a difference --
 8            THE COURT:  I will not allow questions outside of
 9   scope of the direct.  So that being said, the line of
10   questioning is not allowed.
11            If you want to prove your point otherwise, you can
12   do it with other witnesses.  Not with this one.
13            MR. B. GUZMAN-GUZMAN:  Understood.
14   BY MR. B. GUZMAN-GUZMAN:
15   Q    Now, when was -- the initial appointment, I heard it was
16   July 4th; am I correct?
17   A    No.
18   Q    July what?
19   A    The initial conference was held on July the 1st, 2014.
20   Q    Do you know who was the Chief Executive Officer at that
21   time?
22   A    The president of the company.
23   Q    The president of the company?
24   A    Correct.
25   Q    Do you have any evidence that demonstrates that, that
```

1   conclusion?

2   A    Just our file.  Basically, our initial conference --

3   when we go to the initial conference, we ask who is the

4   president of the company.

5   Q    Is the president of the company to you the same as the

6   Chief Executive Officer?

7   A    Yes, it was the president.  At that time, we only

8   received information about the president of the company.

9   Q    But you knew that the corporation had a license to

10  operate as a security agency company, and he had a Chief

11  Executive Officer that needed to be a licensed detective.

12  A    We know from our experience that they need a license,

13  but at that point our meeting was held with Mr. Rivera.

14  Q    Who was the president on the corporation papers;

15  correct?

16  A    Correct.  Was the person who was in the office at that

17  point when we made our appointment.

18  Q    Did Myrta Negron made an appointment by phone, or she

19  walked in and Mr. Rivera was there?

20  A    She made an appointment by phone.

21  Q    Did she try to contact him in the office?

22  A    When?

23  Q    To the best of your knowledge, before making the first

24  appointment.

25  A    No.

1    Q    You testified that she had two ways -- that the

2    investigator had two ways of getting the initial appointment.

3    One was by phone, and the other one was walk in.

4    A    In this case it was by phone, we made an appointment.

5    It was not a surprise visit, as we call.

6    Q    And why was that initial contact made, do you know?

7    A    Why?

8    Q    Yes.

9    A    Because we need to set an appointment and meet with the

10   representative of the company in order to get the

11   information.

12   Q    By why did you pick Special Police Force?

13              MR. GLICK:  Objection, Your Honor.  The question,

14   as I understand it, inquires into the reason for an

15   investigation and the decision by a Government agency to

16   enforce the law.  The initial reason for that is protected by

17   the deliberate of process privilege.

18              Also to the extent that investigations in general,

19   some are driven by complaints.  Others are not.

20              The Department of Labor's strong position is that

21   the informant's privilege also protects the reason for an

22   investigation being started, to the extent that there could

23   be a chilling effect on workers reporting wage violations.

24              And so for all of these reasons, we strenuously

25   object to this line of questioning.

1          THE COURT:  Objection sustained.

2          MR. B. GUZMAN-GUZMAN:  Your Honor, in this case the

3    corporation is no longer working, and we are already at

4    trial.  All I want to know if it was a complaint or was

5    selected randomly.

6          MR. GLICK:  Same objection.

7          MR. B. GUZMAN-GUZMAN:  I don't need the name --

8          THE COURT:  Objection sustained.  This company is

9    still -- it's not same company.  It's another company.

10         MR. B. GUZMAN-GUZMAN:  I respectfully do not agree

11   that they have another company.  It's a different company,

12   Your Honor.  And I do not agree with that.

13         THE COURT:  It may be a different company, but I --

14   I may be mistaken, but I believe it's also owned by

15   Mr. Rivera.

16         MR. B. GUZMAN-GUZMAN:  There is another company

17   where Mr. Rivera is the shareholder, but it's not brought up

18   in this complaint.

19         THE COURT:  In any event, the objection is

20   sustained for the grounds expressed by Mr. Glick.

21         MR. GLICK:  Your Honor, just so the record is

22   clear, we would make the same objection regardless of whether

23   there is a successor company in any kind of form.

24         THE COURT:  Okay.

25         MR. GLICK:  Thank you, Your Honor.

