IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

R. ALEXANDER ACOSTA, SECRETARY OF
LABOR,[1]

Plaintiff,

v.

SPECIAL POLICE FORCE CORP., et.al.,

Defendants.

CIVIL NO. 15-1506 (CVR)

**OPINION AND ORDER**

**INTRODUCTION**

The present case stems from violations to the Fair Labor Standards Act ("the
FLSA").   On April 29, 2015, the United States Secretary of Labor ("the Secretary")
brought this action against Defendants Special Police Force Corp. ("SPF"), Héctor Rivera
("Rivera") and Freddy De Jesús ("De Jesús") ("Defendants") alleging failure to pay
employees the federal prescribed minimum wage and overtime premiums in violation of
the FLSA, as amended, 29 U.S.C. §§ 206, 207 and 215(a)(2).   The Complaint also alleged
that Defendants failed to make, keep and/or preserve proper records of hours worked by
employees, wages paid to employees and employees' home addresses in violation of
federal law.   29 U.S.C. §§ 211(c) and 215(a)(5).

After dispositive motion practice,[2] the issues that remained to be determined at

---

[1] At the time this suit was filed, Thomas E. Pérez was Secretary of Labor.   On April 28, 2017, R. Alexander Acosta
became Secretary of said agency.   Secretary Acosta is thus automatically substituted as a Defendant in this case.   See
Fed. R. Civ. P. 25(d).
[2] On February 20, 2018, the Court granted the Secretary's Motion for Summary Judgment as to the minimum wage
and overtime claims against Defendant SPF. The Court also awarded liquidated damages and enjoined Defendant SPF
from future violations of the FLSA. (Docket No. 126).   On June 29, 2018, the Court granted the Secretary's Motion
and ordered Defendant SPF to pay a total of $162,246.09 in back wages plus an additional $162,246.09 in liquidated
damages, plus post-judgment interest from the date of judgment until the date of payment of the back wages and

_____

trial were: (1) whether Rivera was an employer pursuant to 29 U.S.C. § 203(d), during the period covered by the Complaint and is therefore liable for the payment of back wages and liquidated damages and subject to an injunction against future violations of the FLSA; (2) whether De Jesús was an employer pursuant to 29 U.S.C. § 203(d), during the period covered by the Complaint and is liable for the payment of back wages and liquidated damages and subject to an injunction against future violations of the FLSA; and (3) whether Defendants violated the record keeping provisions of section 11(c) of the FLSA, 29 U.S.C. § 211(c).

On February 13, 14, and 15, 2019, a non-jury trial was held.   When Plaintiff rested, Defendants Rivera and De Jesús argued for dismissal under Fed. R. Civ. P. 52 (c).   The Court granted co-Defendant De Jesús' petition but denied Rivera's petition.   (Docket Nos. 162 and 163). SPF, the corporation, did not make a similar petition.   The non-jury trial continued and concluded on March 1, 2019.

Plaintiff presented the testimony of the following witnesses: Gloriana Ortíz Cruz ("Ortiz"), a former security guard with SPF, José Vázquez, the Director of the Caribbean District office for the Department of Labor's Wage and Hour Division, in charge of Puerto Rico and the Virgin Islands, and co-Defendants Rivera and De Jesús. In turn, Jonathan Andújar Méndez ("Andújar") and José A. Torres-Longo ("Torres"), the company's accountant, testified on behalf of Defendant Rivera.   No evidence or witnesses were presented on behalf of SPF.

_____

liquidated damages. (Docket Nos. 146 and 148).

_____

# FINDINGS OF FACT[3]

1.  Defendant SPF was a corporation duly organized under the laws of the Commonwealth of Puerto Rico, where it engaged in the business of providing security services. (Docket No. 126, at 6).

2.  Defendant Rivera started SPF in 2009, along with Eric Resto Rivera ("Resto"), a licensed detective. (Feb. 14 Tr. 5:15-16; Ex. 16, at 11:7-11:23; Defs.' Ex. A).

3.  In his capacity as a detective, Resto obtained a license for SPF to operate as a security agency. (Feb. 14 Tr. 33:7-9; Defs.' Ex. A).

4.  Defendant Rivera invested all of the money to start SPF. (Docket No. 134 ¶ 4[4]; Feb. 14 Tr. 8:3-5, 55:14-15).

5.  On January 7, 2009, Defendant Rivera signed and filed a "Certificate of Incorporation" with the Commonwealth of Puerto Rico incorporating SPF (Docket No. 134 ¶ 5; Ex. 4).

6.  SPF's "Certificate of Incorporation" identifies Defendant Rivera as the "Resident Agent in charge" and as an "incorporator" (Docket No. 134 ¶ 7; Ex. 4; Feb. 14 Tr. 7:10-24).

7.  On January 30, 2009, Defendant Rivera signed SPF's corporate bylaws.

_____

[3] After the non-jury trial, the Court asked the parties to file simultaneous post-trial briefs to include findings of fact and conclusions of law. (Docket No. 166). SPF failed to abide by the Courts' Order and did not file a brief. Defendant Rivera submitted findings of fact which were wholly unsubstantiated, as he provided no citations to the record to buttress them. Consequently, the Court did not credit Rivera's proposed facts.
[4] The Court adopted the proposed stipulations in the parties' Joint Pretrial Memorandum. (Docket No. 134, at 6-12 [¶¶ 1-54]). (Feb. 15 Tr. 49:16-18).

_____

(Feb. 14 Tr. 54:2-14; Ex. 5). The bylaws established that the only "officers of the Corporation" then designated were a president, a treasurer, and a secretary. (Ex. 5, Art. VI, Sec. A).

8.  SPF's corporate bylaws also provided that SPF's "President will be the main executive officer of the Corporation" and that among the President's "powers and duties . . . are representing the Corporation in official activities." (Ex. 5, Art. VI, Sec. D ¶ 1). The same corporate bylaws established that the Treasurer "will approve the expenses that arise from day to day for the Corporation"; "will be the custodian of all funds and financial reports"; and "will also perform all other duties and functions inherent to the position," among other duties specifically enumerated as well as those "inherent to the position." (Id., Art. VI, Sec. D ¶ 4).

9.  On August 27, 2012, Defendant Rivera signed a corporate resolution, as President and Treasurer of Special Police Force, that certified that he was the "owner and sole shareholder of the Corporation, for all pertinent legal purposes." (Docket No. 134 ¶ 9; Ex. 10).

10. Pursuant to the resolution, Andújar, who had been listed on the 2009 Certificate of Incorporation as an "incorporator" (Ex. 4) and had signed SPF's corporate bylaws (Ex. 5), "assign[ed] his share and interest" in SPF to Defendant Rivera. (Ex. 10).[5]

_____

[5] Andújar was SPF's general manager or "assistant to the manager," and his role at SPF is further described below, including at Paragraph 48. (Feb. 15 Tr. 78:3-6; Ex. 20, at 15:3-10, 23:21-22). Andújar testified he "asked to be taken out of all the corporation's documents" in 2012 for multiple reasons. (Mar. 1 Tr. 15:3).   As of 2012, Andújar "spent more

_____

11. Defendant Rivera's half-brother, Javier Ortíz Ortíz, signed the 2012 corporate resolution as "Secretary" of Special Police Force, but had no role in Special Police Force other than to sign the 2012 corporate resolution and some bank account opening paperwork. (Ex. 10; Feb. 14 Tr. 12:13-20; see Ex. 7, at 3).