```
 1                THE COURT:  Noted.
 2   BY MR. B. GUZMAN-GUZMAN:
 3   Q    Do you have any knowledge if Ms. Myrta Negron tried to
 4   contact the chief executive of the company?
 5   A    Not to my knowledge.
 6   Q    Do you have any knowledge if she ever had a conversation
 7   with Eric Resto, Detective Eric Resto?
 8   A    Not to my knowledge.
 9   Q    Do you have any knowledge of who the licensed
10   detective -- I am going to rephrase that.
11                Do you have any knowledge of who was the licensed
12   detective who operated Special Police Force?
13                MR. GLICK:  I would just object to the form.  The
14   additions of the words "operated the company."
15                MR. B. GUZMAN-GUZMAN:  Well, Your Honor --
16                THE COURT:  What do you mean by operated?
17                MR. B. GUZMAN-GUZMAN:  Your Honor, in order to have
18   a license to operate as a company, you need to comply, and
19   the Chief Executive Officer --
20                THE COURT:  One thing doesn't have to do with the
21   other.  You can have a licensed detective and have someone
22   else who does the decision-making.
23                MR. B. GUZMAN-GUZMAN:  That's what I am getting at.
24                THE COURT:  Why are you tying --
25                MR. B. GUZMAN-GUZMAN:  Because the law requires,
```

1    the law of private detectives of Puerto Rico requires that

2    the chief executive operator has to be a licensed detective,

3    valid licensed detective.  And this company had one.  His

4    name was Eric Resto, and he was there at the company at the

5    time of the intervention.

6             THE COURT:  Well, what does that have to do with

7    the testimony of the director?  I think you are posing

8    questions which this witness doesn't have any knowledge toe.

9             MR. B. GUZMAN-GUZMAN:  Well --

10            THE COURT:  You are trying to bring up matters

11   which I believe are outside the scope, and you may bring that

12   forward when your client has a chance to present his

13   witnesses.

14            MR. B. GUZMAN-GUZMAN:  Okay.  All right.

15   BY MR. B. GUZMAN-GUZMAN:

16   Q    You testified about Exhibit No. 2.

17            Now, before that, do you have any knowledge of who

18   kept payroll records for Special Police?

19   A    Who kept the payroll records?

20   Q    Yes.  Who was the person in charge of payroll records

21   for the company?

22   A    Yes.  Mr. Rivera and Mr. Torres were in charge of the

23   payroll records.

24   Q    Do you have any documents that prove or suggest that

25   Mr. Rivera was the person that kept the payroll records?

1    A    Yes.  From the initial conference notes -- that

2    information is on our initial conference notes.

3    Q    Are those notes conclusions from Myrta Negron?

4    A    What do you mean by conclusions?

5    Q    Well, they are the notes.  They are no official

6    documents of the company.

7         Are the notes conclusions of Ms. Myrta Negron based

8    on whatever she saw?

9         MR. GLICK:  Objection.  Argumentative.

10        THE COURT:  Sustained.

11   BY MR. B. GUZMAN-GUZMAN:

12   Q    Who wrote those notes that you are talking about?

13   A    Investigator Myrta Negron.

14   Q    Where did she get the information?

15   A    From the interview that she did from Mr. Rivera and

16   Mr. Torres at the place of business.

17   Q    My question is, based on your answer, I can conclude

18   that you don't have any document that states that Mr. Rivera

19   was in charge ever payroll records?

20        MR. GLICK:  Objection.  Asked and answered.

21        THE COURT:  It's a matter of semantics as to what a

22   document is within your definition.  There are some notes

23   which the witness states that say that.

24        MR. B. GUZMAN-GUZMAN:  I am trying to get the

25   involvement of Mr. Rivera in payroll records.  He is telling

1  me that Mr. Rivera had payroll records and the accountant was

2  the one keeping payroll records.

3          THE COURT:  No.  He said both were in charge of the

4  payrolls and that information comes from the notes that

5  Ms. Negron took at the initial conference.  That's the basis

6  of the witness' note.

7  BY MR. B. GUZMAN-GUZMAN:

8  Q    My question is -- or the base of your knowledge and --

9  to your personal knowledge, is there any document that

10 establishes that Mr. Rivera was in charge of payroll records?

11         MR. GLICK:  Objection, Your Honor.

12         THE COURT:  Grounds?

13         MR. GLICK:  Same problem as --

14         THE COURT:  It's the same question because it's a

15 matter of what the attorney believes a document is.

16         MR. GLICK:  Thank you, Your Honor.

17         The objection is, the witness has testified

18 regarding the basis of his knowledge.

19         THE COURT:  It's asked and answered.

20         MR. B. GUZMAN-GUZMAN:  The objection was sustained;

21 right?

22         THE COURT:  Yes.  Asked and answered.

23         MR. B. GUZMAN-GUZMAN:  Okay.  I am going to

24 rephrase.

25

1  BY MR. B. GUZMAN-GUZMAN:

2  Q    To the best of your knowledge, if there is any record

3  from the company, as suggested, that Mr. Rivera was in charge

4  of recordkeeping.  I guess it's a different question?

5  A    To the best of my knowledge, there is no records of the

6  company that establishes that Mr. Rivera was in charge of the

7  recordkeeping.

8  Q    On the notes from Ms. Negron, are there any notes that

9  Mr. Resto was present at any of the meetings?

10  A    Not that I recall.