12. During the period covered by the Complaint, Defendant Rivera was the President, Treasurer, sole owner, and sole shareholder of Special Police Force. (Docket No. 134 ¶ 8; Feb. 14 Tr. 8:6-12, 9:13-10:2, 11:12-25; Ex. 10).

13. Defendant Rivera opened SPF's two bank accounts, personally signing the account opening paperwork. Rivera opened the first Doral Bank account for SPF on January 26, 2013, and the second Doral Bank account for SPF on September 28, 2013. (Feb. 14 Tr. 17:8-10, 17:25-18:11, 20:20-21:10; Ex. 6; Ex. 7).

14. Defendant Rivera was the only individual authorized to sign checks for each of the two SPF bank accounts. (Feb. 14 Tr. 18:17-25, 21:11-19, 31:16-21; Ex. 6, at 4-10; Ex. 7, at 4-7; Ex. 19, at 30:2 -20).

15. As part of the paperwork for opening the second Doral Bank account on September 28, 2013, Defendant Rivera submitted a "Certificate of General

_____

time" in the continental United States than he did in Puerto Rico. He elaborated that "let's say there was a problem and I did not have money to do the traveling. Because I had been traveling. So any problem that the company might have," Andújar would not be around to "resolve it." (Ex. 20, at 23:12-16, 23:23-24:13; Mar. 1 Tr., 9:18-23, 15:11-14, 16:10-17:4). Andújar also testified that Resto and Andújar had some financial agreement, that Resto "never complied," which was another reason Andújar wanted to be taken out SPF's corporate documents. (Mar. 1 Tr. 15:1-3; see id. at 15:17-20, 19:6-9). Tying these explanations together, Andújar explained that his intention in being removed from the corporate documents was not "to get into any trouble," regarding "overtime, or any problem of the company." (Mar. 1 Tr. 17:6-14).

_____

Corporate Resolution" stating that as President of SPF, he was "authorized to act on behalf and in representation of this Corporation to perform and execute any and all business." (Ex. 7, at 5). Defendant Rivera also submitted a "Certificate of Resolution Regarding Facsimile Signatures" stating that "use of a facsimile of the signature of the officer indicated" therein "is desirable to facilitate and accelerate the internal operations of this Corporation," and that SPF had "authorize[d] . . . use" of the "facsimile signature." This facsimile signature was Rivera's. (Id. at 6).

16. SPF's 2013 "Annual Reconciliation Statement of Income Subject to Withholding" filed with the Puerto Rico Department of Treasury, listed Defendant Rivera as SPF's "withholding agent." (Feb. 14 Tr. 13:24-14:6; Ex. 9). Defendant Rivera signed this document electronically on October 21, 2014, declaring "under penalties of perjury" that he had personally "examined" the document and that its contents — including the monthly and annual dollar amounts of "Services Rendered by Individuals" — were "to the best of [his] knowledge and belief," "true, correct and complete." (Ex. 9, at 2).

17. Defendant Rivera invested additional money into Special Police Force whenever necessary, such as when the company had cash flow issues. (Docket No. 134 ¶ 16; Feb. 14 Tr. 31:22-24).

18. In his capacity as President of SPF, Defendant Rivera signed the written proposals SPF presented to its prospective clients. (Docket No. 134 ¶ 11; Feb.

R. Alexander Acosta v. Special Police Force Corp.
Civil No. 15-1506 (CVR)
Opinion and Order
Page 7
_____

14 Tr. 14:24-15:14; Ex. 11).

19. These proposals detailed to prospective clients the kind of security services SPF offered. Rivera's proposals explained that "[e]ach one of the specialized security services areas requires a rigorous process of personnel screening, coaching, training and certification, guaranteeing a high degree of excellence and professionalism for all of our clients." Rivera also promised in the proposals that "we at the Special Police Force Corp. guarantee to protect" clients' security. (Ex. 11, at 4).

20. Shortly after SPF obtained the contract to provide security services at the Pine Grove Condominium, Defendant Rivera attended a meeting with the administration of said condominium. (Feb. 13 Tr. 24:22-25).

21. Rivera "introduced himself as the owner of Special Police Force" to one of SPF's new employees, Ortíz, at the Pine Grove Condominium. (Feb. 13 Tr. 21:8-14, 23:20-24:8, 24:20-25:1, 49:4-6).

22. Sometime after SPF had already taken over security staffing at Pine Grove, that condominium needed additional security guards. The condominium's vice president understood Defendant Rivera as the person at SPF with authority over recruitment and directed Ortíz to contact Defendant Rivera to coordinate recruitment of guards for SPF to assign to Pine Grove. (Feb. 13 Tr. 31:20-32:15, 32:22-33:3, 96:22-25).

23. Ortíz called Defendant Rivera, who gave the green light for recruitment of new SPF's guards. Defendant Rivera then directed Ortíz to work with SPF's

Director of Operations, De Jesús, to coordinate recruitment for approximately one to one and a half months.[6] (Feb. 13 Tr. 31:20-32:12, 32:22-33:3, 96:21-24).

24. Defendant Rivera personally visited the posts where SPF's security guards worked, for instance to install security cameras and repair computers. Ortíz communicated directly with Defendant Rivera about the installation and maintenance of those cameras at Pine Grove, and former employee Emma García ("García") saw him perform such work at the field site where she was stationed. (Feb. 13 Tr. 30:24-31:19, 53:18-23; Feb. 14 Tr. 90:6-9; Ex. 1, at 10:13-11:4, 38:2-22).

25. Defendant Rivera also communicated directly with Ortíz to oversee her use of a computer program that SPF used to store information about various condominium residents' and visitors' personal information. (Feb. 13 Tr. 34:22-25, 38:3-13, 59:20-23).

26. SPF's employees understood Defendant Rivera to be their "boss" — the person who supervised their direct supervisors — and knew him to be the company's owner as well. (Feb. 13 Tr. 38:14-15, 41:19-21, 55:5-9; Ex. 1, at 8:2-5, 9:14-18, 10:7-12).

27. Defendant Rivera personally signed an employment verification letter on SPF letterhead for SPF employee García after she initially requested such a

---

[6] Although Ortíz did not know the exact time period she was involved in this recruitment, it was before July 2014, when Ortíz resigned from SPF. (Feb. 13 Tr. 41:8-10, 62:4-6, 96:21-97:4). Ortíz was consistent in her testimony regarding the dates she recalled and the dates she did not.

letter from her direct supervisor, so that she could obtain a personal loan. (Ex. 1, at 17:1-18:5; Ex. 4 to Ex. 1[7]; Mar. 1 Tr. 10:23-11:2).