11  Q    Do you have any recollection, or are there any notes in

12  your files about Mr. Resto's health condition since the

13  intervention on July 1st?

14  A    Not that I recall.

15  Q    Do you have any knowledge if Mr. Resto is deceased at

16  the present time?

17  A    At the present time, I believe so, yes.

18  Q    When did you find out that Mr. Resto had passed away?

19  A    I don't know, but I don't remember the date.

20  Q    Do you have any notes on the date -- or to the best of

21  your recollection, are there any notes taken by Ms. Myrta, or

22  have you received any information of the specific day that

23  Mr. Eric Resto passed away?

24  A    No, I don't have.

25  Q    If I tell you he passed away on the 15th of August of

1    2014, would that be about right?

2            MR. GLICK:  Your Honor, I object.  We are getting

3    beyond the scope of the cross.  And I believe the witness has

4    testified regarding the limits of his knowledge here.

5            THE COURT:  I agree.

6            Sustained.

7            MR. B. GUZMAN-GUZMAN:  Okay.

8            MR. GLICK:  Your Honor, may I ask a point of

9    clarification.  I certainly want to respect the rights of all

10   our counsel to proceed with cross-examination, but I am not

11   sure about conferring among each other and then

12   cross-examines three times.

13           MR. B. GUZMAN-GUZMAN:  Your Honor, what I am doing

14   is simply -- to make matters easier for the Court, I am

15   dividing, just briefly -- divide with brother counsel Arturo

16   Guzman the discussion, who was going to go over the

17   discussion of Exhibits 2 and 3, so that I don't have to go on

18   my intermission about it, and he can do it on his.

19           THE COURT:  Okay.

20           MR. B. GUZMAN-GUZMAN:  That was it.

21           THE COURT:  They are trying not to ask the same

22   questions.

23           MR. B. GUZMAN-GUZMAN:  Exactly.  Not to cover the

24   same areas.

25           THE COURT:  I will appreciate that because that was

1   not followed in the prior cross of Ms. Ortiz.  Same areas

2   were covered.

3   BY MR. B. GUZMAN-GUZMAN:

4   Q    Mr. Vazquez, you testified that the financial situation

5   of the company came to discussion during the meetings, but

6   you did not tell us what was the financial situation of the

7   company.  What was it?

8   A    At that point they have a difficult financial situation,

9   and they were not able to pay all the back wages at one time.

10  Q    That was in -- before or after August?

11  A    That was after August that we became aware of that

12  financial situation.

13  Q    Before August, from your experience, do you think that

14  the corporation would have been able to pay the debt to the

15  Department of Labor if it were properly operated?

16          MR. GLICK:  Objection.  It calls for speculation,

17  and I think it exceeds the scope of the purpose for which

18  Mr. Vazquez testified.

19          THE COURT:  Sustained.

20          The premise was "do you think."  That goes to

21  speculation.

22          MR. B. GUZMAN-GUZMAN:  Well, I was acting based

23  on --

24          THE COURT:  In any event, he is not a financial

25  officer to be making that assessment of a company that he

1    doesn't work for.

2    BY MR. B. GUZMAN-GUZMAN:

3    Q    There was a possible payment plan requested of a

4    three-year payment plan; am I correct?

5    A    We usually don't give payment plans in excess of two

6    years, so at some point they requested a three-year payment

7    plan.

8    Q    I am going to jump to another area.

9         You testified that at some point Attorney

10   Santiago-Malavet, who passed away, became the Special Police

11   legal representative in this matter.  Do you remember what

12   months and years he appeared?

13        MR. GLICK:  Objection.  I don't think it accurately

14   characterizes the witness' testimony regarding the attorney.

15        THE COURT:  He mentioned that Attorney Santiago was

16   at a meeting, but that was basically it.

17        MR. B. GUZMAN-GUZMAN:  No.  A couple of meetings.

18   But I wanted to know what months did he -- was it early in

19   July?

20        THE COURT:  What's the relevancy as to that?

21        Not relevant.  Move on.

22        MR. B. GUZMAN-GUZMAN:  Okay.  I am going to

23   rephrase.

24        Your Honor, I am not going to ask any more

25   questions.

**CROSS-EXAMINATION**

BY MR. A. GUZMAN-GUZMAN:

Q    Good afternoon.

A    Good afternoon, sir.

Q    You stated in your testimony that there were about five meetings; right?  The first one that went along was with Mr. Andujar; is that correct -- Mr. Rivera.  Excuse me?

A    I was present at three meetings.

Q    How many meetings were there in this case with Ms. Myrta Negron?  How many meetings were there?

A    At least six meetings with Mr. Rivera.

Q    Your presence was random, in random meetings, or you appear in the last three meetings?  First three meetings?

A    I was present in the last three meetings that we had.

Q    Do you have any documents that establish on which -- or where was the -- excuse me.  Let me rephrase that.

          On the last meeting you said that Mr. De Jesus was there.

A    Correct.

Q    You have a document that attests to that?

          MR. GLICK:  Objection.  This witness is not a custodian of documents.

          MR. A. GUZMAN-GUZMAN:  Your Honor, this witness has testified about an investigation done by another person.  So it implies, and as he said, he read the file.  He is