28. The letter signed by Defendant Rivera, in his capacity as SPF's president, stated in relevant part: "I, Héctor Rivera Ortiz, hereby certify that Ms. Emma García Santos works for the company Special Police Force Corp., over which I preside". (Ex. 4 to Ex. 1).

29. Defendant Rivera's "Verification of Employment Letter" elaborated that the recipient should "please let [Mr. Rivera] know" if the recipient, the Puerto Rican Cooperative, needed more information about Ms. García's employment. (Ex. 4 to Ex. 1).

30. In 2013, Defendant Rivera personally signed a letter on SPF's letterhead disclosing that SPF would withhold $40.00 from the pay of employees such as García, on the supposed ground that the SPF's employees were "merchants" and were required to register as such with the Treasury Department of Puerto Rico. Rivera's letter detailed the information SPF's employees needed to provide SPF's "central office" to facilitate the guards' registration with the Treasury Department. (Ex. 1, at 12:15-13:10, 15:2-16:10; Exs. 2-3 to Ex. 1; Mar. 1 Tr. 10:16-22). SPF subsequently withheld the $40.00 from García's pay. (Ex. 1, at 14:5–13).

31. When Ortíz resigned from SPF, she understood Defendant Rivera as the

---

[7] Ex. 4 is an attachment/exhibit to the document admitted as Ex. 1 during the Non-Jury Trial.

_____

appropriate person to whom to report her resignation and in fact reported her resignation directly to him. (Feb. 13 Tr. 41:12-21, 62:4-12).

32. Defendant Rivera was the only person authorized to sign checks for SPF. (Feb. 14 Tr. 18:17-25, 21:11-19, 31:16-21; Ex. 6, at 4-6; Ex. 7, at 4).

33. All paychecks given to employees contained Defendant Rivera's signature and only Defendant Rivera's signature, whether because he personally signed the checks or a stamp with his signature was used to sign the checks. (Docket No. 134 ¶ 13; Feb. 14 Tr. 85:11-13; Mar. 1 Tr. 58:9-15; Ex. 1, at 11:5-9; Ex. 13, at 2 (¶ 7); Ex. 15, at 2 (¶ 9); Ex. 8).

34. From at least 2012 to 2014, Defendant Rivera was physically present at SPF's office on instances that could be at "any time of day." (Feb. 13 Tr. 34:3-7, 34:11-21; Ex. 16, at 56:15-16, 59:18-19, 61:11-12, 61:21-22; Mar. 1 Tr. 60:24-62:14; Ex. 19, at 13:22-14:2, 17:19-18:17).

35. Defendant Rivera was familiar with SPF's payroll process and periodically helped total the hours worked by SPF's employees, based on information compiled from the attendance sheets that SPF's line-level supervisors collected from the field posts. SPF's outside accountant Torres then input employees' hours on a spreadsheet with other pre-populated information. (Docket No. 134 ¶¶ 14-15, 36-37; Ex. 19, at 17:11-18:17, 23:3-6; Ex. 20, at 39:15-18; Mar. 1 Tr. 23:25-24:8, 27:21-28:13, 32:19-21; Exs. 2-3).

36. Defendant Rivera personally made loans to some employees which were repaid through SPF's payroll. (Mar. 1 Tr. 63:7-65:5; Ex. 2, at 18

_____

["Comments" column listing "HRO"]; Ex. 2, at 20 ["Comments" column], 21 ["Comments 2" column]).

37.  In 2012, Defendant Rivera, along with Resto, Andújar, and Torres, made the decision to retain one week's worth of wages from each employee to help with SPF's cash flow deficits. (No. 134 ¶ 17; Ex. 19, at 31:9-36:11).

38. Following Defendant Rivera's decision to retain employees' wages, employees did not begin to have their withheld wages reimbursed to them until sometime in 2013, "no less" than 14 months after the retention decision was made. (Docket No. 134 ¶ 18; Ex. 19, at 35:13-18, 36:6-11).

39. Some employees had to wait up to eighteen months before SPF reimbursed their "retained" wages. (Docket No. 134 ¶ 19; Ex. 19, at 36:9-11).

40. The policy of retaining wages from employees continued in effect until the Wage and Hour Division began an investigation of SPF in July 2014. (Docket No. 134 ¶ 20; Ex. 19, at 34:21-24; Mar. 1 Tr. 67:25-68:3).

41. Eric Resto had originally obtained the license for SPF to operate as a security agency because Resto was a detective. (Feb. 14 Tr. 33:7-9, 43:5-8; see Defs.' Ex. A).

42. Although Resto was deceased well before this litigation, it is largely undisputed that Resto was involved in the decision to establish SPF in 2009 and the hiring of Andújar; at the outset of the corporation's founding, he was involved in decisions about how much security guards were paid (amounts that generally did not fluctuate in subsequent years), certain

disciplinary policies[8], creating templates for payroll that Torres later used; and the default price levels for client contracts. (Feb. 15 Tr. 70:7-12, 72:11-12, 80:16-18, 80:23-24, 87:16-18; Mar. 1 Tr. 26:23-25, 47:9-13; Ex. 20, at 34:8-15; Ex. 2). Resto never invested any money in SPF's operations. (Ex. 16, at 12:23-25).

43. There is no evidence that Resto had an ownership stake in SPF or was a corporate officer within the meaning of any of the documents in evidence, such as the Articles of Incorporation.

44. Resto died in August 2014 of a health condition that had been worsening for approximately two years. (Feb. 14 Tr. 33:10-19).

45. During the time that Resto's "disease progressed, he could no longer carry out certain functions" at SPF and from 2012 onward, visited SPF's office at most "once in a while." (Feb. 14 Tr. 65:9-13; Feb. 15 Tr. 85:17-88:1).

46. After Resto's death, Defendant Rivera functioned as SPF's "CEO," "ran the operations of the company" and oversaw all administrative personnel. (Docket No. 134 ¶ 21; Ex. 13, at 2 (¶ 5a); Ex. 15, at 1 (¶¶ 1-2)).

47. The personnel whom Defendant Rivera oversaw included, but was not limited to Andújar, De Jesús, and Torres. (Ex. 15, at 1–2 (¶¶ 2, 4).[9]

---

[8] Although such "regulations" or "policies" were supposedly in writing, there are no documents in evidence that actually show Resto's signature or the content of such policies. (Feb. 15 21:9-14, 80:22-81:2, Mar. 1 Tr. 10:11-15). Accordingly, the Court gives little weight on the conclusory testimony regarding such "regulations" or "policies."

[9] Andújar currently resides in Kansas, where he has lived for at least three years. (Ex. 20, at 5:1-10; Mar. 1 Tr. 6:5-9). As of August 2012, Andújar was spending more time in the continental United States than in Puerto Rico.   (Mar. 1 Tr. 9:18-23). Ortíz and García testified that, during the period covered by the Complaint, they saw Andújar ever less frequently; García saw Defendant Rivera at SPF's client sites at least as often as she saw Andújar. (Ex. 1, at 38:13-39:6; Feb. 13 Tr. 34:3-15, 59:14-22, 89:21-90:3).