```
 1   testifying about that file.
 2             THE COURT:  I will allow it.
 3             MR. GLICK:  I withdraw the objection, Your Honor.
 4   BY MR. A. GUZMAN-GUZMAN:
 5   Q    Do you have any documents that establish that
 6   Mr. De Jesus was there?
 7   A    Yes, we do.
 8   Q    Do you have it with you?
 9   A    No, I don't have it with me.
10             THE COURT:  Were you at that meeting, sir?
11             THE WITNESS:  I was in the meeting.
12   BY MR. A. GUZMAN-GUZMAN:
13   Q    What will be that document that you say establishes that
14   Mr. De Jesus was at that meeting?  What was the name of the
15   document?
16   A    As I said before, we keep a file.  Within this file we
17   have a case diary.  In that file we also have a case
18   narrative.
19   Q    The question is simple.
20             THE COURT:  Finish answering.
21             Did he finish answering the question?
22             MR. A. GUZMAN-GUZMAN:  Your Honor, he is talking
23   about what is compiled in the file.  And I just asked him --
24   testified about that, the diary, the notes, the investigation
25   notes.  I just want to know what was the document.  What's
```

1    the name of the document.  I don't want to -- I just want him

2    to just go directly.  What was the document, not what the

3    file contains.  That is not the question.  It's what is the

4    document that establishes the persons that were there.

5              THE WITNESS:  As I was trying to say, in the file

6    we have a case narrative.  In the case narrative we have

7    every action that has been taken in that case.

8              We also have a case narrative.  In the case

9    narrative, we have a disposition section.  In that

10   disposition section, basically it explains how the case ends

11   up.

12             So in that disposition section, we have the persons

13   who were present at the last conference or what we call the

14   final conference.

15   BY MR. A. GUZMAN-GUZMAN:

16   Q    I am kind of lost there because you said the case

17   narrative two times.  There is two case narratives?

18   A    No.  There is only one case narrative.

19   Q    You started talking about the diary, and you said there

20   was one case narrative.  Then about the investigation, you

21   said about the notes, and you said case narrative again.

22             Where is the case narrative?  In the diary or the

23   case notes, or it's both the same?

24   A    No.  There is one document that is called diary, case

25   diary.  And there is another document in the file that is