48. Andújar was SPF's general manager or "assistant to the manager" at SPF (Feb. 15 Tr. 78:3-6; Ex. 20, at 15:3-10, 23:21-22). The roles delegated to Andújar at certain times included some levels of responsibility regarding corporate operation[10] but Andújar could not independently make decisions regarding SPF's operations. Before making or implementing any operational decisions, Andújar had to consult with either Resto or after Resto's death, Defendant Rivera. For example, Andújar had to report up "all information about all contracts, about employees," and "[a]ny and all information of what was done on the day-to-day-basis" at the company's posts in which Andújar was involved. (Feb. 14 Tr. 57:22-24, 82:16-18; Feb. 15 Tr. 73:4-8, 90:7-9, 94:21-24; Ex. 20, at 19:16-19).[11]

49. SPF contracted with Torres for accounting and payroll services. Torres was a self-employed outside accountant for SPF from 2010 to 2015. (Mar. 1 Tr. 22:23-24, 23:12-13; Ex. 19, at 10:9-16).

50. Torres only went to SPF's office every 15 days, to help process the payroll. (Ex. 19, at 17:19-21; Mar. 1 Tr. 32:25-33:2, 34:7-10). To process payroll, Torres used a spreadsheet that had been provided to him and added some additional columns for his own reference. (Mar. 1 Tr. 26:18-22, 28:14-22). Torres "would simply take the hours and calculate them" according to pay

---

[10] Many of Andújar's responsibilities eventually shifted to De Jesús, apparently because of Resto's declining health and Andújar's absence from Puerto Rico. (Feb. 13 Tr. 32:13-33:3, Feb. 14 Tr. 65:1-18)

[11] At the deposition of SPF taken pursuant to Federal Rule of Civil Procedure 30(b)(6), Andújar was not able to testify on behalf of the company regarding "time records for hours worked by employees," SPF's "corporate structure," or "bookkeeping practices." (Ex. 20, at 7:18-8:8).

rates already populated in the spreadsheet. (Mar. 1 Tr. 29:14-18, 30:21-31:3, 47:9-13).

51. Torres did not have personal knowledge of the company's "administrative procedures" or what duties Resto performed at the office. (Mar. 1 Tr. 41:19-25, 42:14-16).[12]

52. For SPF to renew its documents to continue to operate as a security guard company in Puerto Rico, it needed a new licensed detective onboard. (Docket No. 134 ¶ 22).

53. Defendant Rivera made the decision for SPF to cease operations because no licensed detective was willing to join the company. (Docket No. 134 ¶ 23; Ex. 16, at 65:5-7, 75:18-76:24; Feb. 14 Tr. 102:21-25).

54. Defendant Rivera prepared and signed a letter to clients dated January 20, 2015, informing them that SPF would cease operations on February 28, 2015. (Docket No. 134 ¶ 24; Ex. 17; Feb. 14 Tr. 43:23-44:4, 103:15-18, 104:3-9, 114:13-15). Rivera's letter thanked SPF's clients for "having chosen us for such a long period of time as your Protection, Security, and trust company" and "for the attention you gave us and the time we were able to protect you." (Ex. 17).

---

[12] It should be noted that Torres provided hesitant and inconsistent testimony about Defendant Rivera's involvement in the decision to retain a week's worth of employees' wages, his regular presence at SPF's office, and involvement in the payroll process. During Torres's deposition, he repeatedly discussed Defendant Rivera's role in each of these topics, but on the stand, he conspicuously strained to avoid nearly any mention of Rivera. (Compare Mar. 1 Tr. 34:15-17, 37:9-12, 38:2-12, 40:24-41:2, 41:21-24, 48:1-24, 54:19-21, with Ex. 19, at 17:11-18:17, 30:2-6, 30:19-20, 34:3-16, and Mar. 1 Tr. 61:6-62:14, 66:19-67:24). Accordingly, the Court finds Torres's trial testimony on these topics to be unpersuasive.

55. Although Rivera consulted with Andújar in issuing the letter announcing SPF's cessation of operations, Rivera "personally draft[ed]" and signed the letter.  He did so because Rivera was the public-facing name associated with the company and his name had long appeared on all client proposals. (Feb. 14 Tr. 103:15-18, 104:3-9, 113:2-11, 114:13-15, Feb. 15 Tr. 94:15-18).

56. On May 5, 2015, Defendant Rivera received a payout of $5,978.00 after the "liquidation" of SPF. Defendant Rivera issued the check to himself months after the Department of Labor had informed him that employees were due back wages. (Docket No. 134 ¶ 25; Ex. 18; Feb. 14 Tr. 45:7-46:2).

57. The same day, Rivera also issued a payout of $4,238.00 to himself from one of the SPF's accounts, to reimburse himself for legal fees he had personally paid in cash on behalf of the corporation. (Ex. 18; Feb. 14 Tr. 44:17-45:4, 45:16-46:2, 69:13-16, 105:4-13, 111:24-112:4).

58. On May 5, 2015, Defendant Rivera also authorized similar payments to Torres and Andújar after the "liquidation" of SPF. (Docket No. 134 ¶¶ 26-27; Ex. 18; Ex. 19, at 38:9-39:4).

59. Early in the U.S. Department of Labor Wage and Hour Division's   ("WHD") investigation into SPF's compliance with the FLSA, WHD Investigator Myrta Negrón[13] set up an initial conference by directly contacting Defendant Rivera. (Feb. 13 Tr. 102:7-20, 105:14-20).

---

[13] Negrón retired from the U.S. Department of Labor in December 2017. (Feb. 13 Tr. 102:4-6). District Director Vázquez testified about WHD's investigation of SPF both based on his direct supervision of Negrón during the investigation, and based on the WHD's investigation file kept in the regular course of business. (Id. at 101:7-25, 103:13-105:6).

R. Alexander Acosta v. Special Police Force Corp.
Civil No. 15-1506 (CVR)
Opinion and Order
Page 16
_____

60. WHD's initial conference with SPF took place on July 1, 2014.  Rivera and Torres represented SPF at that conference and provided information about the size of the company's gross revenues. (Id. at 103:8-12, 106:5-23).

61. Through Defendant Rivera and Torres, WHD learned at the initial conference that "Mr. Rivera [and] Mr. Torres were in charge of the payroll records" at SPF. (Id. at 106:21-23, 135:16-23).

62. Defendant Rivera also represented Defendant SPF at all of the meetings held with WHD during the investigation, including meetings on August 12, September 15, September 19 and December 5, 2014. (Docket No. 134 ¶ 28; Feb 13 Tr. 121:9-25, 124:12-25, 125:10-19; Mar. 1 Tr. 50:9-25).

63. At one of the meetings that Defendant Rivera attended, a "pre-final conference" in approximately late July or early August 2014, WHD advised SPF, including Rivera, of the investigation's findings that back wages were due for SPF's failure to pay premium pay for hours worked in excess of 40 hours during a workweek. (Feb. 13 Tr. 122:5-21; Feb. 14 Tr. 41:24-42:9).