```
 1   called the case narrative.

 2   Q    Did you personally file that document, it would be

 3   redundant, at that file?

 4   A    I don't understand the question.

 5   Q    Who made -- let me rephrase the question.

 6        Who made that document that says that Mr. De Jesus

 7   was there?

 8   A    The investigator.

 9   Q    So you didn't do it?

10   A    No.  That's part of the investigation.

11   Q    Hold on a second.

12        So your testimony is that the document that states,

13   just tell me if I am not correct, that Mr. De Jesus was at

14   that meeting was done by Myrta Negron.  That is what you just

15   testified.

16   A    Yes.  She wrote --

17   Q    Thank you.

18   A    -- that document.

19   Q    Thank you.

20        And to the best of your knowledge, that happened

21   just once in this case; yes or no?

22        THE COURT:  What happened once?

23        MR. A. GUZMAN-GUZMAN:  A meeting that was present

24   De Jesus.

25        THE COURT:  Okay.
```

1   BY MR. A. GUZMAN-GUZMAN:

2   Q    To the best of your knowledge, the presence of De Jesus

3   in any meeting only happened once.

4   A    To the best of my knowledge, yes, only once.

5   Q    And what's the time of that report that we are talking

6   about now done by Myrta Negron?

7            MR. GLICK:  Objection.  Asked and answered.

8            THE COURT:  Sustained.

9            MR. A. GUZMAN-GUZMAN:  Your Honor, it's another

10  question.  The question is, it happened just one time, and

11  that report -- we are talking about the same.  I just want to

12  make sure that that report was filed by Ms. Myrta Negron.

13           THE COURT:  That has been asked and answered a

14  couple of times already.

15           MR. A. GUZMAN-GUZMAN:  I withdraw the question.

16  BY MR. A. GUZMAN-GUZMAN:

17  Q    Any other filing -- let me rephrase that question.

18           Did you ever file any notes in the five case of

19  Special Police?

20  A    Did I did --

21  Q    Did you personally?

22  A    No.

23  Q    That would also mean that in regard to those meetings

24  that you were with Special Police, you didn't file any notes

25  on that -- you didn't file any notes of that discovery by --

```
 1    A     No.

 2    Q     There were six meetings, approximately six meetings that

 3    you said.

 4    A     Five to six meetings.

 5    Q     Okay.  I want to know in which ones you were present.

 6    The first?  The second?

 7              THE COURT:  He already testified he was at the last

 8    three meetings based on a question that you posed previously.

 9    BY MR. A. GUZMAN-GUZMAN:

10    Q     Do you know in those three last meetings that you were,

11    in all was Attorney Santiago-Malavet present; right?

12    A     To the best of my knowledge, yes.

13    Q     And you know the capacity in which he was present in

14    that meeting.

15    A     As a legal representation from Special Police.

16    Q     You talk that Mr. Rivera was present.  I am talking

17    about Hector Rivera was present in those last three meetings

18    that you were there.

19    A     That's correct.

20    Q     What was his capacity?

21    A     As the president of the company.

22    Q     You mentioned Mr. Andujar present in those three

23    meetings.

24    A     Not that I recall.

25    Q     Anybody -- you mentioned Mr. Torres --
```

1    A    Yes, I did mention Mr. Torres.

2    Q    -- present in those three meetings that you were

3    present.

4    A    Yes.

5    Q    What was his capacity?

6    A    He was the accountant of the company.

7    Q    Any other person present on those three meetings?

8    A    As I told you before, I met with Mr. Rivera, Mr. Torres,

9    and Mr. Santiago, twice.  And at the last meeting of the

10   final conference, Mr. De Jesus, Mr. Rivera, Mr. Torres.

11   Q    Last meeting was Mr. De Jesus, Mr. Torres and

12   Mr. Rivera.  Anybody else?

13   A    And Mr. Santiago.

14   Q    I cannot assume.  I have to ask you the question.

15   Ms. Myrta Negron was in all meetings; right?

16   A    Yes, of course.

17   Q    So it was another person on that meeting.

18   A    Sorry about that.

19   Q    Myrta Rivera (sic) was in the capacity of the

20   investigator for the agency.

21   A    Correct.

22   Q    And you were in your capacity as supervisor for

23   Mrs. Rivera; correct?

24   A    Ms. Negron.

25   Q    I am sorry.

1    A    I was there as the direct supervisor and as the district

2    director.

3    Q    Okay.  So you were there as a direct supervisor and

4    district director.

5    A    Correct.

6    Q    On what capacity was Mr. De Jesus in that sole meeting

7    that you attest he was present on your sixth meeting; right?

8    A    I don't know.  I don't recall.

9         MR. A. GUZMAN-GUZMAN:  Your Honor, in order to

10   minimize the number of questions, may I confer with brother

11   counsel?

12        THE COURT:  Yes.

13        MR. A. GUZMAN-GUZMAN:  No further questions,

14   Your Honor.

15        THE COURT:  Okay.

16        Mr. Rodriguez.

17        MR. RODRIGUEZ-IZQUIERDO:  I am going to be very

18   brief, Your Honor.  I just want to ask the question a

19   question.

20                    **CROSS-EXAMINATION**

21   BY MR. RODRIGUEZ-IZQUIERDO:

22   Q    Mr. Vazquez, you mentioned that it was at the last

23   meeting, probably the sixth meeting, when De Jesus, according

24   to you, attended the final meeting.

25        MR. GLICK:  Your Honor, I want to respect the right