64. SPF's employees regularly worked more than 40 hours in a workweek and continued to work such overtime hours after WHD's investigation began. SPF's employees continued to be paid their regular rate of pay, without any premium pay, for all hours worked over 40 in a week, even after WHD informed the company and Rivera on July 1, 2014 that they were required to pay employees overtime for hours worked over 40 in a workweek. (Ex. 2, at 17; Feb. 13 Tr. 110:22-111:19, 115:17-116:2; Docket No. 134 ¶ 46).

65. WHD requested two years of SPF's payroll records during the investigation. (Feb. 13 Tr. 107:4-8).

66. Defendant Rivera was the "main point of contact" at SPF for WHD to request records, such of as employee addresses. (Feb. 13 Tr. 121:4-11).

67. During WHD's investigation, SPF produced all the time and pay records it maintained, namely sign-in attendance sheets and payroll spreadsheets.[14] Such records are the only time and pay records that SPF had for the security guard employees for the period covered by the Complaint. (Docket No. 134 ¶ 41; Feb. 13 Tr. 107:9-23, 126:6-15; Mar. 1 Tr. 49:10-18, 68:4-10; Exs. 2, 3).[15]

68. For the time period at issue, SPF's time and pay records did not contain any of the following required information:

a. Any information regarding the wages due each employee specifically for the first 40 hours worked in a given seven-day workweek, or for the "straight time hours" worked on a given day. (Feb. 13 Tr. 108:21, 112:9-15, 115:11-14; see Ex. 2.) In other words, even though employees sometimes worked in excess of 40 hours per workweek, the only pay information contained in SPF's records was the gross pay and net pay due each employee for the entire pay period. (Feb. 13 Tr. 111:25-112:12,

---

[14] Employees kept track of their hours using sign-in attendance sheets located at the client's posts where employees worked. (Docket No. 134 ¶ 34).

[15] Exhibit 2 is a sample of the payroll spreadsheets that SPF maintained, and Exhibit 3 is a sample of the sign-in attendance/time sheets. (Feb. 13 Tr. 109:24-110:11, 116:21-117:7).

_____

115:2-14; see Ex. 2.)[16]

b. For the period at issue through July 28, 2014[17]: any information regarding the total hours for each employee worked by seven-day workweek. (Docket No. 134 ¶ 51; Feb. 13 Tr. 108:5-11, 110:19-111:7; Ex. 2).[18]

c. For some employees, any home address information.[19] (Feb. 13 Tr. 119:2-16; Docket No. 134 ¶ 50).

69. During WHD's investigations pursuant to the FLSA, it looks to whether hours and pay information is "segregated" by workweek, and "segregated" as between hours up to, versus above, 40 hours in a week, as part of its detection of whether employers paid overtime premiums for hours over 40 in a workweek. (Feb. 13 Tr. 100:22-101:2, 105:26-106:9, 106:24-108:21).

70. In response to the interrogatories that the Secretary propounded in this litigation, Defendant SPF identified Defendant Rivera as the person who had custody of all of SPF's documents. Other than Defendant Rivera, Defendant SPF did not identify any individual ever associated with SPF as having any documents responsive to the Secretary's document requests.

_____

[16] The sign-in attendance/timesheets (e.g., Ex. 3) do not contain any information about wages due. (Feb. 13 Tr. 117:24-118:2, 118:16-20.)

[17] Prior to that date, SPF paid employees on a semi-monthly basis (i.e., twice a month, on the 15th and last day of each month). (Docket No. 134 ¶ 42; Mar. 1 Tr. 57:12-58:2).

[18] Exhibit 3 does not contain any information about total hours worked by any employees for any period longer than a single day. (See Ex. 3; Feb. 13 Tr. 117:24-118:2, 118:12-20.) Only beginning July 29, 2014 did SPF's pay records (*e.g.*, Ex. 2) began to contain information about employees' hours segregated by seven-day workweek. (Feb. 13 Tr. 113:7-20; see Ex. 2, at 17.)

[19] Exhibits 2 and 3 do not contain any information about employees' home addresses. (See Exs. 2, 3; Feb. 13 Tr. 108:6-7, 113:3-6, 118:2-3, 119:2-3).

Defendant Rivera personally declared under penalty of perjury that the interrogatory responses were truthful to the best of his knowledge. (Ex. 13, at 3–4 (¶¶ 14-15), "Writing Under Oath"). Defendant Rivera's responses to the Secretary's interrogatories posed directly to him were substantially identical (except that he also identified José Torres, but not any other individuals associated with SPF, as being in possession of some relevant documents). (Ex. 15, at 3 (¶¶ 14, 16).

71. Defendant Rivera currently owns and operates a security guard company called Security Police Force Corp. (Docket No. 134 ¶ 53; Feb. 14 Tr. 46:4-9; Mar. 1 Tr. 11:19-23, 68:19-69:6).

72. On December 22, 2014, Rivera signed the "Certificate of Incorporation" for Security Police Force Corp. (Ex. 16, at 82:13-83:7).

73. De Jesús, formerly an Operations Manager at SPF, is the President of Security Police Force Corp. (Docket No. 134 ¶ 54; Feb. 14 Tr. 46:10-12; Feb. 15 Tr. 11:13-18, 11:22-12:1).

74. De Jesús hired Andújar to work at Security Police Force Corp. after SPF ceased operations. (Ex. 20, at 55:19-56:11, 58:4-16, 58:20-59:25).

75. Torres is the Treasurer of Security Police Force Corp. (Ex. 19, at 39:5-12; Mar. 1 Tr. 68:11-15).

76. Many of SPF's employees immediately transitioned to work for Security Police Force Corp. in March 2015 following SPF's dissolution, and thereafter performed the "same type of work at Security Police Force as

_____

[they] did at Special Police Force." (Ex. 1, at 19:15-20:14, 21:24-22:2; Ex. 20, at 57:6-8; Ex. 19, at 39:13-24).

77. The office of Security Police Force Corp. is located in the same building where Defendant SPF had its office. (Ex. 16, at 81:17-82:1).

Before moving on, the Court addresses Plaintiff's request for an adverse inference due to Defendant Rivera's failure to testify on his behalf during the non-jury trial as part of his defense.    Defendant Rivera never took the stand as a defense witness to explain his involvement in crucial issues in this case, such as the decision to retain a week's work of employees' wages, or who at SPF had responsibility for hiring or firing employees. Rivera only testified as part of the Secretary's case, during which the Court repeatedly announced its rulings pursuant to Federal Rule of Evidence 611 to limit the scope of defense counsel's cross examination based on the scope of the Secretary's direct examination.   Therefore, Rivera's testimony was circumscribed to the limited questions posed by the Secretary's counsel.    At that time, the Court specifically noted that should Defendant Rivera take the stand in his defense, he would have an opportunity during the presentation of his own case to present "his [own] testimony" and to "sit" for "a full direct." (Feb. 13 Tr. 129:9-130:12, 135:10-13; Feb. 14 Tr. 58:11-59:19; see also Feb. 14 Tr. 93:13-22, 96:9-14).