```
 1    to cross-examine, but it sounds like the same contents so far
 2    as last cross-examination.
 3              THE COURT:  I don't know what the question is.
 4              MR. RODRIGUEZ-IZQUIERDO:  Well, Your Honor, it is
 5    that I am going to go as to the documents that may contain
 6    information to that effect and the accessibility of those
 7    documents in terms of best evidence.
 8              THE COURT:  Okay.  Give me a second.
 9              You want the last --
10              MR. RODRIGUEZ-IZQUIERDO:  I am going towards the
11    point of the best evidence rule, whether there is a document
12    that could clarify or confirm the fact that Mr. De Jesus --
13              THE COURT:  Would you please approach on that?
14              MR. RODRIGUEZ-IZQUIERDO:  Yes.
15              THE COURT:  Please approach.
16              (Whereupon, the following proceedings were held at
17    sidebar:)
18              THE COURT:  You keep insisting on a document.
19    Mr. Vazquez was at the meeting present.  And based on his
20    recollection, he says that Mr. De Jesus was there.  What
21    better evidence can I have as to that?  I don't need any
22    document, but it's obvious that Mr. De Jesus can take the
23    stand, and he can say, "I was not present."  And then I will
24    ask his credibility, and I will make a determination.
25              MR. RODRIGUEZ-IZQUIERDO:  And if I may, Your Honor.
```

```
1    The thing is, Your Honor, assuming there is a document

2    that --

3                THE COURT:  There is a --

4                MR. RODRIGUEZ-IZQUIERDO:  A minute, let's say.

5                THE COURT:  There is nothing  --

6                MR. RODRIGUEZ-IZQUIERDO:  If it's readily

7    accessible, then -- which would be the best evidence to

8    establish his presence at that meeting.  The testimony or a

9    record of the company which is kept in the normal course of

10   the business.  So I am trying to see whether -- if that

11   document is accessible, should not that document have been

12   submitted?

13               THE COURT:  But he was at the meeting.  Mr. Vazquez

14   was at the meeting.

15               MR. B. GUZMAN-GUZMAN:  They haven't even identified

16   Mr. De Jesus.

17               THE COURT:  Did you ask him?  This is not a

18   criminal case that I need to identify anybody.

19               MR. B. GUZMAN-GUZMAN:  I know this is not a

20   criminal case, but if there is a best evidence that is

21   available, why not bring it up?

22               THE COURT:  Okay.

23               MS. JACOBS:  May I just respond to that?

24               THE COURT:  Yes.

25               MS. JACOBS:  The Defendants in this case, we had a
```

1   long discovery period in this case, as you know.  None of the

2   Defendants cert any document requests, interrogatories, and

3   chose not to do any depositions.

4            THE COURT:  And this evidence was pro se for most

5   of you.

6            MS. JACOBS:  I am just noting that know discovery

7   was conducted by the Defendants.  Had they done discovery, a

8   copy of the redacted file would have been turned over, but

9   they asked for nothing.  So I don't want there to be any

10  impression that we are withholding -- that we withheld

11  documents that should have been turned over.

12           We are not introducing these documents into

13  evidence in this case.  They had ample opportunity to

14  discovery three years ago, and they chose not to.

15           MR. B. GUZMAN-GUZMAN:  That is not it.  They have

16  the burden of proof, and they have to prove what they are

17  saying.

18           THE COURT:  And they have a person, a witness who

19  under oath is saying that Mr. Freddy De Jesus was there.

20  Mr. Freddy De Jesus can take the stand under oath and testify

21  otherwise.  That takes care of that.

22           MR. RODRIGUEZ-IZQUIERDO:  Your Honor, if I may.

23  But he is --

24           MR. B. GUZMAN-GUZMAN:  The thing is that --

25           THE COURT:  Your objection is on the record.  I

```
 1    will not allow it.