Toward the close of Defendant Rivera's case, his counsel initially indicated that Rivera would testify for a very limited purpose, namely in connection with two proposed exhibits. After the Court admitted one exhibit and took judicial notice of a provision of law, Defendant Rivera's counsel stated his intention that Rivera testify "that his decision to close the company was because he was compelled to by law."   After the Court correctly

observed that Rivera had already testified to that limited point during the Secretary's case, Defendant Rivera promptly rested his case without testifying and without his counsel making any other proffer. (Mar. 1 Tr. 72:4-78:25; see Feb. 14 Tr. 102:21-103:10 [Rivera testimony that SPF "had to cease operations" because SPF lacked a "valid license," and SPF's clients had been asking "for the documents to be delivered to verify that [they] were in compliance with the law" before clients would renew contracts]).

While the Court rejects Plaintiff's invitation to draw an adverse inference from Rivera's failure to take the stand, the Court finds that what little testimony he offered left gaping holes in his defense, and was contradictory to what he previously offered in his answers to Plaintiff's interrogatories, thus undermining his credibility.   Rivera had the opportunity to correct these deficiencies and set the record straight as to these important matters via his direct testimony during his case in chief, and he failed to do so.

During the Secretary's case, Defendant Rivera provided inconsistent testimony, as compared to his sworn answers during discovery, regarding a number of key topics, including his role at SPF following the death of Eric Resto. (*E.g.*, Feb. 14 Tr. 111:15-21). For example, Rivera offered the sweeping testimony that he "had to consult everything with Andújar because Andújar was the one who was assuming control of the operations of the corporation" and "had the knowledge" regarding "security" that Rivera supposedly lacked. (Feb. 14 Tr. 95:16-20). This testimony directly contradicts Defendant Rivera's sworn interrogatory responses that Rivera himself "ran the operations of" SPF after Resto's death and oversaw all administrative personnel. (Ex. 15, at 1 (¶¶ 1-2); Docket No. 134 ¶ 21). Rivera's testimony also contradicts Andújar's testimony, offered in Rivera's

defense, that after Resto's death, Andújar actually reported to Defendant Rivera. (Feb. 15 Tr. 90:7-9).[20]

Rivera's testimony that he personally had "zero" knowledge of "security," also contradicts the undisputed evidence that he personally installed security cameras at SPF's clients' posts; communicated directly with SPF's employees about the installation and maintenance of those security cameras; and communicated directly with at least one SPF employee regarding the computer program that SPF used to store clients' data that determined which residents or visitors could enter client sites — not to mention all the other evidence discussed above about his personal role in the corporate operations. (Compare Feb. 14 Tr. 95:20-21, with Feb. 13 Tr. 30:24-31:19, 34:19-21, 38:3-13, 53:20-54:2, 59:17-23; Feb. 14 Tr. 90:6-9; Ex. 1, at 10:13-11:4, 38:2-22).

At trial, Rivera could not remember his own testimony from earlier in the day about whose decision it was to cease operations, and further testified inconsistently about that decision. (Compare Feb. 14 Tr. 102:8-12 (Rivera's decision), with Id. 102:16-17 ("don't remember"), Id. 102:18-25 (in response to a leading question by his counsel, "think" he "answered that it was Mr. Jonathan Andújar's decision," but then providing an explanation for the decision that referenced his own involvement after all). In any event, the parties stipulated before trial that "Defendant Rivera Ortiz made the decision for Special Police Force to cease operations." (Docket No. 134 ¶ 23); see Christian Legal Soc'y

---

[20]  Having observed the demeanor of the witnesses and reviewed the documentary evidence, the Court credits Andújar's testimony that following Resto's death, Andújar reported to Defendant Rivera. This testimony is also corroborated by Rivera's sworn interrogatory responses that Rivera oversaw all administrative personnel at the time, and Andújar's testimony that Andújar could not independently make operating decisions at SPF. See Finding of Fact ¶ 48.

_____

Chapter of the Univ. of Cal. v. Martinez, 561 U.S. 661, 677, 130 S.Ct. 2971 (2010) ("Factual stipulations are binding and conclusive . . . .").

For these reasons, Rivera lost a vital opportunity to set the record straight, and with the limited testimony he provided during the Secretary's case in chief, he failed to explain material factual matters that go to the heart of this case.   Consequently, the Court gives Rivera's testimony little credibility.   See Porcal v. Ciuffo, No. 10-CV-40016-TSH, 2013 WL 3989668, at *4 (D. Mass. Aug. 1, 2013) (it remains within the purview of the trial judge to place a "particular significance" on a party's failure to testify in a civil matter").

## CONCLUSIONS OF LAW

As stated above, the only remaining issues to be decided in this case are whether Rivera meets the definition of an "employer", as that term is used in the Fair Labor Standards Act, and whether the corporation violated the FLSA by failing to maintain accurate recordkeeping. Specifically, whether or not the corporation failed to make, keep and/or preserve: records of the total hours worked by employees each seven-day workweek; records of the total daily or weekly straight-time wages due for hours worked during the workday or workweek; and records of employees' home addresses.

"Under the FLSA, an 'employer' is 'any person acting directly or indirectly in the interest of an employer in relation to an employee'" and uses the economic reality test in order to so determine.   Factors to consider when determining whether an individual may be held personally liable include: (1) "the individual's ownership interest in the corporation; (2) the degree of control over the corporation's financial affairs and

R. Alexander Acosta v. Special Police Force Corp.
Civil No. 15-1506 (CVR)
Opinion and Order
Page 24
_____

compensation practices; and (3) the "role in 'caus[ing] the corporation to compensate (or not to compensate) employees in accordance with the FLSA.'"   Under this analysis, no single factor is "dispositive"; the analysis looks to the "totality of the individual's level of involvement" in the corporation.   Baystate Alternative Staffing, Inc. v. Herman, 163 F.3d 668, 678 (1st Cir. 1998); Manning v. Boston Med. Ctr., 725 F.3d 34, 47 (1st Cir. 2013).

In applying this fact-based test, the First Circuit has "generally agreed that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable . . . for unpaid wages." Manning, 725 F.3d at 47.   At the same time, the First Circuit has noted that "courts should not apply the analysis in a manner that would make any supervisory employee, even those without any control over the corporation's payroll, personally liable for the unpaid or deficient wages of other employees." Id.   The overarching question is whether the individual was personally responsible "'for making decisions about the conduct of the business that contributed to the violations of the [FLSA].'" Chao v. Hotel Oasis, Inc., 493 F.3d 26 (1st Cir. 2007).

After a careful analysis of the documents admitted during trial, the stipulated facts and the testimony heard, the Court finds that Defendant Rivera was an "employer" of SPF's employees, within the meaning of 29 U.S.C. § 203(d), during the time period at issue, and is jointly and severally liable for the back wages and liquidated damages to those employees that have been found due.