 2              MR. RODRIGUEZ-IZQUIERDO:  He has also testified

 3    that there are documents that can corroborate that appearance

 4    of that attendance.

 5              THE COURT:  I don't need corroboration of a

 6    testimony under oath.

 7              MS. JACOBS:  I don't think under the Rules of

 8    Evidence you can introduce documents to bolster a witness'

 9    testimony.  That's my understanding.

10              THE COURT:  I agree.

11              MS. JACOBS:  Thank you.

12              (Back on the record.)

13              MR. RODRIGUEZ-IZQUIERDO:  Your Honor, we have no

14    further questions.

15              THE COURT:  Any redirect?

16              MR. GLICK:  No, Your Honor.  Thank you.

17              THE COURT:   Mr. Vazquez, you are excused.

18              (Witness excused.)

19              THE COURT:  For time sake, I have to take care of

20    some duty matters that will be let's say 15 minutes.  Do you

21    want to continue with the next witness today, or do you want

22    to recess and then continue tomorrow?  It's up to you.

23              I have nothing in my calendar tomorrow, nor Friday,

24    but this case.  But since I am on duty, there will be

25    interruptions.
```

```
1              So it's up to you.

2              MS. JACOBS:  Your Honor, our next two witnesses are

3    adverse witnesses, Mr. Rivera and Mr. De Jesus.  I am fine

4    adjourning for today and picking it up tomorrow morning.

5              THE COURT:  Okay.

6              MS. JACOBS:  I will have the interpreters here for

7    that.

8              THE COURT:  How do you feel Mr. Rodriguez and both

9    Attorney Guzman man?  Do you want to recess until tomorrow?

10             By the way, staff leaves at 5:00, so I will not

11   hold the trial beyond 5:00.

12             MR. RODRIGUEZ-IZQUIERDO:  I have no problem in

13   adjourning at this time to continue tomorrow.

14             Ismael Rodriguez, for the record.

15             THE COURT:  Mr. Benjamin Guzman?

16             MR. B. GUZMAN-GUZMAN:  I join my brother counsel.

17             THE COURT:  And Mr. Arturo Guzman?

18             MR. A. GUZMAN-GUZMAN:  That will be fine to

19   continue tomorrow, but tomorrow I may have a situation.  As I

20   explained to the court, I am in the custody of my kid.  So I

21   need to leave just before 5:00.

22             THE COURT:  At what time do you have to tell them

23   up?

24             MR. A. GUZMAN-GUZMAN:  It's here in Hato Rey.  It

25   will be at 5:00, so 4:45 would be perfect.
```

1          THE COURT:  Okay.  We will conclude before that.

2          MS. JACOBS:  I don't believe that if I start my

3    direct with Mr. Rivera today I am going to finish.

4          THE COURT:  That's fine.  But in all honesty, I

5    would rather recess now and take care of other matters today

6    so I don't get too much behind.

7          If you want to leave your documents and papers

8    here, that's fine.  We will close the courtroom when we

9    conclude, but it's up to you.  So they will be safeguarded.

10         Tomorrow we will be resuming at 9:00.

11         MR. GLICK:  Your Honor, may we just ask while we

12   are discussing scheduling.  Does the Court have a preference

13   or a plan with regard to, at the conclusion of the parties'

14   cases, whether the Court would prefer to hear any summations

15   or oral argument or just take findings of fact?  How does the

16   Court plan to...

17         THE COURT:  I will leave it to your discretion.  If

18   you want to make a closing argument -- there is no jury, so

19   it's not, in essence, required.  So it's up to you.

20         And as to findings or proposed opinions and order,

21   I will make a decision as to that later.

22         MR. GLICK:  Thank you, Your Honor.

23         THE COURT:  Anything else at this time before we

24   conclude?

25         MS. JACOBS:  No, Your Honor.

1

2                  (PROCEEDINGS ADJOURNED AT 5:00 P.M.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

I, JOE REYNOSA, Official Court Reporter for the United States District Court for the District of Puerto Rico, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct computer-aided transcript of proceedings had in the within-entitled and numbered cause on the date herein set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.

S/Joe Reynosa

_____

**JOE REYNOSA, CSR, RPR**
United States Court Reporter
Federico Degetau Federal
Building, Room 150
150 Carlos Chardón Street
San Juan, Puerto Rico 00918-176
(787) 772-3000

Joe Reynosa, CSR, RPR
Official Court Reporter