First, Defendant Rivera was one of SPF's incorporators and the only corporate officer from 2012 onward, serving both as President and Treasurer. Pursuant to SPF's

Articles of Incorporation, as President, Rivera was SPF's "main executive officer," with the power to "represent[] the Corporation in official activities."   Rivera was the company's sole shareholder and owner. He was the only person to invest money in SPF and did so at the incorporation and subsequently throughout the corporation's operations when SPF had financial issues. These facts are especially compelling in establishing liability under the economic reality standard because they "suggest[] a high level of dominance over the company's operations," a level of dominance further evidenced in this case by Rivera's eventual decision for SPF to cease operations and role in communicating that decision to SPF's clients. Manning, 725 F.3d at 47 (emphasizing significance of defendant's power to dissolve a corporation).

Second, Defendant Rivera had operational control over significant aspects of SPF's business at all relevant times. As Treasurer, Rivera had the ultimate authority to approve all of SPF's expenses. Rivera was the only person authorized to sign company checks, and his signature in fact appeared on all company checks, including employees' payroll checks. He oversaw all administrative personnel from at least August 2014 onward, and well beforehand supervised the company's hiring process, delegating the day-to-day implementation to others such as Operations Manager De Jesús.   Rivera prepared and signed client-oriented documents such as business proposals. Rivera personally signed letters verifying that employees worked for SPF, stating in such documents that SPF was the company "over which [he] preside[d]."

Defendant Rivera also made several loans to individual employees that were administered through SPF's corporate payroll. Rivera was personally involved in SPF's

R. Alexander Acosta v. Special Police Force Corp.
Civil No. 15-1506 (CVR)
Opinion and Order
Page 26
_____

payroll process, helping total employees' hours. Rivera also represented SPF at all meetings with the WHD; held himself out as involved in maintaining employment records, as well as SPF's other corporate records; and as Treasurer he was the designated custodian for all financial reports. See Baystate, 163 F.3d 668 (discussing relevance of "individual's operational control over significant aspects of the business"); Manning, 725 F.3d at 49 (reversing dismissal of complaint alleging non-owner's "involvement in employment," "payroll operations," and "recruiting activities"); see also Irizarry v. Catsimatidis, 722 F.3d 99, 115 (2d Cir. 2013) (weighing under the totality of the circumstances analysis the fact that a defendant "had the authority to sign paychecks throughout the relevant period" and in fact did so).

Third, Defendant Rivera was personally involved in key decisions that caused SPF to "undercompensate employees and to prefer the payment of other obligations" over the timely payment of wages. See Manning, 725 F.3d at 48; Baystate, 163 F.3d at 678. Specifically, Rivera was an architect of the wage retention policy pursuant to which employees had an entire week's worth of wages withheld for between 14 and 18 months, continuing into the time period for which back wages are at issue in this case. As the only owner, shareholder, investor, and the Treasurer with ultimate approval over SPF's expenses, Defendant Rivera's approval of the wage retention policy effectively shifted the corporation's financial liabilities to the backs of employees, leaving them unpaid for an entire workweek for over a year. This decision directly contravened the FLSA. See Biggs v. Wilson, 1 F.3d 1537, 1540 (9th Cir. 1993) (FLSA violation accrues when any wages remain unpaid on the employees' regular payday); *accord* Rogers v. City of Troy, 148 F.3d

52, 58 (2d Cir. 1998) (up to two-week delay in wage payment did not violate FLSA when all employees were still "paid at least the minimum wage for every hour . . . worked" and other mitigating factors were present). Rivera's wage retention decision had a "measurable and immediate impact on" SPF's workforce, causing SPF "not to compensate employees in accordance with the FLSA" throughout the time period at issue.   Manning, 725 F.3d at 47.

Rivera's power to "cause the corporation to compensate (or not to compensate) employees in accordance with the FLSA" see Baystate, 163 F.3d at 678, is also evidenced by his personal involvement in deductions from employees' wages for other reasons, such as the $40.00 deduction in connection with SPF's misclassification of its employees as independent contractors and requirement that they register as "merchants" with the Treasury Department of Puerto Rico.   As former presider Hon. Judge Gustavo Gelpí previously held, other deductions from minimum-wage employees' pay violated the FLSA. See Opinion and Order dated Feb. 20, 2018 (Docket No. 126, at 18) (deductions brought employees' regular hourly rate of pay below $7.25). Regardless of whether the separate $40.00 "merchant" deduction may have constituted a freestanding FLSA violation, Rivera's role in that deduction policy is persuasive evidence of his role in decisions about employee compensation.

As in all corporations of any size — particularly, as here, corporations with several dozen or more employees — operational decisions and administrative functions at SPF were carried out by more than just one person.   Regarding this issue, Resto, Andújar, De Jesús, Torres, and other supervisors had various roles at SPF, and those roles varied over

time.   The Court need not and does not decide whether any of these other individuals also met the standard under 29 U.S.C. § 203(d) (other than De Jesús, whom the Court has already held not liable, <u>see</u> Docket Nos. 163-64).   It is sufficient for the Court to conclude that the evidence regarding others' roles does not negate Rivera's own liability. Regarding this matter, the Court explains briefly as follows: "The FLSA contemplates" that employees may have "several simultaneous employers, each responsible for compliance with the Act." <u>Baystate</u>, 163 F.3d at 675.   Rivera was the only investor, shareholder, owner, and officer at the company. He had "ultimate control over" several key aspects of SPF's operations, including its bank account, approval of expenses (including in his capacity as Treasurer), maintaining corporate records including employment records, creation of client proposals, and held himself out to WHD as the primary corporate representative. <u>See</u> <u>Hotel Oasis</u>, 493 F.3d at 34.

Rivera also held himself out to employees as the person with ultimate oversight over certain aspects of the hiring process and authority to verify employment. Rivera was instrumental in a number of "critical decisions regarding the allocation of [SPF's] resources," diverting funds from employees' wages to the corporation's bottom line, and ultimately deciding to cease operations entirely.   <u>See</u> <u>Manning</u>, 725 F.3d at 49. It does not negate his own liability that Rivera delegated many day-to-day functions to line-level supervisors (such as personally interviewing employees or assigning them to work at particular posts) and did not personally design and implement each and every corporate policy (such as establishing security guards' rate of pay or setting prices for clients' contracts). *E.g.*, <u>Baystate</u>, 163 F.3d at 676 (observing in the related context that a

R. Alexander Acosta v. Special Police Force Corp.
Civil No. 15-1506 (CVR)
Opinion and Order
Page 29
_____

corporate employer often exercises control over employees through "indirect supervisory oversight" and does "'not need to look over his workers' shoulders every day in order to exercise control'") (*quoting* <u>Brock v. Superior Care, Inc</u>., 840 F.2d 1054, 1060 (2d Cir. 1988)).

At Defendant Rivera's request, the Court has taken judicial notice of the Law of Private Detectives of Puerto Rico, P.R. Laws Ann. tit., 25, § 285h.   Under Puerto Rico law, a corporation that provides security services can apply for a license to operate provided only that "its senior executive officer is a private detective" with a certain separate license.   Defendant Rivera has pointed to that law, in connection with the fact of Resto's death, as motivating Rivera's decision to terminate SPF's operations. But Rivera's decision for SPF to cease operations (and promptly to open a new security guard firm with substantially similar clients and the same employees) was no less an exercise of Rivera's "ultimate control" over SPF's operations even if motivated by an effort to comply with certain aspects of the Law of Private Detectives.

Nor does the Court draw any further findings or conclusions regarding SPF's compliance or non-compliance with the Law of Private Detectives. Defendant Rivera has not established that Eric Resto acted as one of SPF's "chief" or "senior executive officer[s]" in conformity with the Law of Private Detectives, let alone that Resto's role at SPF before his untimely death negates the conclusive evidence regarding Rivera's own role. Particularly in light of the fact that the issue — namely whether a security agency has conformed with the Law and its requirements regarding chief or senior executive officers — is the subject of frequent litigation, the Court cannot and does not conclude that the

R. Alexander Acosta v. Special Police Force Corp,
Civil No. 15-1506 (CVR)
Opinion and Order
Page 30
_____

Law's provisions have any bearing on the actual record in this case regarding the allocation of authority within the corporation.   See United States v. Bravo-Fernandez, 828 F. Supp. 2d 441, 459-60 (D.P.R. 2011) (recognizing the "ambiguous meaning" under the Law of Private Detectives of the term "principal executive officer"), *rev'd on other grounds*, 722 F.3d 1 (1st Cir. 2013); Ranger Am. of P.R., Inc. v. Loomis Fargo & Co. of P.R., 171 P.R. Dec. 670 (2007); Ranger Am. of P.R., Inc. v. Policía de P.R., K AC2007-8205, 2011 WL 5166513 (P.R. Cir. June 30, 2011)).

Suffice it to say that there is no evidence before the Court regarding any administrative or judicial determination regarding SPF's compliance with the Law of Private Detectives. In any event, the Law of Private Detectives does not require that the person who occupies the highest position in the hierarchy of a security agency be the same person who petitions for a security agency license as the corporation's "chief" or "senior executive officer." Ranger Am. of P.R., 2011 WL 5166513, at *4; see also Bravo-Fernandez, 828 F. Supp. 2d at 459 (recognizing statute's ambiguity).   The evidence suggests that as President, Rivera was actually the company's "main executive officer." (Ex. 5, Art. VI, Sec. D ¶ 1). Accordingly, given the actual evidence in this case, the Law of Private Detectives has no bearing on the question of Rivera's liability pursuant to 29 U.S.C. § 203(d).

Having concluded that Defendant Rivera is an employer under 29 U.S.C § 203(d) of the same employees as Defendant SPF, and jointly and severally liable for the back wages and liquidated damages already found due, the Court in its discretion also enters an injunction against Defendant Rivera requiring compliance with the FLSA. 29 U.S.C. §§ 215(a)(2), 217.   As previously noted, Defendant Rivera was personally involved in key

R. Alexander Acosta v. Special Police Force Corp.
Civil No. 15-1506 (CVR)
Opinion and Order
Page 31
_____

decisions that led to FLSA violations at SPF. Even before dissolving SPF, Rivera founded a new security guard company, Security Police Force, which has many of the same employees, supervisors, and clients as did SPF. Rivera owns Security Police Force and operates the new company from the same office where he operated SPF.    For substantially the same reasons as those noted by Hon. Judge Gelpí, in issuing an injunction against SPF on summary judgment, and now that the Court has found that Rivera is also personally liable for the same violations — many of which continued for months even after the Wage and Hour Division specifically informed Rivera of the Act's requirements — an injunction is appropriate to ensure that Rivera bears the burden of future compliance with the Act.   See Docket No. 126, at 25 (entering injunction absent evidence of "present" violations, based on consideration of all other relevant factors).

The injunction is neither punitive nor a hardship. Rather, having considered the factors discussed in the relevant cases, and given the evidence regarding the history of Rivera's non-compliance long after being informed of WHD's findings, and based on the further reasoning as set forth in Hon. Judge Gelpí's opinion including the absence of a good faith attempt to comply with the FLSA, the Court in its discretion enters this injunction to send an important message that reiterates the Act's compliance requirements. See Herman v. Hector I. Nieves Transport, Inc., 91 F. Supp. 2d 435, 450 (D.P.R. 2000); Herman v. Hogar Praderas de Amor, Inc., 130 F. Supp. 2d 257, 269 (D.P.R. 2001).

Turning to the recordkeeping issues, the Court concludes that Defendants SPF and Rivera violated 29 U.S.C. § 211(c) in three respects.

_____

First, Defendants did not make, keep, or preserve any records of many employees' home addresses, in violation of 29 U.S.C. § 211(c) and 29 C.F.R. § 516.2(a)(2).

Second, until late July 2014, Defendants did not make, keep, or preserve any records of the "total hours worked each workweek" by their employees, in violation of 29 U.S.C. § 211(c) and 29 C.F.R. § 516.2(a)(7). Although some records indicated the hours "worked each workday," the recordkeeping requirement of "total hours worked each workweek" stands alone. WHD, the agency charged with enforcement of the Act, looks to those totals on a workweek basis as part of its detection of whether employers paid overtime premiums on a workweek basis in conformity with the law.

Third, Defendants did not make, keep, or preserve any records of the "[t]otal daily or weekly straight-time earnings or wages due for hours worked during the workday or workweek," in violation of 29 U.S.C. § 211(c) and 29 C.F.R. § 516.2(a)(8). Given these recordkeeping violations, the Court extends the injunction against SPF (See Docket No. 126, at 24-26) to include a requirement to comply with the Act's recordkeeping requirement, and also includes that requirement in the injunction concurrently entered against Defendant Rivera. 29 U.S.C. §§ 215(a)(5), 217.   The Court notes that the corporation failed to present any witnesses or documents in its defense to these claims.

For all these reasons, the Court finds SPF and Rivera violation of their record-keeping duties under 29 U.S.C. § 211(c) and 29 C.F.R. § 516.2(a)(2).

## CONCLUSION

For the foregoing reasons, the Court finds that Héctor Rivera is an "employer" as that term is defined in section 3(d) of the Fair Labor Standards Act. Having concluded

R. Alexander Acosta v. Special Police Force Corp,
Civil No. 15-1506 (CVR)
Opinion and Order
Page 33
_____

that Defendant Rivera is an employer under 29 U.S.C § 203(d) of the same employees as

Defendant SPF, and jointly and severally liable for the back wages and liquidated damages

already found due, the Court in its discretion also enters an injunction against Defendant

Rivera requiring compliance with the FLSA. 29 U.S.C. §§ 215(a)(2), 217. Due to the

recordkeeping violations, the Court extends the injunction against SPF and Rivera (See

Docket No. 126, at 24-26) to include a requirement to comply with the Act's recordkeeping

requirement.   29 U.S.C. §§ 215(a)(5), 217.

Judgment will be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, on this 27th day of March 2019.

S/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ RIVE
UNITED STATES MAGISTRATE JUDGE